UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

S1 09-Cr-1058-02 (KMW)

v.

DAVID RUBIN,

Defendant.

--------------------------------------------------------X

## DAVID RUBIN'S SENTENCING MEMORANDUM

Bradley D. Simon
Kenneth C. Murphy
Brian D. Waller
Jonathan Stern

SIMON & PARTNERS LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

Attorneys for David Rubin

Dated: January 24, 2014

## Table of Contents

| | | |
|---|---|---|
| I. | PRELIMINARY STATEMENT | 1 |
| II. | PERSONAL HISTORY | 2 |
| | A. David's Upbringing and Early Years | 2 |
| | B. David Rubin's Early Entry into Business | 4 |
| | C. CDR Became a Diverse and Multi-Faceted Company | 6 |
| | D. David's Works of Charity and Kindness | 7 |
| | 1. David's Generosity of Time and Spirit | 8 |
| | 2. David's Financial Generosity | 11 |
| | 3. David's Dedication to Education | 14 |
| | E. David's Positive Effects as A Businessman and Civic Leader | 20 |
| | F. David's Role as Father and the Rubin Family | 23 |
| | G. | 27 |
| | H. | 34 |
| | I. David's Dedication to His Extended Family | 36 |
| | J. | 38 |
| III. | THE GUIDELINES AND 18 U.S.C. § 3553 | 39 |
| | A. The Guidelines Calculation | 40 |
| | B. The Guidelines Calculation in the PSR is Wrong Regarding Loss | 42 |

1.    The so-called "kickbacks" do not represent losses to the issuers or other

parties in the transactions.................................................................................... 42

    a)    There Was No Loss Where Only One Bidder Was Actually Interested

    in the Transaction and the Bid-Rigging Involved Only Courtesy or

    Complementary Bids ..................................................................................... 44

        (1)   Lease-to-Own Deals ......................................................................... 44

        (2)   The SunAmerica Multi-Unit Housing Deals ..................................... 50

        (3)   The Tennessee Municipal Bond Funds Deals ................................... 54

        (4)   The Similarities Between All Three Transaction Types .................. 57

    b)    Because The Purported Victims Are All Conduit Agencies, There Can

    Be No Loss....................................................................................................... 59

2.    The Broker Fees Should Not Be Included in the Loss Calculation .......... 61

3.    The Swap Fees Should Not Be Included in the Loss Calculation ............ 63

4.    The Losses Due to Fraudulently Lowered Interest Rates Must Be

Specified .................................................................................................... 64

5.    The PSR Improperly Includes an Enhancement for More Than 50 Victims
    65

C.    Regardless of the Guidelines Calculation, the Court Should Depart

Downward........................................................................................................... 65

    1.    The Court Should Depart Downward Under U.S.S.G. § 5K2.0(a)(1)...... 66

        a) ████████████████████████████████████████

        ████████████ ................................................................................ 66

        b) ███████████████████████████████████ ................. 69

  2.  The Court Should Depart Downward Under U.S.S.G. § 5K1.1 ............... 78

  3.  The Court Should Depart Downward Under U.S.S.G. § 2B1.1 Because the

Total Offense Level Substantially Overstates the Seriousness of the Offense ..... 80

 D.  The Consideration of 18 USC 3553(a) Factors Justifies A Non-Guidelines

Sentence Regardless of The Downward Departures ..................................................... 86

  1.  The Nature and Circumstances of the Offense and the History and

Characteristics of The Defendant (3553(a)(1)) ...................................................... 87

   a)  The Nature and Circumstances of the Offense ................................... 87

   b)  The History and Characteristics of David Rubin ................................ 91

   c)  The General Purposes of Sentencing Will Be Satisfied By A Sentence

Substantially Below the Advisory Guidelines Range 3553(a)(2) ................... 92

   d)  The Kinds of Sentences Available 3553(a)(3) .................................... 96

   e)  The Need To Avoid Unwarranted Sentencing Disparities Necessitates

A Sentence Substantially Below the Advisory Guidelines Range 3553(a)(6) 98

   f)  The Need For Restitution 3553(a)(7) ................................................. 99

IV. CONCLUSION .................................................................................................. 100

## Table of Authorities

### Cases

*Gall v. United States,* 552 U.S. 38 (2007) ...................................................... 39, 40, 87, 96

*Griffin v. Wisconsin,* 483 U.S. 868, 874 (1974)................................................................ 96

*Irizarry v. United States,* 553 U.S. 708, 709 (2013); ........................................................ 40

*Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011); .............................................. 40, 91

United States of America v. David Shamilzadeh, 04-Cr-194 (JG), United States District

    Court, Eastern District of New York ............................................................................ 98

*United States v. Adelson*, 441 F .Supp. 2d 506, 509 (S.D.N.Y. 2006), ............................ 81

*United States v. Booker*, 125 S.Ct. 738 (2005) ................................................................. 39

*United States v. Canova*, 412 F.3d 331, 353 (2d Cir. 2005)............................................. 62

*United States v. Cavera,* 550 F.3d 180 (2d Cir. 2008)...................................................... 40

*United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005)................................................. 39, 41

*United States v. Dominic Corollo et al.* 10-Cr-654 (HB) ................................................. 80

*United States v. Dominick Carollo, et al.* (10-cr-654) ...................................................... 62

*United States v. Eisen*, 1991 WL 180403 (E.D.N.Y. Sept. 3, 1991) ................................ 63

*United States v. Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ............................. 81

*United States v. Gaind*, 829 F. Supp. 669, 669 (S.D.N.Y. 1993) ..................................... 94

*United States v. Galante*, 111 F.3d 1029 (2d Cir. 1997) .................................................. 66

*United States v. Gupta*, 904 F.Supp.2d 349, 353 (S.D.N.Y. 2012). ................................. 86

*United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992)............................................... 66, 77

*United States v. Kamadeen Idowu Oladimeji*, 463 F.3d 152 (2d Cir. 2006) .................... 63

*United States v. Keller*, 539 F.3d 97 (2d Cir. 2008) ......................................................... 40

*United States v. Knights*, 534 U.S. 112 (2001) ................................................................... 96

*United States v. Milikowsky*, 65 F.3d 4 (2d Cir. 1995) ....................................................... 77

*United States v. Peter Ghavami et al.* (10-cr-1217) ............................................................. 62

*United States v. Phillip Murphy*, 12-Cr-235 (MOC) ........................................................... 79

*United States v. Pope*, 554 F.3d 240, 246-247 (2d Cir. 2009) ............................................ 86

*United States v. Riccardi*, 1998 U.S. Dist. LEXIS 14467 (S.D.N.Y. Sept. 14, 1998) ...... 77

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) .......................................................... 40

*United States v. Sang*, 512 Fed. Appx. 103 (2d Cir. 2013) ................................................. 63

*United States v. Tzolov*, 435 Fed. Appx. 15 (2d Cir. 2011) ............................................... 42

