transactions for which there was really only one interested, competitive bidder. For these transactions, the GIC rates themselves were an essential component of each bond offering and actually drove the transaction. These GICs were entered into under circumstances involving highly structured, inter-related documents requiring non-generic, sophisticated investment agreements. The so-called kickbacks were actually fees paid by the financial institutions to CDR for structuring the financing that would potentially or with predictability (in some cases) provide substantial profits to those institutions. Most importantly, as explained below, these were not fees or monies that would have otherwise gone to an issuer. It is pure speculation for the Government to argue that a prospective provider would have paid a higher interest rate for a GIC had no bid-rigging occurred. Thus, the Government cannot prove that there was any loss to the issuer. In all likelihood, had the banks not made the structuring and finder's fee payments to CDR, they would have simply made a greater profit rather than pay a higher interest rate on an investment agreement. Accordingly, it is improper under the 2B1.1 analysis to include $11,691,595.83 in gains David and CDR received on those deals in determining the Guidelines calculation.

Unlike the more generic GICs involved in *United States v. Ghavami et al.,* (e.g. construction funds, reserve funds, escrow agreements, etc.)—where the issuer or conduit borrower identified at the beginning provided the true underlying credit to the transaction, and would get the benefit of additional earnings on the GICs—the GICs at issue in these three program types were necessary to support the entire bond offering. Stated differently, the generic GICs at issue in *Ghavami* generated additional income that was used to reduce the number of bonds that were needed. The GIC did not have to

43

support the deal.[5]  With respect to the Lease-to-Own and SunAmerica deals specifically,

the GIC's critical role was to "cover" the costs of the transaction (i.e. letter of credit fees,

attorneys' fees, remarketing fees, bond interest, etc.).  Consequently, there was a

significant incentive for all parties to seek the highest possible rate on the GIC because if

a sufficient rate could not be obtained, there would not have been a bond offering.  Thus,

while the co-conspirators were admittedly rigging bids without disclosing their

machinations, each nonetheless had an incentive to seek the highest possible GIC rate.

Moreover, for these transactions, had there been a higher GIC rate, because of the

structure of the transaction, it would most likely have gone to the letter of credit provider

or some other player in the transaction, since the GIC rates were designed to pay the

interest on the bonds prior to specific borrowers being identified and to pay the costs of

the professionals.  A higher rate would not have led to a larger sum of money available

such that a smaller number of bonds had to be issued or that the issuer or conduit

borrowers would have a windfall.

### a)   There Was No Loss Where Only One Bidder Was Actually Interested in the Transaction and the Bid-Rigging Involved Only Courtesy or Complementary Bids

#### (1)   *Lease-to-Own Deals*

The largest category of deals for which the Government claims that CDR was

paid "kickbacks," are referred to collectively as the "Lease-to-Own" deals.  According to

---

[5] If a municipality knows that it will get income from a GIC, it can issue fewer bonds.  The better
the return on a GIC, the fewer bonds a municipality must sell.

the Government, the Lease-to-Own deals comprise a total of $6,162,207.74 in losses in the form of "kickbacks" paid to CDR.[6]

In approximately 1996, Freddie Mac sought a proactive program to assist poor to moderate-income people who did not have enough money to buy or pay the closing costs on a home. In response to this need, David devised the highly structured Lease-to-Own program[7] whereby a municipality would issue tax-free bonds and use the proceeds to purchase homes that could be leased to, and later purchased by, financially qualified individuals (i.e., low to moderate-income individuals or households meeting Freddie Mac underwriting standards). At the time the bonds were issued, however, neither the homes nor the lessee/purchasers were identified.

Pending the identification of lessee/purchasers and the houses to be acquired, the proceeds of the bond issue (net various costs paid at the closing) were invested in a GIC. The GIC had to provide sufficient funds to pay current interest on the bonds, because neither the issuer nor any other entity involved in the transaction other than the Forward Purchaser (described below) provided any payments that could be used to pay debt service.[8] In addition, if there were any excess earnings, they would not have been

---

[6] The transactions identified by victim identification numbers 4, 28, 55, 126, 133, 146, 191, 192, 193, 194, 201, 203, 204, 220, 233 and 284 in a chart entitled "Rubin Loss Calculation Master," which has been provided by the Government to the defense (hereafter the "Government Loss Chart") were the Lease-to-Own transactions. In addition, a summary of the Government Loss Chart that categorizes the purported losses to David and/or CDR is attached hereto as Exhibit 104.

[7] *See* September 16, 2008 Dani Naeh interview at ¶ 46.

[8] *See, e.g.,* the Official Statement ("OS") relating to the East Delta Housing & Finance Agency Lease Revenue Bonds, 2000 Series A and 2000 Series B (the "East Delta OS"), which states that the obligation to make payments on the bonds is limited to certain revenues and certain funds held under the Trust Agreement and making it clear that the issuer has no obligation to provide any other funds. (Ex 98, at p. 3, 17-18).

45

available to the conduit issuer or any other entity involved in the transaction. Instead, any excess earnings would be held in the Program Fund and could ultimately be used to reduce amounts required to be paid by the Forward Purchaser.[9]

As lessee/purchasers and houses were identified, an administrative agent would borrow money from the issuer, which was funded by draws upon the GIC (reducing the amount invested in the GIC), and then purchase the houses and enter into the lease purchase agreement.[10] A Mortgage Loan on the property secured the loan to the administrative agent. For an initial period, the lessee/purchaser paid rent to the agent and that rental income was paid to the trustee and used to pay the corresponding interest and principal on the bonds that financed the purchase. After approximately a three-year period, the lessee/purchaser was to purchase the home from the agent, in part by assuming the Mortgage Loan. Upon assumption, the Mortgage Loan was no longer eligible to be financed using tax-exempt money and the tax-exempt bonds that originally financed the Mortgage Loan had to be paid off. Accordingly, a "Forward Purchaser" needed to be involved from the beginning of the transaction who would promise to purchase the Mortgage Loans at prices sufficient to ensure that enough funds would be available to repay the bonds.[11] Once the bonds were repaid, the bond issuer (which was

_____

[9] *See, e.g.,* East Delta Offering Statement ("OS"), which states that the Forward Purchaser is obligated to pay an amount equal to the principal amount of any FHLMC Certificates *plus a portion of the funds necessary to pay the outstanding 2000 Series B Bonds.* (Ex 98, at p. 3). We have attached only a portion of the OS. Of course, if for some reason the Court wishes to view the entire OS, we can provide the same.

[10] *See, e.g.,* East Delta OS, which generally describes the program and the requirements that tenants had to meet. (Ex 98. at p. 2, 27-29)

[11] *See. e.g.,* East Delta OS. (Ex 98, at p. 3).

normally a housing authority) no longer had even the nominal role that it originally performed.

David tried to enlist as many banks as possible to participate in the Lease-to-Own program and specifically assume the role of the Forward Purchaser (and the obligation to purchase the Mortgage Loans from the administrative agent after the bonds were issued and the programs were launched). Of course, any bank that was willing to assume the role as the Forward Purchaser would be assuming certain risks in exchange for a fee. Despite David's solicitations, Société Générale ("SocGen") was the only bank interested in assuming this role. This obligation on the part of SocGen resulted in what was later identified as the Forward Purchase Agreement ("FPA") for each of the Lease-to-Own deals.[12]

Although SocGen was paid a healthy fee for entering the FPA (a fee that can be gleaned from the Official Statements for each of these bonds), the risks for which it was paid potentially could have—and maybe did, unbeknownst to David—cost SocGen a significant amount of money. As often is the case in structured finance, a portion of the fee paid to SocGen on the FPA was paid to CDR on an ongoing basis for its services in structuring these transactions and bringing these deals to the bank. These fees, which were not disclosed to the issuer, were agreed upon between SocGen and CDR before the transactions closed and amounted to a total of $6,162,207.74 over the several Lease-to-Own bond issues. The Government has identified these fees to CDR as "kickbacks" and

---

[12] The FPA actually brought with it a great deal more obligations.

argues that those payments should be included in both the loss and restitution calculations.