*United States v. Zafar*, 291 Fed. Appx. 425 (2d Cir. 2008) ............................................... 42

*Williams v. New York*, 337 U.S. 241, 247 (1949) ............................................................... 77

### Statutes

18 U.S.C. § 3553 ......................................................................................................... passim

18 U.S.C. § 3561 ............................................................................................................... 96

18 U.S.C. § 3662 ............................................................................................................... 91

### Other Authorities

T.D. 8801 Arbitrage Restrictions on Tax-Exempt Bonds (December 30, 1998) ............. 89

### Rules

FI-66-89 Allocation and Accounting Rules on Tax Exempt Bonds for Arbitrage Rebate

    Purposes, January 30, 1992 ......................................................................................... 88

U.S.S.G. § 2B1.1 ......................................................................................................... passim

U.S.S.G. § 5F1.2 .......................................................................................................... 96, 97

U.S.S.G. § 5K1.1 ................................................................................................ 65, 78

U.S.S.G. § 5K2.0 ................................................................................................ 65, 66

### Regulations

Temp. Reg. §1.103-15AT ................................................................................ 88

Temp. Reg. §1.148-2T .................................................................................... 88

Treas. Reg. §1.148-2 ...................................................................................... 60

Treas. Reg. §1.148-4 ...................................................................................... 88

Treas. Reg. §1.148-5 ...................................................................................... 62

Treas. Reg. §1.148-6 ...................................................................................... 49, 50

## I.   PRELIMINARY STATEMENT

Notwithstanding the offenses to which he has pleaded guilty, David Rubin's life
has been marked by extraordinary achievement coupled with daunting challenges.  In
2009 two seminal events occurred within months of each other, the ramifications of
which he struggles with on a daily basis;

r. Months later,

earned of his indictment in the Southern

District of New York by the Antitrust Division of the Justice Department.

On December 30, 2011, David accepted responsibility for his wrongdoing and
entered guilty pleas in the above-captioned case.  The guilty pleas are a black stain on an
otherwise extraordinary life.  For thirty years, David has been a committed philanthropist
and community leader who has devoted countless hours of his time and energy to a host
of charities and civic endeavors.  His efforts to build affordable housing for the homeless
in Los Angeles and his work on behalf cancer patients and orphaned youth are just a few
of the causes he has championed and where his accomplishments have been widely
recognized.

All of his achievements, however, pale in comparison to the role he has played in
the past four years as a husband and father.  David Rubin has been the rock in his family,

. Finally, in the words

of his daughter, Laura, David Rubin has been the children's safety net in a destabilized
family with an uncertain future; an unparalleled source of comfort and stability for all of

1

his seven children but, most importantly, for his three youngest, ages four, nine and
twelve, who still live at home.

## II.  PERSONAL HISTORY[1]

### A.  David's Upbringing and Early Years

David Rubin is the child of a Holocaust survivor. His mother, Bella, now eighty
seven, was interned at a Nazi labor camp in Poland when she was only seventeen years
old. She escaped during a death march and hid in a farm until the end of the war. Most
of his mother's relatives were murdered in Auschwitz. (Letter of Bella Rubin, Ex 7).
David's father, Sussman Rubin, worked for the United Nations Health Relief Agency
(UNHRA), helping Holocaust survivors in refugee camps throughout Germany rebuild
their lives. While most Jews were running away from Eastern Europe at the time,
Sussman Rubin was running in, and through his work, helped save thousands of lives. It
was during this time that Sussman met David's mother, Bella. Several years later, when
the French government was preparing to pull out of North Africa, Sussman relocated
there, and, at considerable risk to himself (Arab extremists executed his immediate
successor in that position), helped bring North African Jews to safety in Israel. David's
lifelong commitment to Jewish causes was inspired in large part by his family's tragic
history and his father's heroic example.

_____

[1] The facts set forth in this memorandum are gleaned from the Pre-Sentence Report ("PSR"), the
letters submitted on behalf of Mr. Rubin provided herewith (under a separate cover) and conversations the
undersigned have had with Mr. Rubin and his family. Facts set forth herein not specifically stated in the
PSR or in any letter to the Court have been reviewed and confirmed by Mr. Rubin.  "Ex" refer to the
exhibits filed under the separate cover.

2

David's parents instilled in him the importance of family, hard work, achievement, community and, in particular, the importance of caring for the less fortunate. They demonstrated by example the essential role of commitment to community. David's father spent his life working for Jewish causes and the betterment of his community. David is the youngest of four children.

In his letter to the court, David's older brother, Nachum,

(Letter of Nachum Rubin, Ex 12). For the past twenty-five years, David has participated significantly in the financial responsibility for Joshua's care.

While David's parents, like himself, have always been deeply involved in Jewish causes, their charity and caring did not stop there. David was born in Mexico and lived there until he was two. When the family moved back to the United States, David's parents brought with them a young Mexican girl for whom they had been caring. Adrianna Valencia (now Adrianna Valencia Sullivan), was essentially raised by, and is considered an integral part of, the Rubin family. David's parents are intimately involved in Adrianna's life. They remain in close contact and continue to provide her and her children with financial support. Ms. Valencia Sullivan explained in her letter to the Court:

> I started living with David Rubin's family in 1963, when I was
> 14 years old and David was 2. This is when my father died
> and I had to leave home. An acquaintance in Mexico City was
> working for a lady who knew David's mom. She introduced
> me to her and from that day on, I lived in David's home, as
> one of the family. I even slept with David's sister in the same
> room. When the family decided to return to the U.S., I asked
> to go along, as I had no other family to turn to. David's

3

> parents agreed and they hired a lawyer to make sure that all of
> my papers would be processed properly.

(Letter of Adrianna Valencia Sullivan, Ex 84)

In discussing her own family, Ms. Valencia Sullivan wrote that she tried to raise

her own children in the same manner that the Rubins raised David and his siblings.

> Mr. and Mrs. Rubin took a lawyer and made sure that I
> became an American resident. I eventually married a
> wonderful man, and have three wonderful children of my own,
> as well as grandchildren … I brought my children up the way I
> saw Mr. and Mrs. Rubin bringing up David: to know the value
> of hard work; to be respectful of others; and to help other
> people when they are in need.

(Id. at Ex 84).

### B.    David Rubin's Early Entry into Business

Starting when he was in junior high school, David worked after school in his

parents' clothing store, Bella's Fashions.  David's mother, Bella, writes:

> David would help us every free minute he had, whether by
> advertising, carrying merchandise, organizing the store,
> helping with sales, etc.  When his friends would call for a play
> date, if he knew we had new merchandise coming, he would
> say he is busy, and come to work with us, to make it easier for
> us.

(Letter of Bella Rubin, Ex 7).