The essential fact is this: only SocGen was willing to be the Forward Purchaser and without a Forward Purchaser, there were no Lease-to-Own transactions. The fact that only SocGen was willing to be the Forward Purchaser in the Lease-to-Own transactions has been verified by another key cooperating witness, Douglas Goldberg. Mr. Goldberg has confirmed on numerous occasions that David tried to get other financial institutions (other than SocGen) interested in the Lease-to-Own transactions, but was unsuccessful. For example, in a 2007 interview with the Government, Mr. Goldberg stated: "Rubin tried to get others to do these deals but no one else would. They couldn't hedge it accurately"[13] On another occasion, he said: "Rubin had shopped these lease-to-own deals to everyone on the market when he tried to replace SocGen."[14] In fact, specifically with respect to the Harrisonburg Redevelopment and Housing Authority deal (victim identification no. 4 of the Government Loss Chart), Mr. Goldberg stated that "SocGen was the only provider willing to take the risk and the only competitive bid."[15] Mr. Goldberg also confirmed that, even if another broker brokered the Lease-to-Own deals, SocGen would still have won the GIC. "On the Lease-to-Own deals, Soc Gen's bids were 60-70 basis points [higher] than the new bidders. Soc Gen was always going to

---

[13] February 26, 2007 IRS Interview with Doug Goldberg, at CDR-ROI-0009-0010 (para. 61). Because of the volume, we have not provided copies of the interview notes referenced herein but will do so if the Court deems it necessary.

[14] June 10, 2009 interview (20090610-Goldberg-CDR-R001)

[15] Nov. 3, 2010 IRS Interview with Doug Goldberg, at CDR-ROI-2949.

win under these circumstances and Soc Gen knew that even if someone else bid or brokered the deal Soc Gen was going to win."[16]

The role of the Forward Purchaser was crucial. As the only Forward Purchaser available, SocGen, therefore, had the ability to dictate various terms. For example, the Forward Purchaser had a *de facto* ability to reject the GIC provider on these transactions. This was not a secret to anyone. As a result, SocGen was in a unique position to dictate what it was willing to pay on the GIC, because it could effectively insure that it would be the GIC provider. Moreover, it had a strong economic incentive to provide at least a market rate, since any amounts paid by it under the GIC reduced its potential liability as a Forward Purchaser. Thus, while there was indeed "bid rigging" with respect to the awarding of the GICs in the Lease-to-Own programs, that rigging was simply the act of seeking additional "courtesy" bidders. These additional bidders were necessary in order to satisfy (at least facially) the safe harbor provision of the United State tax code so that the rates on the GICs would be presumptively treated as "fair market rates."[17]

To be clear, David does not deny that, because courtesy bids were involved in the GIC bidding on those deals, he was a party to bid rigging in criminal violation of the Antitrust laws. However, there is no basis to argue that the issuer suffered *any* loss. In fact, under the Treasury Regulations, the Lease-to-Own transactions could have been closed (and the bonds issued) without CDR having resorted to utilizing courtesy bids. What CDR should have done was disclose to bond counsel that there were no other

---

[16] Jun. 10, 2009 FBI Interview Memoranda, at CDR-ROI-0138. According to the memo, SocGen bids "were 60-70 basis points lower than the next bidders." This seems to be a clear mistake, as the bids were "higher" than the next bidder's.

[17] Treas. Reg. §1.148-6(iii).

49

interested bidders. In that case, the safe harbor presumption would not have been available to the issuer and there would have been a rebuttable presumption that the GICs were *not* acquired at fair market value.[18] The issuer would have then needed an opinion by an expert that the GIC rates were fair market value or some other evidence to overcome that presumption. This would have been the proper course of action. Nevertheless, because CDR failed to follow this course does not mean that the issuers incurred any losses. Accordingly, with respect to those deals, there is no basis to find that there was a loss such that the gain (i.e. the so-called "kickback") should be considered. U.S.S.G. § 2B1.1 application n. 3(B).

### (2)    The SunAmerica Multi-Unit Housing Deals

There is second category of bonds for which the Government seeks to attribute a total loss amount of $3,528,343.97 to David and CDR. Specifically, these were bonds issued by various conduit agencies (described more fully below) and for which the funds raised were to be used for the development of "Section 42" multi-unit housing (hereafter the "Multi-Unit Housing Deals"). "Section 42 housing" refers to low-income housing developed by private developers for which the private developer receives a substantial tax credit. This housing tax credit was created under the Tax Reform Act of 1986 to encourage the utilization of private equity in the development of affordable housing.[19]  In each and every one of these transactions, SunAmerica, Inc., a life insurance company (also a financial services company offering retirement planning and savings products)

---

[18] Treas. Reg. §1.148-6(i).
[19] These transactions are victim identification numbers 025, 064, 081, 103 and 190.

was the credit provider on the bond issue and also won the GIC. During the relevant time period, SunAmerica was the leading investor in Section 42 housing in the United States. SunAmerica also had a lower credit rating than most banks.

For the Multi-Unit Housing deals, CDR set up the structure of the offerings and attracted the participants. For the transaction to work, the bonds had to be secured by a letter of credit, and SunAmerica, because of its understanding of the Section 42 housing market, was best positioned to evaluate the risks of the various loans for the housing and provided the letter of credit at the best cost. CDR acted as the Program Advisor for these transactions, which was disclosed in the bond offering documents, and JP Morgan was the underwriter. Notably, CDR entered into a fee arrangement with SunAmerica, pursuant to which CDR was to receive .25% annually from SunAmerica, based upon the amount of unloaned bond proceeds, in return for having brought SunAmerica into these bond offerings, and also for additional services provided to SunAmerica such as the preliminary underwriting.[20]

CDR was not the GIC broker on these transactions. However, CDR and David were in contact with the broker, Paragon, and discussed with the broker what financial institutions would be bidding, how they expected SunAmerica to win and at what levels the GIC had to be in order for the transaction to work. Importantly, the Multi-Unit Housing Deals involved bonds issued at a variable rate, supported by the SunAmerica

---

[20] An SEC Administrative Proceeding was initiated against CDR regarding the Multi-Unit Housing Deals. As a result of the SEC investigation, the SEC determined that CDR was subject to a conflict of interest in that the Payment Agreements required potential borrowers to submit financial information to CDR for its review and approval before applying for loan approval from SunAmerica. There was no determination, however, that CDR ever did anything wrong except its failure to disclose to the issuers or the borrowers the fee it received from SunAmerica. Most notably, there was no determination that CDR caused a loss to any issuer or borrower. (Ex 99).

letter of credit. Investors in the bonds would look solely to SunAmerica for repayment of the bonds and accordingly the bonds were priced as if they were obligations of SunAmerica. In turn, prior to the date that borrowers were identified and loans were made, SunAmerica could look only to the GIC and its earnings for payment of interest on the bonds or repayment of advances made by SunAmerica. Accordingly, SunAmerica as letter of credit provider required that the GIC bear an interest rate tied directly to the interest rate on the bonds and, therefore, to SunAmerica's credit. The GIC interest rates also had to be sufficient to cover not only the interest costs on the bonds but also have a spread above those costs sufficient to pay all the costs of issuance of the bonds (i.e. trustee fees, remarketing fees, letter of credit provider fees, attorneys' fees, etc). As mentioned, SunAmerica had a much poorer credit rating than a bank, such as BoA, and accordingly, any GIC provider would be subject to potentially greater risks in providing an interest rate that tracked the rate on the bonds. Because of this, Paragon informed CDR that no financial institutions were bidding on the Multi-Unit Housing Deals.[21]  Only SunAmerica was willing to provide the GIC.

Given that SunAmerica was best able to evaluate its own risks (and that a higher rate on the GIC would directly benefit SunAmerica because it would not have to provide additional funds to pay interest on the bonds), it is not surprising that SunAmerica easily won all of the GICs for the Multi-Unit Housing Deals. However, it was *not* because other bidders were deliberately excluded or indications were given that favored SunAmerica to the detriment of other possible providers. Instead, it was because

---

[21] Feb. 26, 2007 IRS Interview with Doug Goldberg, at CDR-ROI-0009-0010 (para. 65).

SunAmerica, the GIC provider, was assuming not only the SunAmerica credit risk but also a timing risk based on when the multi-unit housing loans would originate. As the largest investor in Section 42 Housing in the country, Sun America was comfortable evaluating the credit risks of potential borrowers and Section 42 Housing transactions and the concomitant risk borne by the GIC provider that the loans would not originate timely.

Moreover—and perhaps more importantly—SunAmerica was willing to pay the highest level on the GIC because it was the credit enhancer and most willing to absorb its own risk. In essence, for these unique Multi-Unit Housing Deals, SunAmerica *was* the market. And while other financial institutions were solicited to submit bids to meet the safe-harbor requirements, similar to the Lease-to-Own transactions, those institutions had no real interest and were never going to outbid SunAmerica. There is no basis to argue, therefore, that had there *not* been complimentary or courtesy bids solicited, there would have been a higher rate paid on the GIC. Also, like the Lease-to-Own transactions, had all of this been disclosed, the tax-exempt bonds still could have been issued and SunAmerica still would have paid the same interest rate on the GICs. The issuer, however, would not have had the benefit of the market rate presumption.