From an early age, David developed an interest in business.  He noticed that many

of the professional women who came to his mother's store were ill informed on the

subjects of finance, investments and savings.  David realized he could earn extra money

by providing financial services seminars geared primarily to women.  He enlisted three

professionals from different facets of the business world (a life insurance salesman, an

annuity salesman and a stock broker) to speak at his seminars.  David posted flyers and

4

brochures throughout the neighborhood advertising the first event. The initial seminar had a capacity crowd of 150 women. The following seminars resulted in even greater numbers.

A member of David's synagogue learned about his seminars and offered him a job at his bank, ███████████████████ which would later become part of Ameriquest Mortgage, a well-known mortgage banking company in the Los Angeles community. As Assistant Marketing Director, David continued to offer financial seminars, which helped bring more depositors to the bank. It was during this period that David began to learn about municipal finance. Brokers would call looking to deposit money for their municipal customers. David soon realized that brokers earned lucrative commissions on the investments of their municipal customers and decided to go into the brokerage business himself, joining a firm called Kominz and Company. His job was to find municipal customers for the banks.

A short time later, at the early age of 21, David formed his own consulting company, ████████████ He traveled around the country as a consultant to banks, assisting them in setting up funding desks and providing them with lists of potential municipal clients. He also put together seminars for the banks. He was only 22 years old at the time.

Because of David's success, a larger and more established firm, ██████████ ████████████████████ ), recruited David and made him a thirty percent partner. It was at ████ Alexander that David first learned about guaranteed investment contracts (GICs). He became a broker for pension and defined benefit plans and insurance companies and soon realized how pension plans could benefit from GICs with

5

insurance companies.  David began to educate insurance companies regarding this new marketplace and how they could seek investments by offering fixed rates.  David realized that GICs were extremely advantageous to defined benefit plans because they yielded a higher rate of return than what traditional banks and U.S. Treasuries could offer.

After brokering GICs for pension funds, he soon realized that GICs would be an attractive investment mechanism for municipalities.  Funds obtained through municipal bond issuances generally took time to be drawn down.  When a bond was floated for a municipal project, the bond proceeds had to be placed somewhere until they were used. Investing the bond proceeds in a GIC enabled the municipality to earn a higher rate of return than it would in other alternative investment accounts.

In January 1986, David formed his own company, CDR Financial Products, Inc., with the intention of developing a marketplace for municipal reinvestment and GIC placement for qualified pension plans.

C.    **CDR Became a Diverse and Multi-Faceted Company**

Within a short time, CDR became a diverse, multi-faceted company. The brokering of GIC contracts for municipalities was just one aspect of its operations.  CDR also provided debt consulting services for a host of corporations, spanning various industries, such as real estate and not-for-profit institutions, including several universities, hospitals, water systems and transportation authorities.  CDR successfully advised clients with severe debt and liquidity issues, who were affected by adverse market changes.  While CDR had many large financial institutions as clients, it also specialized in assisting clients who might not be able to obtain financing from traditional sources.  David has long been recognized as an industry leader for his expertise in the

6

fixed-income marketplace and he was extremely proud of CDR's reputation as a firm with a creative ability to develop successful innovative strategies and solutions to complex customer and industry problems, with a core focus on increasing GIC providers to meet the demands of the then-growing industry. At its height, CDR had more than twenty employees with several divisions headed by highly compensated and well-qualified people. For example, Scott Sokol headed the pension business, Stewart Wolmark was responsible for the municipal GIC business and Bill Wojciechowski was head of the term-life reinsurance business.

### D.    David's Works of Charity and Kindness

Time and again, people who know David have attested to his generosity and charitable nature. David Rubin is not a person who stands idly by while others around him struggle. He is the family member, friend and neighbor who is first to pitch in when someone is in need. Samuel Gruenbaum, a former securities lawyer with the SEC, adjunct law professor and CEO of a healthcare company, describes David as a "rare man who has given more of himself and his resources to others than anyone I know." He continues: "While it may seem unlikely that one individual could do as many things as [we will explain] to the degree that [we will] describe[], it is the simple truth that David has done so." (Letter of Samuel H. Gruenbaum at p. 3, Ex 35). What these letters, and many others, clearly establish is that David has not only donated huge sums of money to charities, but he has dedicated literally thousands of hours of time over the past thirty years to worthy causes.

7

## 1.    David's Generosity of Time and Spirit

Throughout his entire adult life, David has exhibited a level of true kindness and generosity—not just in terms of money, but also in terms of time and spirit. For example, while attending college, David volunteered his time by teaching a class in economics at Yeshiva University Los Angeles ("YULA") Boy's High School. In fact, it was while teaching at YULA that David met a student, Joey Goldstein, who introduced David to his sister, Gail (who later became David's wife).

Sharon Bastomski describes David's "high energy and enthusiasm" in his early twenties when he was a volunteer youth counselor. Indeed, many of David's students followed his example and are now charitable, involved members of their own communities. David organized trips for teenagers to places like the Grand Canyon and Yosemite National Park. These were new experiences for many of those children. As Ms. Bastomski explains: "David made sure that we all felt part of the group and he made sure that we all knew that each and every one of us was important. Although David was already working at a full time job at the time, we all felt his undivided attention when he was with us. He not only gave his time, but he gave from the heart. We knew he was genuinely interested in our wellbeing [sic]." (Letter of Sharon Bastomski, Ex 17).

Maurice Dean, a small business owner who operates a town car service in Los Angeles, gave an example of David's generous spirit and how it has continued even in the face of the burdens of Gail's illness: "When I announced my plans to marry, David,

insisted that we have our wedding at his home ... He continues, to this day, to surprise us all with his genuine and sincere generosity." (Letter of Maurice Dean, Ex 25).

8

David Rubin, despite his business success and accumulated wealth, is a down-to-earth person. There is ample evidence that David exhibits charity and simple kindness to people in all walks of life. Elmer Martinez, the maintenance engineer at Yavneh Hebrew Academy ("Yavneh"), explains that David is "always kind and has a good word for everyone," and "treats all people, big and small, with respect." (Letter of Elmer Martinez, Ex 55). Jason Rosenwasser, the technician who fixes and maintains the saltwater fish tank in David's home, describes how, although his parents have since died and he has no remaining family in Los Angeles, for many years, "there has always been a place for my family at Passover, Sukkot or just ordinary Sabbath dinner at the Rubin's", which allows Mr. Rosenwasser to "pass on some of the beautiful traditions that I was raised with, to my son." (Letter of Jason Rosenwasser, Ex 71). Or, as Rudy Artiga, another Yavneh employee who has known David and his family for twenty years, explains, David is "respectful" and "the kind of man who invites you to his home, plays basketball with the kids (has even played with my son) and has a big heart." (Letter of Rudy Artiga, Ex 15).

Brian Dror, a friend and colleague, catalogues strangers in their community who have benefitted from David's charity and kindness as well:

> A young couple in our community with 3 young children was having marital issues. David took the time to reach out to the family and again offered his help. He directed his efforts to comfort and counsel the family and did everything in his ability to give that family the help it needed to remain intact and maintain the stability vital for both the parents and children.