Finally, even though CDR assisted in manipulating the bids to the pre-determined SunAmerica rate, CDR also assumed other roles in the transaction for which it earned its 25 basis point fee that resulted in the large payments to CDR. Specifically, as noted in the SEC Cease and Desist Order, CDR was the Program Advisor and undertook certain underwriting duties for which SunAmerica paid it the ongoing fees. CDR did not receive, as the Government appears to argue, a money-for-nothing kickback. Once again, the Government's Loss Calculation Chart paints the picture with too broad a brush. It is

53

certainly inaccurate to impute the $3,528,343.97 of the fees that CDR received as
"unearned kickbacks."

### (3)      The Tennessee Municipal Bond Funds Deals

A third category of pooled financing where courtesy bids were solicited involved
the Tennessee Municipal Bond Fund (bonds issued by Public Building Authorities of
various Tennessee municipalities and collectively called "TMBF").[22]  TMBF is a conduit
agency in the state of Tennessee that creates and administers various types of loan
programs for the benefit of cities and counties in Tennessee.  Bank of America ("BoA")
was involved in several bond offerings involving TMBF.  In many of these offerings,
BoA served several roles including the letter of credit provider,[23] the remarketing agent,
and the underwriter.

Because of the structure of the TMBF transactions, no other financial institution
was as interested in the GIC (or willing to pay as high a rate for it) as BoA was because it
was the letter of credit provider.[24]  Similar to the Multi-Unit Housing Deals, the TMBF
bonds were variable rate demand bonds ("VRDBs").  As VRDBs, the interest rate paid on
those bonds varied and was typically re-set on a weekly basis.  In addition, as "demand"

---

[22] These TMBF transactions are identified by victim identifier numbers 9, 17, 155, 218, 343 and
344 in the Government Loss Calculation.

[23] The letter of credit provider also referred to as the "credit enhancer" in a municipal bond
offering.

[24] While technically BoA did not win the GIC on the TMBF deals, as will be explained further
below, it was essentially the winner because after the winning GIC provider won (at the pre-determined
rates) BoA and the winner entered a total return swap ("TRS").  The TRS is a derivative transaction that
had the effect of transferring the underlying risks inherent in the GIC to BoA.  The "middle man"—the
actual GIC winner as described in the Government Loss Calculation Chart—was effectively paid a spread
to serve in that role.

54

bonds, the bondholders had a right to demand that the bonds be bought back if the bondholder was not happy with the interest rate. It is essential to keep in mind, therefore, that for the TMBF transactions, the bond rates adjusted regularly. More importantly, the bond rate on those bonds was tied to two essential factors: the prevailing market conditions for interest rates generally and the creditworthiness of the letter of credit provider (BoA). The fact that the bond rate was related to the creditworthiness of the letter of credit provider is a simple fact of municipal finance. The letter of credit provider essentially guarantees the bonds to the bondholder. As a result, if a bondholder questions the creditworthiness of the letter of credit provider, the bondholder wants a higher interest rate on that bond because it is considered more risky. The more solid the credit (i.e. the less risk that the letter of credit provider will be unable to make payment on the bonds), the lower the interest rate and vice versa. In fact, bondholders are more interested in the creditworthiness of the credit provider than they are in the creditworthiness of the municipality itself that issues those bonds.

Most importantly, as the letter of credit provider, BoA dictated the bid specifications for the GICs on the TMBF deals. Similar to the Multi-Unit Housing Deals, for each of the TMBF deals, BoA *required* that the variable GIC rate be sufficient to pay the bondholder's interest. Because of this requirement, if BoA's credit dropped (causing the interest on the underlying municipal bonds to go up), the GIC provider had to pay a higher rate on the GIC to cover those bond rates. Thus, the GIC provider was exposed to BoA's credit. If BoA's credit rate went down, the rate on the bonds went up and the GIC rate went up. In addition, BoA explicitly retained the right to accept or reject any GIC

bidder.[25] Because of this, no other GIC providers in the industry were interested in bidding on the GICS.[26]

In the end, BoA was the financial institution most comfortable with that risk. Accordingly, it was willing to pay the highest interest rate on the GICs for the TMBF deals. However, BoA's derivatives desk decided that it could improve the profit on the transaction by indirectly taking the reinvestment risk through the form of a "total return swap" rather than taking that risk directly by acting as the GIC provider. Therefore, David and others at BoA devised a plan to structure the transactions so that other banks would bid on the GICs (even though they had no real interest in those GICs) knowing that BoA would ultimately take the risk through the total return swap, win the bids and then undertake a total return swap with BoA. The total return swap passed the risk on the GIC to BoA without committing capital of BoA, and locked in a small spread for the winning GIC bidder. BoA ultimately became responsible to pay the GIC rates and also received the benefit of utilizing the GIC proceeds. This was all pre-arranged and it was not disclosed to bond counsel for TMBF. Nevertheless, there were no other financial institutions available that were willing to pay more on the GIC than BoA. Ironically, as an *interested* bidder, it was the most aggressive bidder.

For CDR's role in these transactions and David's work structuring the total return swap, CDR was paid ongoing fees totaling $2,001.044.12 that the Government argues are kickbacks. (Ex 104). However, once again, similar to the Lease-to-Own transactions, there is no evidence to indicate that the ultimate winning GIC bidder paid an artificially

---

[25] See bidding specifications for the Public Building Authority of the County of Montgomery and the Public Building Authority of the City of Clarksville attached as Ex 100.

[26] See September 11, 2007 interview of Douglas Goldberg.

suppressed GIC rate to the detriment of TMBF, or that the portion of BoA's profits that were paid to David would have otherwise been paid to the issuer.[27] While admittedly there was wire fraud in that the bid certifications were false and several courtesy bids were solicited for all of these TMBF transactions, there was no loss and, therefore, the gain in the fees received by CDR should not be a part of the 2B1.1 calculation. U.S.S.G. § 2B1.1 application n. 3(B).

Another significant fact ignored by the Government is that CDR received fees from BoA for assuming a part of the risk of these transactions. Specifically, for each of these transactions, CDR paid to third parties, with the issuer's knowledge, a $200,000 one-time fee to assume a portion of the risk on the total return swap.[28] In return, CDR received the ongoing fees depending upon the particular deals. These ongoing fees are a part or the entire amount characterized by the Government as "kickbacks" on the TMBF deals.

### (4)   The Similarities Between All Three Transaction Types

While the structures of these transactions are indeed complex, it all boils down to one simple principle: a financial institution is only interested in unknown or unpredictable problems at another bank or insurance company if it is compensated for taking that risk. Since the GIC provider's compensation comes in the form of the spread

---

[27] Similar to the issuers in the Multi-Unit Housing Deals, TMBF as the bond issuer was a total "pass through" and never received any portion of the GIC monies in any case. The GIC interest was dictated by the bond rate and paid ultimately to the bondholders.

[28] In particular, David undertook some of the risk that the loans would not be timely originated, which would have resulted in unexpected costs to BofA and the GIC providers.

between its costs of funds and the amount that it pays on the GIC, this means that a financial institution bidding on a GIC with unknown or unpredictable problems will bid a lower GIC rate and keep more of the spread for itself. Put another way, a bank or other entity bidding on a GIC is always willing to bid a higher rate if it is only assuming its own credit risk; the best bidder was always going to be the party that understood its own risk. With respect to each of these three categories of transactions, each of the GIC providers was destined to win because each was assuming its own risk due to its respective role and the structure of the transaction. Accordingly, each bidder was best suited to bid the highest level on the GIC and was, therefore, able to dictate what it would pay. In the Lease-to-Own cases, it was SocGen. In the TMBF cases, it was BoA. And with the Multi-Unit Housing deals, it was SunAmerica.

Moreover, these facts were not industry-secrets—all of the professionals in the municipal bond field knew that when it came to these transactions, those key financial institutions were destined to win. There is no evidence whatsoever that other bidders lost out to any of the winners on any of these transactions (unlike others). There is no evidence that for any of these specific transaction types, other bidders were interested in and willing to pay a higher GIC rate.

Additionally, in these highly structured transactions, if it had not been engineered for each of those winning GIC bidders to win, those particular bond offerings would never have come to fruition. Specifically, representatives of SocGen made it clear that if they did not win the GIC, they would not provide the Forward Takeout. Representatives of BoA made it clear that if they did not win the GIC, they would not serve as the credit enhancer on those transactions. And SunAmerica representatives made clear that they

were not willing to be the credit enhancer on these unique, multi-unit housing bonds unless they were also provided the GIC. Thus, without the pre-arranged structure, the bonds would not have been issued. These facts were admittedly not disclosed—and they do not make David or his co-conspirators any less guilty—however, they do significantly undercut the Government's argument that any bond issuing agency lost money.