(Letter of Brian Dror at p. 2, Ex 27).

As Brian Dror also explains, David has taken a passionate interest in helping other families and individuals suffering from cancer. "A young man in our community had his wife diagnosed with cancer. David took the time to reach out to the man, he offered his help and advice on how to deal with the devastating disease, directed efforts at how to deal with the healthcare issues, comforted and counseled the family, and did anything he could to give that man some measure of hope and guidance" (*Id.*)

David Roy, █████████████████████████████████████████████████ offers a revealing experience with David's generosity of time and spirit. He describes



10



(Letter of David Roy at p. 2, Ex 72).

Finally, Rabbi Hershey Ten, President of the Jewish Healthcare Foundation, also describes how, ███████████████████████████████████████ ███ has taken the opportunity to help others ████████████████ Rabbi Ten describes two circumstances where David was able to help people suffering by offering them his advice and support. █████████████████████████████████

████████████████' (Letter of Hershey Ten at p. 1, Ex 81).

### 2.    David's Financial Generosity

While one could argue that a generosity of time and spirit means far more than writing a check and donating money, David has nevertheless done a substantial amount of both. As his friend and business associate, Marc Gelman, describes, "[w]hile it is customary in biblical terms to tithe 10% of your income, I often chastised David when I found him contributing as much as 50% of his income during some years when the charities he supported couldn't survive without his help." (Letter of Marc Gelman at p. 2, Ex 31). In fact, what Mr. Gelman does not know (and as is set forth in the affidavit of David's accountant, Robert Cohen, (hereafter the "Cohen Affidavit")), in some years, David donated to charities far more than fifty percent of his total adjusted gross income. In some years, he actually donated *more* to charities than his taxable income. From the

11

years 2001 to 2012, David and Gail Rubin donated more than $18 million to various charitable organizations, and millions before that. (Cohen Affidavit ¶¶ 3-14).[2]

Malcolm Hoenlein, CEO of the Conference of Presidents of Major Jewish Organizations, an umbrella entity including 50 national Jewish groups, has written to the Court: "[David's] long history of generosity, caring and involvement reflect his deep commitment to improving society at all levels. He gave constantly of his time and resources most often without recognition. His sincerity and depth of feeling was obvious from the start of our relationship. I know few people who were so consistently ready to respond to any need." (Letter of Malcolm Hoenlein, Ex 38).

Rabbi Yosef Klein is Director of Ohr Simcha Therapeutic Campus for Children at Risk, in Israel. His organization houses Israeli children who have either been forcibly removed from their home by Social Services, or who have been placed there by parents who could no longer care for them. Rabbi Klein describes how he approached David for a donation during a visit to the United States. David said he might be interested in becoming a "partner" in the endeavor; however, he wanted to see the facility first. Rabbi Klein thought this was David's polite way of turning him down, but soon learned that this was not the case. Several months later, David called and said he was in Israel and wanted to visit the facility to continue their discussions. After a short tour, David sat down, rolled up his sleeves and told Rabbi Klein how they could do things better. As Rabbi Klein explains, "[David] was not there to simply write a check. He brought with him a

_____

[2] Moreover, although the Government and the IRS investigated this matter (and David individually) for several years, the Government has never alleged that David committed tax fraud. David did, however, self-disclose at his proffer sessions his failure to pay taxes on his housekeeper and babysitter. The Government was otherwise unaware of this. David rectified this transgression in 2012 by filing amended returns for a ten-year period (2002-2012) and paying interest and penalties on the same.

12

vision, an idea that would eventually become the example others would follow. With his

guidance and leadership, Ohr Simcha spearheaded a unique Family Foster Home (FFH)

framework that has grown to a total of 72 children over the past few years." (Letter of

Yosef Klein at p. 2, Ex 47). A year later, David brought his entire family to visit the

facility and celebrate his son Steven's Bar Mitzvah with all of the children living at Ohr

Simcha. Rabbi Klein located pictures of the occasion in which David can be seen

dancing and celebrating with the kids, while holding his son ▮▮▮▮▮ B.R. (who was an

infant at the time) in his arms. (See pictures attached to letter of Yosef Klein, Ex 47).

    Hillel Kellerman, a former business executive who has been involved in

philanthropic work for more than thirty-five years, as a founder, board member and

contributor to many charitable organizations states: "In my work in philanthropy I have

met many wealthy and generous contributors and have worked with many hard working

and altruistic individuals. I have never, ever met anyone who combines the vision,

generosity, selflessness and caring that David has. He is truly one of the most remarkable

individuals I have known and with whom I have worked." Mr. Kellerman goes on to

describe how, in his experience, David asks for nothing in return. "He contributes quietly

and sometimes secretly, expecting no recognition." (Letter of Hillel Kellerman at p. 1,

Ex 44). In fact, as Frank Lee explains, because David had donated so much money to a

school, they offered to name the campus after him but he respectfully declined the honor

and attention. (Letter of Frank Lee at p. 2, Ex 49).

    David has done many acts of financial charity behind the scenes. As described in

one letter, he made an interest free loan towards the down payment on a home for one

person and "funded a local program helping other families with their down payments so

13

they could remain in the neighborhood where their children attend school." (Letter of

Yossi Gross at p. 2, Ex 34). Or, as Maurice Dean explains, when Mr. Dean's town car

became outdated (he is a livery car driver), David helped him to purchase a new vehicle.

(Letter of Maurice Dean, Ex 25). Finally, Benjamin Kiss writes:

> [A] couple of months ago David called me to inquire about a
> family. The father passed away from an aggressive cancer
> over two years ago. David asked me whether the family has
> the means to pay their mortgage, buy food and clothing and
> said he and his wife would like to help. The question was
> posed to me as my position as financial aid chairman makes
> me privy to information regarding families who are in need
> financially and those who are unfortunately ill. These concerns
> of David and his wife have been the same throughout the
> years.

(Letter of Benjamin Kiss at p. 2, Ex 46).

### 3.   David's Dedication to Education

David Rubin grew up attending local Jewish parochial schools in the 1960s and

1970s. David attended these schools on scholarships due to his parents' limited financial

means and he made certain that he re-paid this charity when he grew up. He saw first-

hand the shortcomings of those institutions in the way that they narrowly focused on

religious education at the cost of wider ranging secular subjects such as math, science and

world history. (See Letter of David Nagel at p. 1, Ex 60). From a young age, therefore,

David vowed that he would provide his own children with a more diverse education.

Indeed, well before he even had children, he understood the importance of education.