                **b)**     **Because The Purported Victims Are All Conduit Agencies, There Can Be No Loss**

On top of the fact that the Lease-to-Own, TMBF and Multi-Unit Housing Deals only had one truly interested GIC provider (and, therefore, the interest rates were not suppressed in favor of one provider over another), there is another significant similarity between all of those transactions. Specifically, the fact that each of the entities that issued the bonds in those three transaction-types was acting as a "conduit agency" is an important factor that the Government has ignored when it comes to loss.

In some cases, a governmental entity (or entities) issue municipal bonds for the purpose of making proceeds available to a private entity in furtherance of a public purpose, such as in connection with not-for-profit hospitals, affordable housing, and many other cases. These are called conduit bonds. Conduit agencies, as they are called in the area of municipal finance, are separate legal entities often formed for administrative convenience and for the issuance of tax-free municipal conduit bonds. The conduit agency is restricted by federal tax law to a fixed, up-front fee that it receives when the bonds are issued (and sometimes a percentage of the outstanding bonds in each

year that the bonds remain outstanding).[29]  The agency does not receive any portion of the GIC, but instead earns its issuance fee from rates it charges the conduit borrowers.

Moreover, these three classes of financings are also examples of what are called a "blind pool"—at the time that the bonds were issued, the actual users of the bond proceeds were not identified or obligated to make any payments on the bonds.  The earnings on the GIC are used to pay the interest on the bonds until the private entity (or ultimate governmental borrowers, in the case of the TMBF transactions) that will ultimately receive the bond proceeds assumes the obligation to pay the bond holders (and the GIC is thereafter irrelevant).  Thus, not only does the conduit agency not benefit from the GIC investment, the ultimate users also do not benefit from the GIC investment.

An example of a conduit agency is the Capital Trust Agency ("CTA").[30]  CTA is an inter-local agency located in Florida formed by the City of Gulf Breeze and the town of Century, Florida.  One of the public purposes for which CTA issued bonds was for multi-family affordable housing.  CTA raised the money, however, before there were identifiable, specific projects for that money.  The money was raised in the bond issuance and the GIC interest was used to pay the bond-holders until a private developer came along and took the bond proceeds to build housing, at which point that builder was responsible to pay back the bonds.  Neither CTA, nor the City of Gulf Breeze or the town of Century had an obligation ultimately to pay back the bonds once the private developer took over the project.  CTA was little more than a pass-through—it had no interest in the

---

[29] Treas. Reg. §1.148-2(d) generally sets forth the limits that issuers can earn on investments, including conduit loans.

[30] The CTA is one of the entities identified as a victim on the Government Loss Chart. (See Government Loss Chart at p. 1, victim identification number 25).

GIC rate since the GIC rate had no effect on what CTA was paid. Nonetheless, the
Government has identified a whopping $1,692,902.36 that it alleges was a "kickback"
that should be used in the loss calculation attributable to David and/or CDR because these
were purportedly the fees that CDR received for structuring the Multifamily Housing
Adjustable/Fixed Rate Revenue Refunding Bonds (Summer Park Apartments) Series
1999d-1 and Series 1999d-2. Once again, the Government wants to include this fee
received as a "gain" in lieu of a loss even though it has not established that there was any
basis to demonstrate the courtesy bids on those transactions caused a loss. More
importantly, the Government identifies CTA as a "victim" even though it had no
economic interest at all in the GIC rate; indeed, the GIC rate did not affect it at all.

### 2. The Broker Fees Should Not Be Included in the Loss Calculation

One significant piece of the Government's loss and restitution calculations are the
broker fees paid by the issuers to CDR, totaling $4,271,672.00. There is a fundamental
flaw, however, in this argument. It is indisputable that the issuers would have paid
broker fees to brokers *not* involved in the conspiracy even if the fraudulent bid-rigging
scheme had never occurred. In other words, as the Government itself noted early in this
matter, the bidding process was a part of the safe harbor requirements under the internal
revenue code. (See Superseding Indictment at ¶¶ 11-12) The bidding process and,
therefore, the use of GIC brokers, had to be undertaken in order to qualify these bonds for
the safe harbor provisions of the tax law. The fees that were paid for the brokering

61

services were set by Treasury Regulations and depended upon the size of the deal.[31] Accordingly, regardless of the fraud, the broker fees were a cost that the issuers *had* to incur.[32] There is no evidence at all that either (a) the issuers would have undertaken the GIC broker function internally had they known about the fraud, or (b) that any issuer ever incurred the cost and expense of re-bidding GICs that had previously been brokered by CDR or its co-conspirators as a result of the fraud.

Despite this Court's specific holding when sentencing the defendants against whom David testified in the matter of *United States v. Peter Ghavami et al.* (10-cr-1217), (see July 23, 2013 Tr. 13:1-13 *citing United States v. Canova*, 412 F.3d 331, 353 (2d Cir. 2005)), the Government still insists that broker fees are a loss to be considered both in the Guidelines calculation and in the restitution amount. The Government is wrong. Whether the bids were rigged or not, CDR and its employees provided brokering services for the issuer for whom investment agreements were awarded, bonds were issued and funds were dispersed. None of the transactions for which CDR conducted a bid were ever declared taxable or otherwise invalidated as a result of bid rigging.

This Court's position with respect to the broker fees was also supported by the Honorable Harold Baer, Jr. in his decision rendered during the sentencing hearing of the defendants in *United States v. Dominick Carollo, et al.* (10-cr-654). There, Judge Baer

---

[31] Tres. Reg. §1.148-5(e)(2)(iii) sets a maximum amount of GIC broker fee that may be treated as a "qualified administrative cost." As a practical matter, that regulatory maximum has become the standard fee for GIC brokers

[32] The fact of the matter is that the broker fees were borne by the winning GIC provider. However, the amount of the fees to be paid were disclosed to the bidders and taken into account when determining the rate they would bid on the GIC (i.e., they would reduce the rate to make up for the payment of the GIC broker fee).

62

specifically noted: "[t]he Government reveals the tenuousness of its position when it states that the full amount of the brokers' fees should be counted as a loss because the contracts at issue in this case which provide the issuers with interest payments were worthless to the issuers. The GICs are not worthless; they are simply undervalued. I am therefore rejecting the loss calculation enhancement." (*Carollo* 10/18/12 Tr. at 49). Thus, the broker fee was not a loss to the victim issuers and accordingly does not justify either inclusion in the 2B1.1 loss amount or any restitution order. *United States v. Eisen*, 1991 WL 180403, at §1 (E.D.N.Y. Sept. 3, 1991)("[A] victim cannot be compensated for moneys which it would have parted with in any event."); *see also, United States v. Sang*, 512 Fed. Appx. 103, 104 (2d Cir. 2013); *United States v. Kamadeen Idowu Oladimeji*, 463 F.3d 152, 158 (2d Cir. 2006).

### 3.    The Swap Fees Should Not Be Included in the Loss Calculation

The Government has also included the swap fees paid to David and CDR as part of its loss calculation, amounting to $830,000. However, the evidence at the *Carollo* trial established that swap fees are a normal part of the GIC industry. (*Carollo* Tr. 562; 2398-9). After a provider wins a GIC, it enters into a swap with a counterparty as an "insurance policy" to protect against risks such as interest rate fluctuations. The provider decides the type of swaps it wishes to pursue (e.g. fixed rate to variable rate swap, variable rate to variable rate) and what counterparty to use. The cost of the swap is borne by the provider and *not by the issuer.* Indeed, there was no evidence presented that the swaps had any effect on the issuers at all. In fact, of the two issuers that testified at the *Carollo* trial, neither indicated that they had any expectation at all about whether the

63

providers would enter a swap or whether any fees would be paid in connection with the swap. (*Carolla* Tr. Tr. 2617).[33]

### 4. The Losses Due to Fraudulently Lowered Interest Rates Must Be Specified

The Government has also included losses due to fraudulently lowered interest rates that amount to $1,317,495.76. It is absolutely correct that justified losses due to fraudulently lowered interest rates constitute losses that should be taken into account. However, David should have the opportunity to review the various facts that give rise to the claim that there were fraudulently lowered interest rates in each particular transaction alleged, and the calculation of the amount of those losses, rather than just accept *ipse dixit* the Government's proclamation that he owes almost $1.4 million. This is more important, however, for the sake of the restitution analysis. (See below). As stated previously, for the purposes of a Guidelines calculation of loss and what level of enhancement is appropriate under the 2B1.1 loss chart, even if we accept, *arguendo,* that the fraudulently reduced interest rate losses imputed to David are indeed as large as $1,317,495.76, as alleged by the Government, his loss enhancement is only 16 points rather than 20 assuming that the swap fees, broker fees and kickbacks are removed. *Compare* 2B1.1(b)(1)(I) and (K).