Walter Feinblum explains that he approached David for a financial donation to Yavneh,

an institution in the Los Angeles area that has been around since the 1950s. At the time,

14

although David was only in his twenties and had no children, he agreed to help without

hesitation. Mr. Feinblum states:

> This is what first struck me and impressed me about David.
> The fact is, we all tend to understand and appreciate these
> things once we have children, when it is our children's future
> that is at issue. At that point, the effort to commit becomes
> quite a bit easier. What impressed me most about young David
> was that he just 'got it' from the beginning. He knew that
> educating our youth, and giving them all (not just his kids) was
> important even before he himself was a family man.

(Letter of Walter Feinblum at p. 1, Ex 29). From that day forward, David became very

involved in education.

Fifteen years ago, David, Mr. Feinblum and a third individual made a

commitment to re-build and relocate Yavneh. They wanted it to meet the highest

standards of both religious *and* secular education. Together, they undertook a fundraising

effort to raise approximately $9 million to purchase and reconstruct the campus that was

once Whittier Law School in Los Angeles, California. In this effort, David and Gail

Rubin alone donated $1.5 million. As the current Dean of the school states:

> It is not hyperbole to state that Yavneh is what it is today
> because of David's dedication and vision… More important
> than his monetary donation, however, is the fact that David
> along with a handful of others personally oversaw the
> construction of an additional wing, the re-configuration of the
> law school to accommodate an elementary school, the design
> of the classrooms and other parts of the physical plant, the
> choice of the faculty (including my recruitment from another
> school in Massachusetts) and the planning of the curriculum.
> David always insisted that while he wanted the children to get
> a solid education on religion, it was vital, absolutely vital that
> the kids get a top notch general education on par with any of
> the other parochial or other private day schools in Los
> Angeles. In the last ten years, we have almost doubled our
> enrollment to now approximately 500 students (with a waiting
> list).

15

(Letter of Rabbi Moshe Dear at p. 1, Ex 26). David "poured his heart and soul" into this endeavor. "He personally investigated, interviewed and enlisted the principal of the school; he worked tirelessly to improve the standards of the school; and, all along the way, he funded the school almost single handedly. His charity knows no bounds." (Letter of Dr. Ernest Agatstein at p. 2, Ex 13).

After the school was opened and fully functioning, David was regularly called upon to help pay the bills. Frank Lee, a Certified Public Accountant who served as Treasurer of the school for ten years, Chairman of the Trustee Society for seven years and head of the Financial Aid Committee for twenty years states: "Payroll was twice a month and for most pay periods we had to call David to cover the shortfall...[T]here were many years when his annual contribution to the school exceeded $1 million." (Letter of Frank Lee at p. 1, Ex 49).

David was not just interested in donating money. He was also interested in learning about and improving the quality of the education received by the children to make it the best it could possibly be. "[David] would attend conferences and search out leading educators on ideas as to how to make the school better." Mr. Lee recounts one particularly insightful story:

> I recall walking through the school one day and I saw new
> math enrichment and pre-school programs in session. I asked
> the school bookkeeper about them in as much as they were not
> in my budget. She told me that David thought they would be
> good additions to the school. I told her that since we could not
> afford these programs they had to go immediately. When I got
> back to school several days later I saw that the two programs
> in question were still being offered. I confronted the
> bookkeeper and she advised me that the school was no longer
> paying for them. David thought the programs were so

16

> important for the kids that he was going to pay for them
> himself.

(Letter of Frank Lee at p. 1-2, Ex 49).

In 2001, David, who was President of Yavneh at the time, teamed up with the

President of another local Jewish day school and they took over financial and educational

responsibility of a girls' high school in Los Angeles that had been badly neglected. As a

result, the YULA Girls' High School was born. As Alan Gindi describes:

> While it may have been easier in the short run to simply start a
> new girls high school from scratch, implementing in it the
> values and education we felt necessary, to do so would have
> been very divisive in the Los Angeles Jewish community, and
> perhaps beyond. Instead, in a great spirit of cooperation with
> those around us, David and I worked very closely over a
> number of years to turn this institution completely around and
> creating one of the best run private high schools in Los
> Angeles. We, together, gave and raised the funds needed to
> re-build the whole campus, while at the same time raising the
> funds, and hiring the personnel, needed to create a great
> educational program for the high school girls. If not for
> David's devotion to this cause, his love for the Los Angeles
> community, his passion for great education for all, and his
> willingness to donate substantial funds, there is no question in
> my mind that this endeavor would not have even begun, let
> alone have the success we are enjoying.

(Letter of Alan Gindi at p. 1, Ex 32).

"For decades, David Rubin was the largest contributor to [YULA], allowing the

school to grant scholarships to those less fortunate who could not afford the tuition. He

was not bothered by the fact that he virtually shouldered this responsibility by himself.

On the contrary, he saw it as his obligation to give back to others." (Letter of Marvin

Hier at p. 1, Ex 37).

17

At YULA as well, David did far more than donate money. Abraham Lieberman,

the current YULA Headmaster, explains:

> Several years ago, I was a dean at a school in Brooklyn, New
> York when David called me out of the blue (I did not know
> him) and proposed the idea of becoming the Head at Yula. In
> my first discussion with David regarding education, I was so
> impressed with his passion, focus, and, most of all, his
> comprehensive knowledge of academic issues–not religious
> issues but, instead, true issues about secondary education,
> teaching methods and curriculum as they were being developed
> in modern schools across the country. His depth of
> understanding makes him a unique individual in all these areas.

(Letter of Abraham Lieberman at p. 1, Ex 52). Rabbi Lieberman describes another

instance of David's practical engagement:

> [F]our years ago, we struggled with a major move into
> educational technology. This involved a new financial burden
> to the school and all the pro[s] and cons of a "One to One"
> laptop idea. As an institution, we were truly faced with some
> tough choices. It was David, however, who, in my opinion,
> saved the day. He was able to walk us through each
> component of our major decision, to show us the strong points
> and the weak ones, and to help us reformulate our dream into a
> reality. David does this at the drop of a hat. He is always
> ready to help any institution that seeks his help not just with
> his money but also with his time. He never waits for a thank
> you or says "I cannot,"' he is always there even though we all
> know there is (and has been) much else in his life that he
> needs to juggle.

(*Id.* at p. 2).

There are other examples as well. The Yeshiva Gedolah of Los Angeles (which

has never been attended by any of the Rubin children) also benefitted from David's and

Gail's charity. The Executive Director of the school describes how David "was

instrumental in helping [them] purchase [their] new campus. He assisted [them] in the

decision-making process … providing his business acumen and knowledge. His advice

18

resulted in a very wise choice and [their] school has thrived in its new surroundings."
(Letter of Yossi Gross at p. 1, Ex 34). In addition, David and Gail donated \$100,000
towards the school lobby and were founders of the scholarship fund for students who
required tuition assistance. Through that fund, they have committed to donate \$10,000
per year and have done so for the past fifteen years. (*Id.*)

David's dedication to these schools amounted to thousands of hours of his time.
He was, at different times, President of two separate schools and intimately involved in
the decision-making, management, upkeep and daily functioning of those institutions.
This included attending regular Board meetings, committee meetings, financial
management meetings, educational meetings, surveying the buildings and grounds and
other responsibilities. To his credit, he sacrificed a huge amount of his personal time for
all of these worthy causes.