---

[33]    Q:    Mr. Gibbs, do you remember being asked about hedging on cross-examination?
        A:    Yes.
        Q:    Would you want to know if there were other fees paid to brokers that affected the rates that a provider bid on this GIC?
        [Objection overruled]
        A:    No, I mean that's the provider's side of the equation.

### 5. The PSR Improperly Includes an Enhancement for More Than 50 Victims

As set forth above, the Government alleges losses to which we do not agree. If the Court accepts our arguments, and those loss allocations are removed (i.e. swap fees, broker fees, gains on the Lease-to-Own transactions, etc.), the number of issuers that "lost" money declines significantly. Because a victim is defined as an entity that lost money, *see* 2B1.1, App. n. 1, even accepting the fraudulently reduced interest rate category (and, once again, we accept the category but not necessarily the number calculated by the Government), the entities that lost money (and are, therefore, victims), becomes 36 entities rather than 99. Accordingly, there were more than 10 but less than 50 victims and David's Guidelines enhancement for the number of victims should be 2 rather than 4 levels. *Compare* 2B1.1((b)(2)(A) and (B), App. Notes.

### C. Regardless of the Guidelines Calculation, the Court Should Depart Downward

A downward departure from the resulting Guidelines range is warranted on three separate grounds: first, under U.S.S.G. § 5K2.0(a)(1) because of circumstances not contemplated by the Guidelines,



; and, third, under U.S.S.G. § 2B1.1 (App. Note 19), because the total offense level overstates the seriousness of the offense.

65

### 1. The Court Should Depart Downward Under U.S.S.G. § 5K2.0(a)(1)

18 U.S.C, § 3553(b) and U.S.S.G. § 5K2.0(a)(4) also explicitly authorize sentencing courts to depart downward from the otherwise applicable Guidelines range based upon offender characteristics or other circumstances of a kind and degree, not adequately taken into consideration by the Sentencing Commission and that are exceptional. Indeed, even before the Supreme Court rendered the Guidelines advisory in *United States v. Booker*, the Second Circuit plainly stated that "when a sentencing court determines the circumstances related to family ties and relationships are extraordinary, the Guidelines do not bar it from considering them as a basis for a downward departure." *United States v. Galante*, 111 F.3d 1029, 1033 (2d Cir. 1997) *citing United States v. Sharpsteen*, 913 F.2d 59, 63 (2d Circ. 1990); *United States v. Londono*, 76 F.3d 33, 36 (2d Cir. 1996) and *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992).





---

[34] Benjamin is prescribed a medication for his ticks that he takes on a daily basis as prescribed by a neurologist.



(Letter of Tracey Goldstein at p. 3-4, Ex 9).



b)      **Gail's Survival is a Result of David's Dedication to Her**





70

procedure to stop the bleeding. Joey and I made trips to and from the hospital visiting Gail during these episodes, not knowing if this was going to be the beginning of the end of her life. This time period was so frightening for all of us. We met up with David each time and tried to support he and Gail in any way we could. David was always the pillar of strength. Every step along the way David was present to make every decision, listen to every opinion, as well as to support, care for, calm, and love his wife.

(Letter of Tracey Goldstein at p. 2, Ex 9).















Finally, while some of the sentences given to other co-defendants in this bid
rigging conspiracy might suggest a prison sentence, we remind the Court that the
Supreme Court itself recognized long ago that "the punishment should fit the offender
and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). This court

should consider not only David's criminal conduct, but also his unique and tragic family circumstances in determining whether to sentence him to a term of incarceration.







### 3. The Court Should Depart Downward Under U.S.S.G. § 2B1.1 Because the Total Offense Level Substantially Overstates the Seriousness of the Offense

U.S.S.G. § 2B1.1(b)(1) itself authorizes a court to depart downward where "the offense level determined under [that] guideline substantially overstates the seriousness of the offense." U.S.S.G. § 2B1.1 (App. Note 19(C)). While we in no way attempt to undercut the seriousness of the offense, nevertheless, the resulting high offense level here substantially overstates the seriousness of David's crime. *Id.* (*See also* PSR ¶ 78).

As observed in *United States v. Adelson,* the Guidelines place "inordinate emphasis" in fraud cases on the amount of actual or intended financial loss. *United*

80

*States v. Adelson*, 441 F.Supp. 2d 506, 509 (S.D.N.Y. 2006), *conviction aff'd* 237 F.

App'x 713 (2d Cir. 2007). The Guidelines, "in an effort to appear 'objective,' tend to

place great weight on putatively measurable quantities, such as the weight in narcotics

cases or the amount of financial loss in fraud cases, without, however, explaining why it

is appropriate to accord such huge weight to such factors." *Adelson,* 441 F. Supp. 2d at

509. "In many cases ... the amount [lost] is a relatively weak indicator of the moral

seriousness of the offense or the need for deterrence." *United States v. Emmenegger*, 329

F. Supp. 2d 416, 427 (S.D.N.Y. 2004).[35]

The "heartland" offense, which governs all theft and fraud offenses under § 2B1.1

is the outright stealing of funds regardless of the means. David's offense, however, was

to illegally rig bids in favor of certain providers over others. While undercutting

competition and transparency in the markets is a serious and significant offense, the

amount of the losses here is far from clear. Indeed, despite the enormous time, energy

and resources dedicated to pursuing this matter, and the praiseworthy recovery by the

Antitrust Division of more than $1 billion, the loss with respect to Mr. Rubin is, we

contend, less than $2 million. To be clear, even if the loss is established to be that

amount (as opposed to the $18.5 million argued by the Government), it is nevertheless a

significant and serious monetary damage. But these were not funds, for example, stolen

by Mr. Rubin from the retirement accounts or savings accounts of individuals. In a

worst-case scenario, these were reduced returns that might have otherwise been made by

---

[35] *See also* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker,*
20 Fed. Sent. R. 167, 171 (Feb. 2008) (criticizing fraud loss Guidelines for "fail[ing] to distinguish between
defendants who intend to steal or cause economic harm to others and defendants who, though guilty of
criminal conduct, cause losses they neither desired nor perhaps even foresaw.")

municipalities or municipal agencies on their bond proceeds. In addition, for a
significant number of transactions, the bid-rigging involved what has been identified as
the "last look up." In other words, the winning GIC bidder was told that if they did not
bid more, they would lose the GIC and, as a result, that bidder actually increased their bid
above what they intended.

While David is responsible, along with others, for his part in certain losses in
several transactions (i.e. where there was evidence of a deliberately lowered GIC interest
rate), it cannot be denied that David and CDR had a great deal of positive impact in the
industry. CDR was involved in more than 5,000 bond offerings and/or municipal
reinvestments. In addition, CDR played a large part in expanding the municipal
reinvestment business over the years in that David was responsible for bringing many
new insurance companies and banks into the GIC arena that had not previously been
involved in the industry. For example, when CDR brought Security Life of Denver into
the GIC marketplace as a provider, AIG immediately increased their rate with respect to
float contracts in an effort to try to prevent Security Life from winning.

Some of the large financial institutions that CDR brought into the GIC
marketplace were: Transamerica, Capital Holdings, Inc., Manufacturers Life, Aegon
Insurance, SunAmerica, Mony, XL Financial Products, Crown Life Insurance Co. and
Posti Panki.

Don Boulanger, retired senior corporate executive of ███████, makes this
very point in his letter to the Court. He describes how David, as a young broker,
contacted Boulanger in his capacity as Chief Investment Officer for ██ with a proposal

to assist ███████ n securing GIC deposits from 401K plans. He explains how at the

time, there were only a few insurance company GIC providers:

> Prior to ███ entry into the GIC market, there had been only a
> few companies prepared to take 401K GIC deposits. ███ s
> entry into the market, encouraged by Mr. Rubin, resulted in
> increased players in the industry and ultimately resulted in
> improved pricing for the GIC depositors. This improved
> pricing is expressed in interest basis points and the
> competition provided by ███ s entry had the effect of
> increasing the basis points paid on GIC deposits by several
> basis points. Since the volume of GIC's outstanding at the
> time was about $500 billion, each basis point increase paid on
> GIC deposits increased the income paid to the 401K plans by
> approximately 50 million per year. Thus, it can be said that
> Mr. Rubins' assistance that led to ███ s entry into the GIC
> market, resulted in hundreds of million dollars in increased
> annual benefits to the working men and women participating
> in 401K plans.