A common theme emerges from the letters submitted on David's behalf. David
Rubin does not simply give charity by throwing money at a problem or giving time to a
cause. David always tries to ensure that his contribution is as meaningful as possible and
makes a difference for the long term. It has always been important to David that his
resources not be used as a band-aid to fix a problem for the moment, but rather to fix a
problem indefinitely. Rather than just giving a person a handout to cover a meal, or to
fill a hole in a school budget, he would rather make sure that that person finds a job to
support himself, or create a solution that will assure that a school remains financially
stable.

19

### E.     David's Positive Effects as A Businessman and Civic Leader

While David has undoubtedly made extraordinary financial contributions and time commitments to educational programs and charities connected to his faith, David has also devoted much time and energy to civic endeavors. Because of his commitment to education and his love of teaching, for many years, David taught classes on subjects such as calculus derivatives, in the Math Department at Cal State Northridge and, prior to that, at UCLA's Anderson Business School. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

David has also devoted significant time and energy to the city of Los Angeles. In 2002, Mayor James Hahn appointed David to his Revenue Task Force, which was commissioned to find new funding sources for the city. Following that appointment, Mayor Hahn, recognizing David's expertise in municipal finance, named him Commissioner of the Los Angeles Housing Authority where he served from 2002-2004.

Chartered in 1938 by the State of California, the Housing Authority is a cooperative effort with the city to provide housing for low-income residents. The Housing Authority is Los Angeles's largest provider of subsidized housing with a budget of nearly $500 million. As was the case with all his public endeavors, David collected no salary, but undertook the assignment because of his desire to give back to his City. In announcing David's appointment, the Executive Director of the Housing Authority, Donald Smith, stated: "David Rubin brings a great depth of experience and financial

20

creativity to the Board. We're anticipating a very productive year, especially in a climate
of tremendous housing demand."[3]

The Housing Authority oversaw all public housing in the City and was entrusted
with the development of affordable housing. David, as Finance Chair of the Housing
Authority, worked alongside the development team to secure financing for such housing
programs as the Dana Strand Senior Apartments Project Rehabilitation, which provided
affordable housing for senior citizens that included a community room, a fitness center, a
computer center and education programs for the tenants.

When David was appointed as Co-Chair of the Authority, the Housing Authority
was in deep financial trouble and the federal Department of Housing and Urban
Development ("HUD") wanted to place it in receivership. David traveled back and forth
to Washington and met with HUD officials persuading them to help keep the Authority
afloat. David was also a driving force in the establishment of charter schools in newly
built housing projects, which would provide children at these locations with an education
far superior to that previously offered in the existing public schools.

As Rev. Cecil Murray, the former Pastor of the First African Methodist Episcopal
Church in Los Angeles describes:

> During David's tenure as Housing Commissioner, I can say
> that David made a positive difference in the lives of the
> communities run by the public authorities. Specifically, it was
> well known in the community that he declined his salary as
> Commissioner and instead donated the money to a scholarship
> fund for underprivileged community residents. In addition, he

---

[3] Business Editors, *David Rubin Named Commissioner Los Angeles Housing Authority*, Business
Wire, May 14, 2002. (Ex 103).

> was a very strong advocate for the jobs program at the public
> housing authority.
>
> He was also the first Commissioner in recent years to call for
> the much needed modernization of Jordan Downs and
> Nickerson Gardens, two public housing facilities that were
> run-down and in disrepair. It is now ten years later, and
> although David has not been involved in the public housing
> authority for quite some time, his dream of re-vitalizing
> Jordan Downs is about to come to fruition. That dream was
> initiated and brought about by David Rubin.

(Letter of Rev. Cecil Murray at p. 2, Ex 58).

Even after stepping down as Commissioner, David continued his efforts at

creating affordable housing in Los Angeles through a for-profit company he established

called Enhanced Affordable Development ("EAD"). EAD focused on the rehabilitation

of low income and senior housing. One such project financed by EAD was the Bonnie

Brae Village, a 92 unit, senior housing project housing 120 senior citizens, over 50 of

who were mentally disabled. A large percentage of the residents were formerly

homeless.

David Grunwald, President and CEO of Affordable Living for the Aging, the

organization that manages Bonnie Brae Village, sent David an unsolicited letter on

December 4, 2013. Attached to the letter was another letter addressed to Mr. Grunwald

and personally signed by eleven current residents of Bonnie Brae, personally thanking

him for making their home possible. (Letter of David Grunwald, Ex 36).

In his letter to David, Mr. Grunwald wrote: "By developing this project you have

made it possible for over 120 Seniors to have a safe and affordable place to call home."

Noting the set aside by EAD of 50% of the units for homeless and mentally disabled

seniors, Mr. Grunwald continues: "[Y]ou made it possible for us to stabilize over 50

22

mentally disabled seniors to remain off the streets and sleep comfortably and warmly in

their homes." (*Id.*)

The eleven Bonnie Brae residents who signed the letter to Mr. Grunwald wrote:

> On behalf of many tenants here at Bonnie Brae Village, thank
> you for your work sustaining this community. For many of us,
> moving into an apartment at Bonnie Brae Village has meant
> leaving a desperate situation and having a safe place to call
> home for the first time in years. It has also meant we can
> afford to pay rent while still having money left over for food
> and other necessities.

(Letter of Bonnie Brae residents, Ex 36).

As these letters attest, David provided exemplary financial services to scores of

companies and communities for more than thirty years. His extraordinary professional

accomplishments, unfortunately, have now been severely devalued or diminished as a

result of the offenses to which he pleaded guilty.

## F.    David's Role as Father and the Rubin Family Prior To Gail's Illness

David met Gail Goldstein while David was volunteering and teaching economics

at YULA Boy's High School. Joey Goldstein, who was David's student, invited David to

attend services at his synagogue where he introduced David to his sister, Gail. The two

were married on March 10, 1985. (PSR ¶ 116).



(Letter of Nachum Rubin at p. 1, Ex 12).

23

In 1987, however, their eldest child, Elizabeth, 25, was born. In the years that

followed, six more children were born, culminating in the birth of their youngest son,

Z.R. ▮▮▮▮ in 2009. ▮▮▮▮▮▮▮▮▮▮▮, David was always a supportive,

hands-on father. Many letters to the Court speak about David's personal involvement in

his children's lives, but none better than the letters written by his children. Elizabeth

Rubin recalls:

> There are many more elements to my family, and my father,
> which predate the past four years since my mother's illness.
> The themes of dedication and passion are continuous. My
> father coached my basketball team from 3rd-6th grade in the
> local community girls' league. Games on Sunday and
> practices on Wednesday. My dad would give prizes for most
> free throws made and devise and practice organized plays to
> give our group of 10-year-old girls some semblance of order
> on the court. When I graduated into the middle school league
> and played on my school's team, my dad made an effort to
> come to almost every game. Throughout high school, my dad
> would drive hours through LA rush hour traffic to watch my
> "away" games. The passion to watch his children never
> waned; when I graduated, he made the same effort for my
> brother, and cheers with the same enthusiasm and fervor at my
> sister's middle school games today.