(Letter of Don Boulanger at p. 1-2, Ex 20).

Victor Modugno, a former executive at ███████ also acknowledged that

David brought more players into the GIC market. In a panel presentation by the Society

of Actuaries in San Diego in June 2000, Modugno, the moderator, introduced the featured

speaker, David Rubin, as follows:

> David Rubin, our featured speaker, will follow with more
> details on what insurers are doing in the market today. We are
> very fortunate to have David as a speaker. Not only is he an
> innovator and leader in municipal reinvestment, he also works
> with life insurers in this market and was instrumental in
> getting ████████ in this market in 1990 as well as other
> insurers. David Rubin is the president of Chambers, Dunhill
> Rubin & Co. (CDR), which he founded in 1986. CDR has
> completed over $55 billion in contracts since its inception.
> CDR has evolved into a multi-faceted capital markets group.

(RECORD, Volume 26, No. 2, Society of Actuaries, San Diego Spring Meeting, June 22-

23, 2000) Exhibit 101).

While his reputation and legacy may now be damaged beyond repair, it cannot be denied that, on a whole, David's and CDR's impact in the world of municipal finance was more positive and productive than it was damaging. In fact, Brian Hudson, the Executive Director and CEO of the Pennsylvania Housing Finance Authority, an entity that the Government has listed as a victim of David's crimes, specifically notes, "[w]hile I am aware of and do not condone the offenses against Mr. Rubin, throughout our relationship I have found Mr. Rubin to be a very professional individual. Mr. Rubin assisted [the Pennsylvania Housing Finance Agency] in structuring our portfolio that generated millions of savings for our organization. Mr. Rubin's advice was proven invaluable to PHFA during the housing crisis, it provided flexibility to restructure its position, again saving millions."

Thus, without minimizing his offenses, there is some irony in the fact that David Rubin is now convicted of violating the Antitrust laws with respect to the municipal reinvestment market when, in a significant way, he also was responsible for adding myriad new players to the market, thereby increasing competition many times over.

In addition, the Government concedes that the gross amount of all state and federal settlements *exceeds* the amount that the specific victims of CDR's crimes are entitled to for court-ordered restitution. In other words, the victims, as a group, have received far more monetarily than they lost. However, because the state and federal government agencies that recovered this money apparently did not coordinate sufficiently to insure that all victims received their fair share of the pie, some victims received more than they were entitled to, and others received less than they were entitled to (accepting, for the sake of this argument, the Government's loss calculations). The Government's

84

failure to coordinate with the other state and federal agencies has now lead to an effort to seek the difference directly from Mr. Rubin. While clearly Mr. Rubin has committed crimes and has no one to blame for his current predicament but himself, there is a fundamental injustice in forcing him to personally pay again for that which was already paid for by others.

After lengthy discussions with the Government, Mr. Rubin has determined not to object to certain enhancements. However, we note that application of the Guidelines enhancements for Abuse of Trust (3B1.3) (+ 2 points), Sophisticated Means (2B1.1(b)(10(C)) (+2 points) and Organizer or Leader (3B1.1(a)) (+4 points), has the effect of piling on offense level points to such an exaggerated degree that they substantially overstate the seriousness of David's offense conduct. For example, while the Organizer or Leader enhancement may apply under the letter of the law, it inaccurately gives the impression that Mr. Rubin was the head of a solely criminal organization like *La Cosa Nostra,* for instance. Mr. Rubin was the head of CDR, which, although it engaged in illegal conduct with his knowledge, was an otherwise legitimate business. To enhance his sentence by 4 points for this role alone, literally adds five additional years in prison to his Guidelines range according to the sentencing chart. Such a drastic enhancement is excessive and unwarranted. Without minimizing David's offense, which was serious, the recommended Guidelines sentence does not fit David's crime. Here, the Guidelines calculation is skewed far beyond what is appropriate under the circumstances of this case.

### D.    The Consideration of 18 USC 3553(a) Factors Justifies A Non-Guidelines Sentence Regardless of The Downward Departures

It is well settled that once this Court determines the appropriate Guidelines calculation, it must then turn to what has been referred to as the "bedrock" of all federal sentencing, 18 U.S.C. § 3553 (a) (" 3553(a)");  *United States v. Gupta*, 904 F.Supp.2d 349, 353 (S.D.N.Y. 2012).  In addition to the downward departures that are warranted for the reasons set forth above, there is an independent basis for a variance from the Guidelines range under 3553(a).

The Second Circuit has never given specific guidance as to what weight should be given to the advisory Guidelines range or the factors enumerated under § 3553(a).  It is up to the court's discretion to determine what is reasonable under the circumstances of each case. *United States v. Pope*, 554 F.3d 240, 246-247 (2d Cir. 2009) (internal quotations omitted) ("Generally, if the ultimate sentence is reasonable and the sentencing judge did not commit procedural error in imposing that sentence, we will not second guess the weight (or lack thereof) that the judge accorded to a given factor or to a specific argument made pursuant to that factor.")  Simply put, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.  In this case, where David Rubin's history and character references are exceptional—he has lived a positive life filled with generosity and works of kindness for others, has been an outstanding son, father, husband and friend, has otherwise contributed significantly to his community, and has already suffered significant damages as a result of his own misconduct—we submit that the 3553(a) factors weigh in favor of a

non-Guidelines sentence that does not require incarceration. The seven factors set forth

in 3553(a) are:

- the nature and circumstances of the offense and the history and
  characteristics of the defendant. 18 U.S.C. § 3553(a)(1);

- consideration of the general purposes of sentencing, including: "the need
  for the sentence imposed—"(A) to reflect the seriousness of the offense, to
  promote respect for the law, and to provide just punishment for the offense;
  "(B) to afford adequate deterrence to criminal conduct; "(C) to protect the
  public from further crimes of the defendant; and "(D) to provide the
  defendant with needed educational or vocational training, medical care, or
  other correctional treatment in the most effective manner." § 3553(a)(2);

- "the kinds of sentences available," 18 U.S.C. § 3553(a)(3);

- the Sentencing Guidelines," 18 U.S.C. § 3553(a)(4);

- any relevant policy statement issued by the Sentencing Commission, 18
  U.S.C. § 3553(a)(5);

- the need to avoid unwarranted sentence disparities, 18 U.S.C. § 3553(a)(6);
  and

- the need to provide restitution to any victim. 18 U.S.C. § 3553(a)(7).

*Gall v. United States*, 552 U.S. 38, 49-50, fn. 6.

### 1.    The Nature and Circumstances of the Offense and the History and Characteristics of The Defendant (3553(a)(1))

#### a)    The Nature and Circumstances of the Offense

David's role in the offense is indisputable in that he has pleaded guilty and even

testified at trial on behalf of the Government. However, some degree of background for

perspective is warranted.

Until 1985, the IRS did not require any bidding for investments. Starting with the

1985 Temporary Regulations, the IRS generally required bidding for GIC investments for

a specific type of bond issue (so-called "private activity bonds" that were subject to IRS

rebate).[36] These rules did not apply to investments of bond proceeds in other cases. In fact, the 1989 Temporary Regulations specifically did not require bidding for GICs, but instead provided that GICs purchased with bond proceeds were to be valued at their outstanding principal balance.[37] In the absence of any bidding requirement, GIC brokers often solicited GIC providers and reported back to issuers with a single, best price. Issuers would then decide on their own whether that price or rate was acceptable to them.

In 1992, however, the IRS indicated that it was aware of "abuses involving investment of gross proceeds in securities or contracts that provide a guaranteed rate of return (commonly referred to as 'guaranteed investment contracts')."[38] Shortly thereafter, the IRS adopted regulations requiring a *bona fide* solicitation for GICs and receipt of at least three qualifying bids.[39] Where the GIC had a yield that was more than 25 basis points below the yield on the bonds, no bidding was required,[40] and accordingly, in those cases, GIC brokers could continue to bring in a single price that the issuer could accept or reject. It was only in 1996 that the general structure we currently have for

---

[36] Temp. Reg. §1.103-15AT(d)(6)(iii) (1985).

[37] Temp. Reg. §1.148-2T(d)(5) (1989). It should be noted that the 1989 Temporary Regulations replaced the 1985 Temporary Regulations.