(Letter of Elizabeth Rubin at p. 1, Ex 3).

Warren Lent, a neighbor, also writes how David has always consistently been

involved in every aspect of the lives of his seven children. "I have seen innumerable

instances of David's involvement with children, be it bike riding in the neighborhood,

coaching their Little league teams or helping them with their 4th of July hot dog and

lemonade stands." (Letter of Warren Lent at p. 1, Ex 51).

24

Janine Lowy, a woman whom the Rubins befriended when she and her husband moved to Los Angeles from Australia, described David's actions as a father when the Lowys and the Rubins used to spend time at a camp during the Passover holiday:

> David was always either spending time with his growing family, swimming, playing and generally acting as "head of children's activities" (I still have vivid memories of David balancing a child in one arm, and carrying a multitude of pool floats and toys on the other arm), caring and making sure his elderly parents were looked after, and also trying to spend some quality time with his wife Gitel.

(Letter of Janine Lowy at p. 1, Ex 54)

David has always stressed to his children the importance of hard work, self-discipline and achievement. The values that David instilled in his children are reflected in their accomplishments. His eldest, Elizabeth, graduated with honors from the University of Pennsylvania and is currently in her second year at U.C.L.A. Medical School. His eldest son, Daniel, twenty three, is serving in the Israeli army and his third child, Steven, twenty two, is an undergraduate at the Stern School of Business at NYU. The next child, Laura, eighteen, recently graduated from high school and is studying for a year in Israel prior to entering college. His three youngest children are M.R. █████ age twelve, followed by B.R. █████ age nine, and Z.R. █████ who is four years old.

While David has always been deeply spiritual and adheres to the Orthodox Jewish faith, he practices as a progressive pluralist Orthodox Jew who has not embraced the rigid tenets of the religion with respect to the distinct roles of men and women and other aspects of life. Indeed, he has encouraged all of his children to strive as high as their talents, abilities and hard work will afford, regardless of their gender. Elizabeth Rubin attests to her father's steadfast, unqualified support of her career goals and ambitions.

25

Although very much a part of the Orthodox community, Elizabeth was intellectually

gifted, popular and competitive, and David was immensely proud of her uniquely

independent life vision.  She attributes her broadened professional aspirations to her

father's encouragement and her interactions with those outside the Orthodox community

during her formative years.  She writes that after graduating from the University of

Pennsylvania, "I lived abroad in Shanghai and London before starting medical school. It

was important to my father that I pursue my goals and cultivate my future."  (Letter of

Elizabeth Rubin at p. 2, Ex 3).

    While David, through his success in business, was able to provide his family with

a comfortable lifestyle, he and Gail have always emphasized to his children the vital

importance of respecting and caring for all people, not just those within their religious

community.  For several years, David has made it a tradition for the Rubin family to

spend Thanksgiving Day at the Vineyard Christian Church in Venice, California, where

they serve Thanksgiving dinners to residents of the Church's homeless shelter.  As

Elizabeth describes:

> The past few Thanksgivings, my father took my younger
> siblings to a local homeless shelter to help serve and brighten
> the holiday spirit of the patrons. He has always taught us to
> give to and work for the general good, both in the Jewish
> community, and the world at large. Learning these lessons, as
> a high school student I worked for 3 years with Koreh LA,
> teaching reading in a local public elementary school. My
> interest in the greater community continued in college, where I
> worked teaching Cardiology and general literacy as a Peer
> Tutor in a public high school in West Philadelphia. My
> brother, Steven, worked at the LA Youth Network for
> homeless children throughout high school. My siblings,                L.R.
M.R.           and   B.R.   run an annual "hot dog and
> lemonade" stand every July 4. Each year, they choose a
> different charity to which to donate the proceeds. This past

26

> year, they chose Save a Child's Heart, an Israeli organization
> that provides free life-saving cardiac surgery to children in
> various African countries. My father plays a key role, both
> logistically and inspirationally, in that annual endeavor.

(Letter of Elizabeth Rubin at p. 1, Ex 3).





(Letter of Elizabeth Rubin at p. 1, Ex 3).

28





30



---

[4] A portocath is a small medical appliance installed beneath the skin that connects to the infusion pump and allows for easy delivery of chemotherapy drugs to a cancer patient.







"He gets the children to do normal activities, basketball, swimming and other sports, and
to participate in all school extracurricular activities like science projects, and history
projects [sic] presentations." (Letter of Adell Goldstein at p. 4, Ex 8). As Tracey
Goldstein describes it, somehow, despite being 52 years old, David continues to have
passion and enthusiasm as a parent:

I cannot even imagine at my age dealing with kindergarteners or elementary school children.  The thought of Little League again, tying shoes, brushing teeth, etc. is too much to bear at this point.  But David, who is seven years older than me, does it with fervor.  As an example, just this past Sunday, my son and I went over to the Rubin house to sell David some raffle tickets for a fundraiser my son was doing for the school.  While I was in the kitchen, David whisked through the side door with two of his children, Benjamin (9) and Zachary (4)(it was 10:00 am).  He said, "Tracey, you won't believe what a productive day we have had already.  We were up early and went to feed the ducks, we practiced soccer with Benjamin, we are going to pack a lunch for a picnic and then we have Benji's soccer game at 3:00."  His energy is endless.  There is nothing David will miss for his kids (a school play, a soccer game, a parent-teacher conference).

(Letter of Tracey Goldstein at p. 3, Ex 9).





### I.   David's Dedication to His Extended Family

In addition to being a wonderful husband and father, David is a dedicated son, brother and uncle. As noted previously, his parents have both had long and challenging lives. His father is ninety-four and his mother is almost ninety. Although his sister, Hana, is the physical caretaker of David's parents in Chicago, "David is the one in charge of taking care that all of their needs are met." As Hana describes, "I couldn't organize it and manage it without David's guidance and ongoing support, both financially and technically." (Letter of Hana Frankenthal at p. 2, Ex 10). Hana's husband was recently

diagnosed with gastro-esophageal cancer , so Hana now will be relying on David's

support, financially and otherwise, even more.

David has always provided his parents with substantial emotional support.



(Letter of Nachum Rubin at p. 2, Ex

12).