[38] FI-66-89 Allocation and Accounting Rules on Tax Exempt Bonds for Arbitrage Rebate Purposes, January 30, 1992.

[39] Treas. Reg. §1.148-4(e)(4(i) (1992).

[40] Treas. Reg. §1.148-4(e)(4)(ii) (1993).

bidding was proposed,[41] and that was modified in 1998 to include the requirement of "no last looks."[42]

After the Treasury regulations were put in effect, David, along with his co-conspirators, deliberately subverted the regulations by assisting certain providers in winning investment agreements and working around the Treasury bidding regulations. Specifically, he and his co-conspirators rigged bids by: providing "last looks" to certain favored providers thereby allowing those providers to win; building the bid list so that certain providers were more likely than others to win investment agreements; and soliciting bids from providers that were not able to offer suitable rates or services so that other providers would win the contracts. After the investment agreement contracts were awarded, other CDR employees with David's knowledge falsely certified that the bidding process had been conducted in a *bona fide* manner (Mr. Rubin signed a few such certifications). Although David was not usually involved in the day-to-day bid rigging, he was aware that it was occurring, he did not instruct his employees to cease doing it and, on occasion, he directly participated in it. As David states:

> I cut corners and I did things that I knew were improper and wrong, but I did them anyway and I let my employees do them as well. When I ask myself why, all I can say is, I thought I knew better – whether it was ego or greed. Like anything, there was some level of both. The bonds were issued, the buildings were built, the banks were making money, we were making money, people were working and it all seemed great. I see things now with a clarity that I simply did not have before. I hid things from people and did not disclose facts properly because I thought I knew better and I thought no one

---

[41] FI-28-96 Arbitrage Restrictions on Tax-Exempt Bonds (June 26, 1996).

[42] T.D. 8801 Arbitrage Restrictions on Tax-Exempt Bonds (December 30, 1998).

> was really being hurt.  This was wrong, and I am ashamed of
> my conduct and my attitude at that time.

(Letter of David Rubin at p. 1, Ex 1).

Any crimes such as these that undercut competition, threaten the purity of our capital markets and cost municipalities money are serious.  However, the reasons set forth previously regarding why the Guidelines calculations overstate the seriousness of the offense, must also be considered when this Court evaluates "the nature and circumstances of the offense" as required under 18 U.S.C. 3553(a)(1).  In particular, as previously stated, the Government has collected more money from the wrongdoers than losses actually caused by them.  Moreover, Mr. Rubin's conduct did not cause people to lose their jobs, retirement accounts or substantial sums of personal wealth.  This was not a Ponzi scheme, for example.  Finally, these crimes occurred largely more than ten years ago in an industry that was in flux.  Had David's conduct occurred before the Treasury regulations changed in many of the transactions, he would not have been guilty of federal crimes.  Before the regulations changed, a broker could and did serve as a middle-man to secure a GIC provider for a municipality without the need to solicit multiple bids (except in limited circumstances).

In addition, while he is indeed guilty of federal crimes, his work in the municipal bond industry on balance was positive.  He should receive some credit for the fact that most of CDR's work was not based on fraud.  The vast majority of the deals in which CDR was involved and its work in the industry was positive and productive and resulted in the development of municipal projects that had a constructive impact.  All of this

should be considered when the Court considers as it must "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1).

### b)   The History and Characteristics of David Rubin

18 U.S.C. § 3662 provides that "no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court . . . may receive and consider for the purpose of imposing an appropriate sentence." *See also Pepper v. United States,* 131 S. Ct. 1229 (2011) ("We have emphasized that 'highly relevant — if not essential — to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.'") (citations and quotation omitted).

As evidence of David's background, and as a testament to his character, the Court has been provided with more than eighty letters that were submitted to the Court on his behalf.[43] Friends, relatives, neighbors, co-workers and even one of the victims have personally drafted these letters. These people all stand behind David despite full knowledge of his conduct and conviction. As the letters make clear, all of these people believe in the power of David's redemption and want to educate the Court on the value of David's life as a whole. All of them beg for some degree of mercy from the Court on behalf of David, his wife Gail, and their seven children.

David's has been described as: "a devoted husband and a dedicated father," (Letter of Rabbi Moshe Dear at p. 2, Ex 26); "a true civic minded business leader," (Letter of Brian Dror at p. -, Ex 27); "a positive, responsible and caring person" (Letter

---

[43] Those letters have been submitted in a separate binder that is individually tabbed with a table of contents for the Court's convenience.

of Christopher Clarke at p. 1, Ex 22); "energetic, friendly and a delight to be around"
(Letter of Dr. Ernest Agatstein at p. 1, Ex 13); a "mentor" (Letter of Christian A.
Albacarys at p. 1, Ex 14); a "father figure" (Letter of Frank B. Chang at p. 1, Ex 21); an
"incredible warm, likeable and respected member of [his] community," (Letter of Steven
J. Berger at p. 1, Ex 18); and a "generous person who truly wants to do something good
for society. (Letter of Marc Gelman at p. 1, Ex 31).

     It is not the sheer number of letters that impresses, but the deliberate care and
consideration that was obviously invested by each individual author.  And while some are
more eloquent then others, all of them clearly speak to one or more positive character
traits that David has exhibited during the course of his 52 year life.  David's history and
characteristics are extremely positive.  David Rubin has done far more good in this world
than bad.

           **c)**    **The General Purposes of Sentencing Will Be Satisfied
By A Sentence Substantially Below the Advisory Guidelines
Range 3553(a)(2)**

     Title 18 U.S.C. section 3553(a)(2)(A)-(D) instructs courts to seek the following
goals through sentencing: (i) to reflect the seriousness of the offense, to promote respect
for the law, and to provide justice for the offense; (ii) to afford adequate deterrence to
criminal conduct; (iii) to protect the public from further crimes of the defendant; and (iii)
to provide the defendant with needed educational or vocational training, medical care, or
other correctional treatment in the most effective manner.  18 U.S.C. § 3553(a)(2)(A)-
(D).

     David has acknowledged the seriousness of his offense and exhibited true
remorse.  Others have observed David's genuine regret for his conduct as well:

- Let me be quite clear, no one is more ashamed of what transpired than David Rubin himself and he will be the first to tell you that what he did cannot be defended. But a human being's shortcomings, your Honor, must not be allowed to wipe out years of unstinting good deeds on behalf of those less privileged. (Letter of Marvin Hier at p. 1, Ex 37).

- Our conversations make it clear that he has truly been humbled. He is filled with remorse for his violation and is working seriously to repair himself. There is no question in my mind that he has learned his lesson and that he is absolutely incapable of repeating his offense or anything similar." (Letter of Chaim Seidler-Feller, Ex 76).

- David and I have discussed his wrongdoing. He knows he made bad judgments. He is not above working hard for redemption. (Letter of Herb Mendelsohn, Ex 56).

- On more than one occasion, [my father] has said, "Stevey, I did wrong. Learn from my mistakes." I have learned the importance of always disclosing every detail, no matter how big or small it might be to me. I have heard over and over that you must not skirt around the legality of issues-my father has said more than once, " don't make excuses, if it doesn't feel right, go with your gut. It just is not worth it, Steven. What is right is right and we no better. (Letter of Steven Rubin at p. 1-2, Ex 5).

A sentence here that does not require imprisonment will still reflect the

seriousness of the crime, promote respect for the law and also serve the twin penal goals

of specific and general deterrence. The public is at no risk of further crimes being

committed by David Rubin.[44] David has forfeited his license as a Certified Financial

Analyst and no longer serves as a GIC broker. Courts have held the requirement of

specific deterrence satisfied when the "[e]limination of the defendant's ability to engage

in similar or related activities ... and the substantial loss of assets and income resulting

from [his crime] have decreased for the foreseeable future his ability to commit further

---

[44] In contrast, at the sentencing of Mr. Wolmark before Judge Baer, Probation noted that it could not be sure that Mr. Wolmark would not commit further crimes despite his plea. The same was not said for David in this case.

crimes of the type he was tempted to undertake ..." *United States v. Gaind*, 829 F. Supp. 669, 669 (S.D.N.Y. 1993).

In the years since David's bid rigging ███████████████████████████████████ working in other businesses. CDR, which once generated over $20 million per year in gross revenue, is now worthless. As a corporation, it is a convicted entity facing a criminal sentence. As far as CDR goes, David's lifetime of work has been lost.