As Hana explains, "David is the youngest, and my parents are very attached to

him emotionally. His visits are the highlights of their lives. They look forward to seeing

him and talk about it for days before and after. He brings them joy and gives them

meaning to keep them going." (Letter of Hana Frankenthal at p. 2, Ex 10). The negative

psychological and emotional impact that any term of imprisonment will have on David's

parents is certain to be significant. His mother was a Holocaust survivor and, whether

justified or not, maintains a weighty fear of incarceration and forced detention as a result

of her own personal history. She has experienced and witnessed terrors and horrific

incidents (involving guards, violence, forced movement, restrictions on freedom, etc.)

that general members of the public cannot, and do not, understand. "I shudder to think of

the emotional and physical toll that any prison sentence will take on my mother and

father." (Letter of Hana Frankenthal at p. 2).

David has done whatever he can to support all of his family members in need.

37



Letter of Tzuriel

Frankenthal, Ex 11).

Hana describes how David has helped her personally: "[M]y husband and I run a business and, several years ago, we required a sudden, critical influx of money (this occurred before my sister-in-law's cancer). I flew to David to ask for help. He didn't ask any questions. He immediately wrote out a personal check for me for the whole sum we needed. He said we should use it and repay him whenever we could, at any pace we could." (Letter of Hana Frankenthal at p. 3-4, Ex 10).

## III. THE GUIDELINES AND 18 U.S.C. § 3553

In the wake of *United States v. Booker*, 125 S.Ct. 738 (2005) ("*Booker*"), the

Second Circuit in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), set forth

guidance instructing this court how to proceed to sentence. The Honorable Judge

Newman explained that although the Guidelines are no longer mandatory, sentencing

judges must still "consider" the guidelines along with the factors listed in 18 U.S.C. §

3553(a) (hereafter "3553(a)"). However, since *Booker* and *Gall v. United States,* 552

U.S. 38 (2007), it is now clear that "[a] district court *may not presume that a Guidelines*

*sentence is reasonable*; it must instead conduct its own independent review of the

39

sentencing factors, aided by the arguments of the prosecution and defense. District judges
are, as a result, generally free to impose sentences outside the recommended range."
*United States v. Cavera,* 550 F.3d 180, 189 (2d Cir. 2008) (*en* banc) (footnote omitted,
emphasis added). Moreover, the Court *must* consider all of the sentencing factors
enumerated in 3553(a) and "make an individualized assessment based on the facts
presented." *Gall v. United States,* 552 U.S. 38, 50 (2007); *see also United States v.
Rigas,* 583 F.3d 108, 116 (2d Cir. 2009) ("a District Court must make an individualized
assessment based on all of the sentencing factors in § 3553(a)").

While it may be a distinction without much difference, there is, in fact, a
distinction between a sentence that results in a variance from the Guidelines based upon
the Court's consideration of all the 3553 factors, and a sentence that is applied below the
Guidelines as a result of certain downward departures found within the Guidelines. *See,
Irizarry v. United States,* 553 U.S. 708, 709 (2013); *see also Pepper v. United States*, 131
S. Ct. 1229, 1247 (2011); *United States v. Keller,* 539 F.3d 97, 100 (2d Cir. 2008). For
the reasons set forth below, David's circumstances justify a significant downward
departure based upon at least three relevant departure grounds provided in the Guidelines
or, alternatively, a variance based upon the 3553(a) factors.

### A. The Guidelines Calculation

According to the PSR, David's Guidelines calculation results in a total offense
level of 38. With a criminal history category of I, that offense level equates to an
astronomical imprisonment range of 235 to 293 months. (PSR ¶¶ 99-106). For reasons
that will be discussed extensively below, we disagree with this Guidelines calculation and
believe that it is substantially lower. Specifically, if the losses are less than $2,500,000,

under § 2B1.1(B)(1), sixteen rather than twenty points are added. In addition, if the

Court believes that there are more than ten but less than fifty victims, under §

2B1.1(B)(2(a), two points rather than four points are added. This results in a total offense

level of 32 and equates to an advisory Guidelines range of 121 to 151 months.

While we address here the issue of loss and the exact Guidelines calculation, we

respectfully note that the Court need not determine the specific loss amount prior to

sentencing if it determines, as we have argued, that a non-Guidelines sentence here is

warranted. In fact, it is worth noting while the Government and the defense do not agree

on the loss or restitution amounts, the Government is also moving for a downward

departure and a sentence outside of the advisory Guidelines range, whatever the Court

determines that range to be. (*See* III C. 1 below). The Second Circuit has clearly stated:

> In one circumstance, however, precise calculation of the
> applicable Guidelines range may not be necessary. Now that
> the duty to apply the applicable Guidelines range is not
> mandatory, situations may arise where either of two
> Guidelines ranges, whether or not adjacent, is applicable, but
> the sentencing judge, having complied with section 3553(a),
> makes a decision to impose a non-Guidelines sentence,
> regardless of which of the two ranges applies. This leeway
> should be useful to sentencing judges in some cases to avoid
> the need to resolve all of the factual issues necessary to make
> precise determinations of some complicated matters, for
> example, determination of monetary loss. Similarly, close
> questions may sometimes arise as to the precise meaning or
> application of a policy statement authorizing a departure, and
> a judge who has considered policy statements concerning
> departures need not definitively resolve such questions if the
> judge has fairly decided to impose a non-Guidelines sentence

*United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005). Accordingly, if the Court

determines it appropriate, the complex arguments set forth below could instead be

addressed at a restitution hearing at some point after David's sentencing date of February 3, 2014.

**B. The Guidelines Calculation in the PSR is Wrong Regarding Loss**
    **1.    The so-called "kickbacks" do not represent losses to the issuers or other parties in the transactions.**

The Government argues that for certain deals there are payments it characterizes as "kickbacks" to be included in both the loss and the restitution calculations. The Government is wrong, however. These "kickbacks" should not be considered either in a loss analysis under the Sentencing Guidelines or in a restitution analysis under the Mandatory Victim Restitution Act ("MVRA").

With respect to loss calculations under U.S.S.G. § 2B1.1, the Government's characterization of the "kickbacks" is an attempt to utilize a gain calculation in lieu of a loss calculation, which is improper in this case. The gain analysis shall be used only when there is, in fact, a provable loss, but that loss cannot reasonably be calculated. U.S.S.G. § 2B1.1 application n. 3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."); *see also United States v. Zafar*, 291 Fed. Appx. 425, 429 (2d Cir. 2008); *United States v. Coppola*, 671 F.3d 220, 249 n. 23 (2d Cir. 2012); *United States v. Tzolov*, 435 Fed. Appx. 15, 17 (2d Cir. 2011).

There was no loss for the three categories of transactions where the Government states that there were "kickbacks," despite that there was bid rigging and fraud with respect to the bidding process. These particular bond-offerings (described more fully below)—Lease to Own, the SunAmerica multi-family housing deals and the Tennessee Municipal Bond Funds ("TMBF") deals—involved highly complex, structured

42