Moreover, several people who work with David now describe a different man than the one embroiled in this bid-rigging conspiracy more than ten years ago. Jonathan A. Victor, a Stanford Law School graduate who never practiced law but who has worked with David since 2007 states: "I am uniquely positioned (due to my business dealings with David) to attest to the fact that he takes extreme care to make certain that everything he does is done in the proper manner. Notably, we started working together *after* this investigation started. I want the Court to know that now in his day-to-day business, David takes extreme care to make sure everything we do is proper, undertaken with integrity and does not push any limits. I firmly believe he has learned his lesson well, and will never repeat his past mistakes." (Letter of Jonathan A. Victor at p. 1, Ex 85).

With respect to general deterrence, certainly no one could look at what David Rubin has suffered and say that his criminal conduct was worth it. He has spent nearly the last eight years with this investigation and prosecution hanging over his head (the search warrant at CDR was executed in 2006). The public shame and embarrassment of this high profile investigation and prosecution has been real. Despite his previous stature in his community, David is now a convicted felon who has had to humbly ask friends,

94

family and neighbors for letters of support in anticipation of being sentenced for a federal crime. That act alone has been humiliating and humbling. The Rubin name, of which he had been so proud, has been forever sullied.

While David is still financially sound, it is not an understatement to say that this criminal proceeding has taken a devastating monetary toll on David and his family, as evidenced by the Cohen Affidavit which reveals the substantial reduction in David's charitable donations over the past several years. He has spent more than $8 million defending himself and others. Unlike the *Ghavami* defendants, who were indemnified by UBS, and the *Carollo* defendants, who were indemnified by GE Capital, David Rubin is CDR. There was no bank or large financial institution to indemnify the costs of his defense and the defenses of his co-defendants Stewart Wolmark, Evan Zarefsky, and the company, CDR. David has paid these expenses out of his personal family assets. In the end, the large profits that the Government attributes to the kickbacks are really gross profits. They do not in any way account for the costs of running the business or the payment of taxes. Financially, David lost more on these transactions than he ever earned when all the costs of defense and penalties are added into the mix. Finally, David has already restrained a sum of $3 million (on agreement with the Government) that was set aside for the possible payment of fines and/or restitution. Clearly, while we disagree that the enormous $11.5 million sum in restitution is warranted, we expect that the Court is likely to order some amount of restitution.[45]

---

[45] Neither the Government nor David has ever conceded that his fine, restitution or both together would ultimately be more or less than $3 million.

In short, in both a specific and general deterrence analysis, it is clear that David

Rubin will never again commit such a crime and if he receives a non-prison sentence, no

one could argue that David was *not* severely punished for his illegal conduct. A non-

prison sentence would still promote respect for the law under these circumstances.

### d)   The Kinds of Sentences Available 3553(a)(3)

Another factor to be considered by this Court is the kinds of sentences available.

The Court is not restricted only to a sentence of imprisonment. This Court has the

authority and may exercise its discretion to consider a wide range of alternatives to a

lengthy term of imprisonment as suggested by the Guidelines. 18 U.S.C. §§ 3553(a)(3),

3561(a)(1). In fact, § 3553(a)(3) specifically directs the Court to consider sentences

*other than* imprisonment and the severity of probation or home confinement should not

be underestimated. As the Supreme Court in *Gall* stated:

> We recognize that custodial sentences are qualitatively more
> sever than probationary sentences of equivalent terms.
> Offenders on probation are nonetheless subject to several
> standard conditions that substantially restrict their liberty. *See
> United States v. Knights,* 534 U.S. 112, 119 (2001) ('Inherent
> in the very nature of probation is that probationers do not
> enjoy the absolute liberty to which every citizen is entitled.')
> (*quoting Griffin v. Wisconsin,* 483 U.S. 868, 874 (1974))

552 U.S. at 848 (footnote omitted).

The Court may also consider a period of home confinement. U.S.S.G. § 5F1.2

(Commentary). Home confinement in the federal system ranges from a nighttime curfew

to a 24-hour-a-day 'lock down', community service, probation or any combination of the

96

above.[46] The extent to which individuals are permitted to leave their residence is determined on a case-by-case basis, depending on the goals of supervision and the orders of the court.[47] If the Court determines that the "amenities available in the residence of a defendant would cause home detention to not be sufficiently punitive," it is permitted to "limit the amenities available."[48]

Certainly, were this Court to sentence David to a period of home confinement, there would be significant restrictions on his liberty that would serve to show society at large that there has been punishment. The restrictions of home confinement should not be taken lightly. A defendant serving a term of home confinement cannot, for example, freely come and go from his home as he wishes, he can not go to a movie, go to dinner at a restaurant, go on vacation, visit with a friend or go anywhere he desires whenever he wishes. The defendant's freedom can be severely limited while simultaneously allowing him to be present, in the home, for his wife and children.

Community service as a condition of probation and/or home confinement can serve as a significant sanction. A 2005 publication of the Administrative Office of the U.S. Courts described community service as "flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair -- a 'win win' proposition for everyone involved. *Court & Community: An Information Series About U.S. Probation Pretrial Services: Community Service,*

---

[46] Darren Gowan, "Overview of the Federal Home Confinement Program," *Federal Probation,* p. 11 (December 2000).

[47] *Id.*

[48] U.S.S.G. § 5F1.2, Application Note 2.

97

Office of Probation and Pretrial Services, Administrative Office of the U.S. Court (2005).

In a 2008 fraud prosecution in the Eastern District of New York, Judge John Gleason

sentenced a defendant who had an advisory Guidelines prison sentence of *life*

*imprisonment* to home detention and community service. In sentencing the defendant,

Judge Gleason stated that:

> [N]othing should ever be out of bounds and I've struggled
> with your lawyer's request, struggled with it throughout the
> presentations I've heard here, and I conclude that a sentence
> that doesn't include incarceration is appropriate here.
> Alternatives to incarceration exist that can carry both the
> community and this Court's condemnation of your conduct
> but channel it in a way that's more constructive, given your
> significant charitable works and contributions before this case
> ...[49]

With respect to community service, the Court has been provided with a letter from

Natalie Jackson, the Director of The Harmony Project, a non-profit organization that

brings intensive after school music programs to children in low-income neighborhoods

throughout the Los Angeles Area. Mr. Rubin has volunteered time at the Harmony

Project. Ms. Jackson has made clear that should the Court order a term of community

service as a condition of David's sentence, the Harmony Project could put his skills and

talents to good use. (Letter of Natalie Jackson, Ex 41).

### e) The Need To Avoid Unwarranted Sentencing Disparities Necessitates A Sentence Substantially Below the Advisory Guidelines Range 3553(a)(6)

As stated previously, David's Guideline calculation if our arguments are accepted

by the Court mandates a sentence of between 121 and 151 months. One important factor

---

[49] *United States of America v. David Shamilzadeh,* 04-Cr-194 (JG), United States District Court, Eastern District of New York.

that this Court must consider in determining the appropriate sentence is "the need to avoid unwarranted sentenc[ing] disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). It is not unusual in cases of this nature, with loss amounts (even accepting the Government's numbers) of less that $20 million, for a defendant to be given a non-jail sentence along with a substantial fine, monetary restitution penalty and other conditions of sentencing. Indeed, it would be well within the range of sentencing meted out nationally for similar crimes committed under similar circumstances, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### f)   The Need For Restitution 3553(a)(7)

The Government is seeking in excess of $11 million in restitution from David personally. While we do not agree that such a sum is warranted, undoubtedly, some amount of restitution will be ordered by the Court and David will be required to pay it. While neither David, nor the Government, ever conceded that this was an appropriate amount to cover the mandatory restitution and/or fines, David Rubin *unlike any other defendant in this entire, wide-ranging investigation and prosecution,* agreed to voluntarily restrain a substantial $3 million when he entered his cooperation agreement in the summer of 2012. That money has been segregated from the Rubins' assets and remains available to cover any restitutions or fines that the Court will impose. The Court should consider the fact that David has made this substantial sum available to pay a fine and/or restitution when deciding whether a prison term is truly necessary.

Because of the complexity of the issues (the Government contends that more than fifty individual deals require restitution), it is respectfully requested that the issue of

restitution be resolved at some time after the sentencing date as permitted by the

Mandatory Victims Restitution Act.  18 U.S.C 3664(d)(5).

IV.     <u>**CONCLUSION**</u>



We respectfully ask Your Honor to impose a non-incarceratory sentence, whether that be probation, home confinement, a monetary fine, community service or any combination of the above -- any alternative sentence that the Court deems appropriate to meet the statutory goal of being "sufficient but not greater than necessary" to serve the ends of justice.

Respectfully Submitted,

Bradley D. Simon
Kenneth C. Murphy
Brian D. Waller
Jonathan Stern
Simon & Partners LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

Dated: New York, NY
   January 24, 2014