UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                          :

     v.                          :  S1 09-CR-1058 (KMW)

RUBIN/CHAMBERS, DUNHILL INSURANCE          :
SERVICES, INC. dba CHAMBERS, DUNHILL,
RUBIN & CO. and CDR FINANCIAL                     :
PRODUCTS, INC. and
DAVID RUBIN,                                              :

       Defendants.          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X


## GOVERNMENT'S SENTENCING MEMORANDUM


JEFFREY D. MARTINO      REBECCA MEIKLEJOHN
Chief, New York Field Office    DANIEL TRACER
Antitrust Division       Trial Attorneys
U.S. Department of Justice     Antitrust Division
            U.S Department of Justice

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ......................................................................................................... 2

I.    SENTENCING ENHANCEMENTS ......................................................................... 3

    A.    Abuse of Trust.................................................................................................. 4

    B.    Leader of Criminal Activity............................................................................. 6

    C.    Sophisticated Means ........................................................................................ 9

II.   CALCULATION OF LOSS AMOUNT AND NUMBER OF VICTIMS ............... 14

    A.    Fraudulently Lowered Yields Based on Known But-for Rates ............................ 15

    B.    Kickbacks........................................................................................................ 17

    C.    Broker Fees ..................................................................................................... 30

    D.    Number of Victims ......................................................................................... 35

III.  RESTITUTION.................................................................................................... 36

CONCLUSION........................................................................................................ 39

# TABLE OF AUTHORITIES

**Cases**

United States v. Babar, 512 F. App'x 78 (2d Cir. 2013) .................................................... 7

United States v. Bahel, 662 F.3d 610 (2d Cir. 2011)....................................................... 19

United States v. Carollo, et al., 10 Cr. 654 (HB) ....................................................... passim

United States v. Ghavami, et al., 10 Cr. 1217 (KMW)...................................... 2, 5, 17, 32

United States v. Hirsch, 239 F.3d 221 (2d Cir. 2001) ........................................................ 4

United States v. Marsh, 820 F. Supp. 2d 320 (E.D.N.Y. 2011)........................................ 33

United States v. Maurello, 76 F.3d 1304 (3d Cir. 1996) .................................................. 33

United States v. Moskowitz, 215 F.3d 265 (2d Cir. 2000) .................................................. 5

United States v. Nolan, 136 F.3d 265 (2d Cir. 1998) ....................................................... 15

United States v. Ojemen, 465 Fed. App'x 69 (2d Cir. 2012) ........................................... 10

United States v. Persaud, 411 Fed. App'x 431 (2d Cir. 2011) ........................................ 10

United States v. Rothman, 10 Cr. 200 (HB) ....................................................................... 3

United States v. Spencer, 129 F.3d 246 (2d Cir. 1997) .................................................... 31

United States v. Stewart, 686 F.3d 156 (2d Cir. 2012)....................................................... 4

United States v. Stitsky, 536 Fed. App'x 98 (2d Cir. 2013).................................... 4, 5, 10

United States v. Vrdolyak, 593 F.3d 676 (7th Cir. 2010)................................................ 19

United States v. Zangari, 677 F.3d 86 (2d Cir. 2012)...................................................... 19

**Statutes**

18 U.S.C. § 3553............................................................................................................... 39

18 U.S.C. § 3663A........................................................................................................ 1, 36

18 U.S.C. § 3664.......................................................................................................... 1, 36

**Rules**

USSG § 2B1.1 .......................................................................................................... passim

USSG § 3B1.1 ........................................................................................... 1, 6, 9, 14

USSG § 3B1.3 ................................................................................................. 1, 4, 6

USSG § 3E1.1 ...................................................................................................... 2

USSG § 5K1.1 .................................................................................................. 2, 3

## PRELIMINARY STATEMENT

The Government respectfully submits this sentencing memorandum in advance of the sentencing of Chambers/Dunhill Insurance Services, Inc. ("CDR") and David Rubin (collectively, the "Defendants"), scheduled for March 6, 2014.[1]  This memorandum is intended to respond to many of the arguments made in David Rubin's Sentencing Memorandum ("Def. Memo.") as well as to assist the Court by highlighting pertinent factual information and by addressing a number of legal issues in the application of the United States Sentencing Guidelines (USSG) to Rubin.  In addition, this memorandum sets out the factual basis for this Court to order restitution pursuant to 18 U.S.C. §§ 3663A, 3664.

In particular, the Government submits (a) that a two (2) point enhancement is warranted under USSG § 3B1.3 for Abuse of Position of Trust; (b) that a four (4) point enhancement is warranted under USSG § 3B1.1 for a leader of a criminal activity that involved five or more participants; and (c) that a two (2) point enhancement is warranted under USSG § 2B1.1(10) for an offense involving sophisticated means.  Furthermore, the Government submits that in determining loss and the identity of victims for purposes of applying the USSG, as well as for determining issues relating to restitution, the Court should take into account (a) the amount by which Defendants' bid rigging and bid manipulation fraudulently lowered interest payments on investment agreements based on known but-for yields; (b) the amount of kickbacks Defendants received for steering bids to providers where the money diverted to CDR would otherwise have been available to municipal issuers or the IRS; and (c) the amount of broker fees Defendants received for

---

[1]      Although both Defendants are set to come before this Court for sentencing, this memorandum primarily focuses on issues and information pertinent to David Rubin.

1

conducting bids where their corruption of that process rendered their services to the municipal issuers worthless. As set forth herein, applying these enhancements, and including the three (3) point reduction for acceptance of responsibility under USSG § 3E1.1 that the Government believes will be recommended in the final Presentence Report ("PSR")[2], Rubin's total offense level under the USSG is 36. [3]

The Government respectfully submits this memorandum together with its letter setting forth the basis for a Motion for a Downward Departure for Substantial Assistance pursuant to USSG § 5K1.1 (the "5K1.1 letter").

## BACKGROUND

Rubin was CDR's founder, chief executive officer, managing director and sole owner. He was charged by Superseding Indictment filed on December 7, 2010 for his role in multiple fraud and bid rigging conspiracies in connection with the award of over 200 investment agreements for the proceeds of municipal bonds. On December 30, 2011, less than one week before trial, Rubin pleaded guilty to three counts of the Superseding Indictment pursuant to a plea agreement. The conduct underlying Rubin's guilty pleas is summarized in the Government's 5K1.1 letter and is expected to be detailed in the final PSR.

Six other individuals associated with CDR have been charged in connection with the conduct underlying the Defendants' convictions. To date, three CDR employees, Stewart (Zevi) Wolmark, Evan Zarefsky, and Matthew Rothman, have been sentenced by

---

[2]     As of the date of this submission, the final PSR has not been issued.

[3]     Many of the same legal issues here were recently presented to this Court in the July 24-25, 2013 sentencing of three defendants in a related case, *United States v. Ghavami, et al.*, 10 Cr. 1217 (KMW) (the "*Ghavami* sentencing"). The analysis presented in this memorandum is intended to be consistent with the Court's findings and conclusions in that case, taking into account the unique facts and circumstances relevant to the Defendants.

Judge Baer for their roles in the same crimes to which Defendants pleaded guilty. Their sentences included periods of incarceration of 18 months, 8 months and 6 months, respectively. At sentencing, Judge Baer appears to have adopted the Guidelines level set out in the PSR for each of these three defendants. See, e.g., United States v. Rothman, 10 Cr. 200 (HB), Sentencing Tr. at 5:12-14 (noting the Government's loss figure was $6,308,892.69); 14:6-11 (noting that, with the inclusion of the Government's loss figures, the "probation department's analysis – and I see nothing wrong with it in terms of the guidelines – comes to an offense level of 30"). That level was based, in large part, on the Government's calculation of loss by a method that is consistent with the method the Government is using in this case.[4] In addition, in reaching his decision regarding an appropriate sentence for each of these defendants, Judge Baer considered the Government's motions pursuant to USSG § 5K1.1. Judge Baer has not yet resolved issues of restitution for these defendants. Another CDR employee, Mark Zaino, is scheduled to be sentenced by this Court in the coming weeks. Two additional CDR employees, Douglas Goldberg, and Dani Naeh, are likely to be sentenced in the coming months following a trial scheduled for February 3, 2014 in the Western District of North Carolina.

## I.      SENTENCING ENHANCEMENTS

The following enhancements are warranted in determining Rubin's total offense level under the USSG. The factual basis for the application of these enhancements is

---

[4]      Of note, in the sentencing of three co-conspirator defendants in *United States v. Carollo, et al.*, 10 Cr. 654 (HB), Judge Baer rejected the inclusion of broker fees as loss on the theory that at least some portion of the broker fee can be attributed to legitimate services provided. See Sentencing Tr. at 49:16-22. As detailed below, the Government submits that this is incorrect in relation to CDR, which was hired precisely to ensure that the bidding followed the Treasury regulations; in any event, the Government believes that this result is contrary to Application Note 3(F)(v)(III) of USSG § 2B1.1.

established by the testimony at the trials of two related cases involving bid rigging and bid manipulation in the award of the investment agreements for the proceeds of municipal bonds, and by Rubin's statements and the statements of other witnesses during numerous interviews conducted by the Government.

### A. **Abuse of Trust**

An enhancement for abuse of trust is warranted here because the Defendants had considerable discretion in brokering transactions on behalf of municipal clients and the extent of this discretion allowed them to commit wrongs that were very difficult, if not impossible, for municipalities to detect. Moreover, the enhancement is appropriate in light of the fact that Rubin and CDR were fiduciaries of the municipal clients they defrauded. In addition, in many cases, Rubin and others at CDR purposefully cultivated direct personal relationships with these municipal clients.

In the Second Circuit, the abuse of trust enhancement is appropriate in cases where a "defendant's position [] involve[s] discretionary authority" and "this discretion [is] entrusted to the defendant by the victim." United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001) (internal quotations omitted); see also United States v. Stitsky, 536 Fed. App'x 98, 114 (2d Cir. 2013); USSG § 3B1.3, Application Note 1 (referring to conduct "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)"). This discretion must allow the defendant enough latitude to "commit a difficult-to-detect wrong." Hirsch, at 227; see also United States v. Stewart, 686 F.3d 156, 178 (2d Cir. 2012). Courts also take into account whether a defendant has a fiduciary relationship to the victim as well as whether that relationship is personal rather than an arms-length relationship. Hirsch, at 227

(citing United States v. Moskowitz, 215 F.3d 265, 272 (2d Cir. 2000)).  Your Honor recently applied the abuse of trust enhancement to two defendants convicted of multiple fraud counts, noting that a defendant there "'possessed enough managerial discretion [] to enable him to perpetrate a difficult-to-detect fraud.'"  Stitsky, at 114 (quoting from the trial record at 26:17-20).

During cross-examination in the related trial of *United States v. Ghavami, et al.*, 10 Cr. 1217 (KMW) (the "*Ghavami* trial"), Rubin agreed that municipalities put their trust in CDR and that CDR repeatedly violated that trust.  Ghavami Tr. at 3314:25-3315:5 (testimony of David Rubin).  Rubin does not now dispute that he and CDR violated their clients' trust.  Moreover, independent evidence supports a finding that Rubin and CDR had a fiduciary relationship with their municipal clients.  For example, CDR promoted itself as a fiduciary in its marketing materials and in responding to Requests for Proposals in which issuers sought written proposals from competing firms before hiring a broker.

Testimony of representatives of affected municipalities at the *Ghavami* trial as well as in the related trial *United States v. Carollo, et al.*, 10 Cr. 654 (HB) (the "*Carollo* trial"), supports the conclusion that Defendants abused a position of trust.  Their evidence established that municipal clients lacked the financial and market expertise to maximize the potential yield from their investments, specify the terms for investment agreements, or locate potential institutions to invest their money, all within the parameters set out in the Treasury regulations.  They expected CDR and other brokers to conduct bids that complied with the Treasury regulations and gave them wide and almost complete discretion in how to accomplish that goal.  Throughout the process, the municipal issuers relied on CDR to conduct itself in their best interest and, at the end of the process, relied

on CDR's representations regarding compliance with the Treasury regulations in order to secure tax-exempt status for their bonds.

Furthermore, trial testimony and statements from cooperating witnesses establish that as part of its marketing and business, CDR sought and developed direct personal relationship with many of the municipal issuers that became clients.  After being hired by a municipal issuer, employees of CDR also regularly engaged with the client in multiple rounds of discussion by person, phone or email about the structure of the bond issue and other pertinent details.  These discussions further cemented the relationships between CDR and its clients, and were part of the process of building a relationship of trust with CDR.  The dynamics of this relationship show that Rubin and CDR abused their position of trust in the commission of their fraud.  Therefore, a two-point enhancement for abuse of trust is warranted under USSG § 3B1.3.

### B.  <u>Leader of Criminal Activity</u>

A four-point enhancement should be applied to Rubin because of his role as a leader of a criminal activity that involved five or more participants or was otherwise extensive.  This enhancement is appropriate here in light of Rubin's role as founder and owner of CDR as well as his actions in recruiting and corrupting CDR employees and cultivating relationships with providers that became the foundation of his crimes.

Application Note 4 under USSG § 3B1.1 instructs that seven factors are taken into account in distinguishing an organizer or leader of criminal activity from a mere manager or supervisor: (1) the exercise of decision-making authority; (2) the nature of participation in the offense; (3) the recruitment of accomplices; (4) the right to a larger share of the fruits of the crime; (5) the degree of participation in planning the offense; (6)

the nature and scope of the illegal activity; and (7) the degree of control exercised over others.  In weighing this enhancement, courts look at the defendant's involvement in recruiting others to the scheme and leading other members of the criminal activity.  See, e.g., United States v. Babar, 512 F. App'x 78, 80-81 (2d Cir. 2013).

Rubin founded CDR, a financial advisory firm, in the mid-1980s and was its sole owner and chief executive.  As sole owner of CDR, Rubin provided the overall leadership and direction at CDR and received the vast majority of the firm's profits.  CDR employed at least ten (10) people during the relevant period.  Rubin recruited Wolmark at the time of CDR's inception, and Wolmark subsequently held the titles of chief financial officer and managing director of CDR and supervised the municipal side of CDR's business.  Rubin led and oversaw many of Wolmark's efforts to cultivate relationships with providers in order to steer contracts toward providers that were willing to enter into secret kickback agreements.  Rubin was also personally involved in hiring at least five other CDR co-conspirators, including convicted co-conspirators Dani Naeh, who was a marketer, and Douglas Goldberg, Evan Zarefsky, Mark Zaino and Matthew Rothman, who were analysts.

Rubin was responsible for training his employees.  For example, Naeh and the analysts conducted bidding on a day-to-day basis on behalf of CDR and learned how to steer bids and manipulate awards by observing Rubin and Wolmark and each other.  In addition, Rubin delegated other responsibilities relevant to the conduct at issue.  For example, he instructed Douglas Goldberg, an analyst with the firm, that his job would include signing the broker certifications attesting to CDR's compliance with the Treasury regulations and, at the time he gave Goldberg this assignment, promoted him to the level

of corporate officer (the certifications required the signature of a CDR officer) and offered to pay him extra salary.  Thereafter, Goldberg dutifully fulfilled this function at Rubin's instruction.  See Carollo Tr. at 626:24-627:10 (testimony of Douglas Goldberg).  Moreover, Rubin was the primary contact with all of CDR's lawyers; he controlled communications with CDR's lawyers and determined what would, and what would not, be revealed to CDR's lawyers during consultations about how the business should operate in order to be compliant with pertinent laws and regulations.

In addition, Rubin recruited, established and developed relationships with certain key co-conspirators.  For example, as this Court knows from Rubin's testimony at the *Ghavami* trial and as summarized in the Government's §5K1.1 letter, Rubin established a corrupt relationship with Peter Ghavami, the head of the relevant desk at UBS.  Rubin was also personally instrumental in devising, coordinating and executing a number of municipal bond projects that were subject to bid rigging, where he similarly recruited and directed co-conspirator providers, as well as co-conspirator brokers.  These projects included sixteen separate "lease-to-own" bonds with Société Générale ("SocGen"); five multi-family housing bond issues with SunAmerica ("Sun"); and four Tennessee Municipal Bond Fund ("TMBF") issues with Bank of America ("BOA").  While these transaction differed in their details, for all of them Rubin personally brought a co-conspirator provider on board and hammered out details concerning the municipal bond-related contracts that provider would win and how CDR would be compensated for ensuring that result.  These transactions are discussed in greater detail below, and involved the Defendants' receipt of both disclosed and undisclosed fees.

In summary, Rubin's role in the charged offense conduct included both sole ownership and ultimate authority over a vast enterprise of bid rigging and bid manipulation that persisted from at least 1998 through at least 2006. There is no question that this criminal conduct involved more than five other individuals and that Rubin controlled the entire CDR enterprise and led a number of CDR subordinates and co-conspirators during the course of his crimes. Likewise, as sole owner of CDR, Rubin was entitled to many times the profits that his subordinates earned in the furtherance of criminal conduct. Therefore, a four-point enhancement for leading a criminal activity is warranted under USSG § 3B1.1.

### C. Sophisticated Means

An enhancement for sophisticated means is warranted because Rubin and CDR engaged in particularly sophisticated conduct in the execution and the concealment of the offenses at issue. This conduct goes well beyond the mere steering of bids and then falsely certifying that the bids in question had been conducted in accordance with Treasury regulations. It also goes beyond the occasional use of third parties in order to pay kickbacks to the Defendants. The Defendants, in fact, did both of these things. Beyond that, however, over the course of many years, Rubin and CDR engaged in a number of sophisticated tactics to advance and conceal their crimes. These tactics included structuring complex transactions in ways that camouflaged the kickbacks to conceal their true purpose and significance from municipal issuers and the IRS; using other brokers as fronts in certain transactions to hide the fact that CDR was both brokering an investment agreement and receiving other non-broker fees from the winning provider; and altering contractual agreements with winning providers that reflected the

9

provider's obligation to pay CDR's substantial non-broker fees by removing that provision when the same document was submitted to the municipality and other key participants to the transaction.

Application Note 8 to USSG § 2B1.1 gives examples of sophisticated means and focuses on conduct that is meant to obscure criminal activity, such as separating operations between jurisdictions or hiding assets through the use of corporate machinations.  In United States v. Stitsky, 536 Fed. App'x 98, 112 (2d Cir. 2013), the Second Circuit approved of this Court's application of an enhancement for sophisticated means to a fraud conviction because the underlying conduct "(1) lasted several years; (2) reflected very careful planning; (3) included a careful effort to conceal the fraud by lying to business partners, lawyers, and investors; (4) relied on creating and disseminating marketing publications that contained material misrepresentations; and (5) involved the creation of fictitious documents for the purpose of convincing investors to give money or not to redeem their money." (internal quotations and citations to transcript omitted).  The hallmarks of sophisticated means include document forgery, fictitious entities and corporate shells.  See, e.g., United States v. Persaud, 411 Fed. App'x 431, 436 (2d Cir. 2011).  Moreover, "even where each step in [a] scheme was not elaborate, a scheme as a whole may be sophisticated where all the steps were linked together ... [to] exploit different vulnerabilities in different systems in a coordinated way."  United States v. Ojemen, 465 Fed. App'x 69, 72 (2d Cir. 2012) (internal quotations omitted).

On nine transactions subject to the bid rigging conspiracy, Rubin arranged for CDR's control of the bidding process to be concealed by arranging for a firm named Paragon, rather than CDR, to be the broker of record.  These transactions involved the

four TMBF transactions as well as the five multi-family housing bonds with Sun.  For all of these transactions, CDR employees performed all their normal tasks and controlled the bidding behind the scenes so that the intended provider won the contract.  Regarding the TMBF transactions, Paragon was the financial advisor to TMBF, and, before each affected TMBF bid, Rubin and Paragon's owner bargained over the kickbacks each would receive.  Rubin then arranged for CDR to pay Paragon its share of the kickbacks by falsely claiming that Paragon had provided financial modeling services in connection with lease-to-own transactions – a wholly unrelated set of municipal projects.  Regarding the multi-family housing bond transactions, apparently concerned about a potential conflict of interest because he had arranged to collect a much larger fee from Sun, the provider that Rubin had arranged to win these transactions, Rubin arranged for Paragon to appear as the broker of record.  Thus, although Paragon existed as an independent corporate entity, the Defendants used Paragon as a shell entity in order to control the bidding while hiding that role behind the scenes.

Rubin also took steps to mask other kickbacks.  At times, in order to conceal the link between "swap" fees and any underlying transactions, Rubin instructed CDR employees that he did not want the swap fees to be "tied" to any particular transaction.  Regarding CDR's relationship with Financial Security Assurance Inc. ("FSA"), this meant that CDR was *not* to receive swap fees directly from FSA but, rather, to receive any such fees from the financial institution that was FSA's counterparty in the swap (*e.g,* UBS).  Further, he instructed CDR employees to delay the payment of the swap fees in a further effort to make it appear that they were *not* associated with any particular transaction brokered by CDR.  In other words, the method by which CDR was to collect

11

its kickbacks – disguised as swap fees – was a classic shell game.  By passing the excess profit CDR arranged for FSA to earn at the expense of CDR's municipal clients first to UBS and then back to CDR, Rubin made it almost impossible for anyone to discover that the swap fees were, in fact, kickbacks associated with particular transactions, and, further, contributed to the "plausibility" of the disclosure statements submitted by FSA and CDR saying that that the only fees that CDR received were its normal broker's fees. In this way, Rubin hid kickback payments within the larger totality of complex transactions in order to ensure that their detection would be evaded.

Additionally, on a number of lease-to-own transactions, CDR employee Douglas Goldberg, with Rubin's knowledge, took steps to conceal CDR's dual role in the transactions.  Specifically, he created two sets of contracts, known as term sheets, that contained nearly identical terms except for a fee denominated as an advisory fee to be paid by the winning provider to CDR.  The version exchanged between CDR and SocGen (the winning provider on all except one lease-to-own transaction brokered by CDR), outlined the terms of a complex financial arrangement called a "forward purchase" agreement, or a form of credit support that SocGen provided on the transactions.  As more fully discussed below, SocGen was unwilling to be the forward purchaser unless it won the investment agreements.  As part of this arrangement, CDR would receive an advisory fee from SocGen, ostensibly for being the advisor to the forward purchaser. This was essentially a kickback for ensuring that SocGen won the investment agreements on these transactions.  A nearly identical version of this term sheet was then distributed to the municipality and its working group, except that this "public" version was modified by deleting the paragraph reflecting CDR's rights to receive a forward purchase advisory

fee.  The document was altered because the Defendants believed that their municipal clients might object to CDR's apparent conflict of interest in brokering the investment agreements if they knew that CDR had already contracted to receive a second fee from a party to the transaction and was, therefore, arguably not a neutral broker.

Rubin also engaged in other forms of subterfuge to hide his criminal activity and obvious conflicts of interest from municipal issuers.  For example, from time to time, CDR solicited bids from and attempted to steer investment agreements to XL Financial Products ("X/L"), a provider with which Rubin had an undisclosed consulting agreement and whose profits he was entitled to share under certain circumstances.  For example, in October 2002, CDR solicited bids from X/L for investment agreements with the Port of Oakland.  Rubin oversaw CDR's steering some of the Port's investment agreements to FSA, in exchange for kickbacks, and some to X/L.  According to statements by CDR employee Douglas Goldberg, information about Rubin's financial interest in X/L was deliberately concealed from the Port's financial advisor.  Later, CDR successfully steered other investment agreements to X/L, all without disclosing Rubin's and CDR's conflict of interest.

These tactics strongly support a finding of sophisticated means.  They include conduct that goes well beyond submitting false certifications to encompass the use of complex financial arrangements, altered documentation and mischaracterized payments to further help conceal the fraud.  Moreover, taken together, the multitude of activities undertaken by CDR to market its niche role in brokering investment agreements for tax-exempt bonds while simultaneously engaging in layer upon layer of concealment of its

corrupt activity constitute a totality of sophisticated means.  Therefore, a two-point enhancement for sophisticated means is warranted under USSG § 2B1.1(b)(10)(C).

Finally, the Defendants are incorrect to argue repeatedly that the enhancements outlined above for abuse of trust, leader of a criminal activity, and sophisticated means overstate the magnitude and seriousness of the offense here.  See, e.g., Def. Memo. at 85 (arguing that the enhancements move the guideline calculation to "an exaggerated degree" and that they "substantially overstate the seriousness" of the conduct).  Rather, these enhancements – and the evidence that supports them – reflect the central and active role that Rubin and CDR played in organizing and orchestrating bid rigging and fraud in the market for the investment of the proceeds of municipal bonds, particularly as compared to other defendants.  The Government submits that these factors are key to accurately and fully characterizing the Defendants' conduct.

## II.    CALCULATION OF LOSS AMOUNT AND NUMBER OF VICTIMS

Application of USSG § 2B1.1 depends, among other factors, on the amount of loss and the number of victims affected by a financial fraud.  The appropriate amount of total loss attributable to the Defendants is greater than $7 million, but less than $20 million dollars.  Specifically, the Government has determined that the amount of loss at issue here is $18,110,763.59.  This amount takes into account fraudulently lowered interest payments based on known but-for rates, kickbacks paid to CDR, and broker fees paid to CDR.  Taken together, these losses support a 20-level enhancement under USSG § 2B1.1(b)(1)(K).  Moreover, these losses affected a number of victims that exceeds 50,

but is less than 250.  Therefore, the number of victims affected by the fraud supports a four (4) level enhancement under USSG § 2B1.1(b)(2)(B).[5]

**A.  <u>Fraudulently Lowered Yields Based on Known But-for Rates</u>**

The first component of loss is found in transactions where there is specific evidence that the yield on investment agreements was lowered by the Defendants or co-conspirators, either by fraudulently lowering interest rates or by fraudulently inflating prices for securities sold for escrows, and there is an identifiable but-for rate at which the transaction would otherwise have been executed.  The Government has calculated that this conduct resulted in a loss of $1,317,495.76 to municipal issuers.[6]

According to Application Note 3 to USSG § 2B1.1, loss can be arrived at through a number of methods.  One such method is actual loss, Note 3(A)(i), and it includes "the reasonably foreseeable harm that resulted from the offense."  This measure of loss is appropriate where the loss resulting from particular conduct can be isolated and quantified.  Moreover, although interest is generally not included in loss under Application Note 3(D), that does not apply where, as here, the interest or interest rate in question is the actual harm, rather than a rate sought to be applied to underlying loss.  <u>United States v. Nolan</u>, 136 F.3d 265, 273 (2d Cir. 1998).  In the *Ghavami* sentencing, this Court noted that fraudulently lowered interest rates, even where the but-for rate was given as a mere "indication," were "a reasonable starting point to measure the fraudulent change in interest rates."  Tr. 12:1-2.

---

[5]      The total amounts of loss resulting from each category of conduct outlined below as well as the number of bond issues adversely affected by each category of conduct are reflected in the Government's loss amount master spreadsheet attached as Exhibit A.

[6]      The Government has identified 36 bond issues that were affected by this conduct.

It is clear that Defendants caused a quantifiable loss when, either immediately before or during the bidding, they encouraged and allowed providers, notably General Electric ("GE") and FSA, to win investment agreements at artificially lower interest rates by permitting those providers to reduce a submitted rate at a time when the provider had already quoted a higher, specific rate.  In these cases, but for CDR having allowed a provider to submit a lower bid, the provider had already indicated that it was willing and able to provide a higher rate on the investment agreement.  This higher rate would translate into higher interest payments to the municipality.  Thus, such conduct translates into a direct, foreseeable and calculable loss.  The loss is the difference between the higher, forgone rate and the actual winning rate, as measured over the life of the fraudulently bid investment agreement.  Evidence of these fraudulently lowered interest rates comes directly from tape recordings presented by the Government at the *Carollo* and *Ghavami* trials.[7]

In addition, the Government has calculated the specific loss caused by the Defendants' conduct in rigging bids for Bank of America ("BOA") to win.   Its calculation is based on research by cooperating witness Douglas Campbell, a former senior marketer at BOA, who has reviewed the documentation of twenty-one transactions won by BOA through bid rigging[8] and identified the minimum "but for" rate or price that BOA would have submitted in a truly competitive environment.  His observations draw on nearly a decade of experience as a marketer of municipal investment agreements,

---

[7]       It is worth noting that, in one specific instance, the evidence demonstrates that Rubin and the co-conspirator provider discussed and agreed that the provider should reduce his bid from one specific rate to a lower specific rate because anything above the initial rate would simply have to be rebated to the IRS. This evidence contradicts Defendants' arguments to the Probation Office that there is no evidence supporting the Government's claim that the IRS was both an intended and actual victim of their crimes.

[8]       These interview reports were among those provided to the Defendants during discovery.

including more than four years as a marketer of all types of municipal investment agreements for BOA.  In total, Mr. Campbell has identified nearly $1 million in excess profit that BOA made as a result of Defendants' bid rigging.  This translates into a corresponding loss to the affected municipal issuers and/or the IRS.

This Court is familiar with Mr. Campbell and his ability to estimate the amount by which a bid rigged for BOA to win deviated from a competitive price, based on his testimony at the *Ghavami* trial regarding his bid for an escrow for the State of Massachusetts.  In that testimony, Mr. Campbell expressed BOA's excess profit both in dollars and as a spread in basis points.  See Ghavami Tr. at 2396:13-17 and 2490:15-2491:23 (Testimony of Douglas Campbell).

In total, adding the loss Defendants caused by lowering already quoted interest rates and the loss they caused by rigging bids for BOA to win, the Government has calculated that the Defendants' conduct resulted in a loss of $1,317,495.76 to municipal issuers.  Therefore, $1,317,495.76 should be included as loss for the Defendants in computing their total offense level under USSG § 2B1.1.

## B. **Kickbacks**

The second component of loss is found in transactions for which Defendants received kickbacks, but there is no specific evidence of what the rate on the subject investment agreements would have been "but for" the bid manipulation and the ensuing kickback.  Nevertheless, there is evidence, including statements by Rubin and fellow CDR co-conspirators, that demonstrate that the amounts of such kickbacks would otherwise have been available to be paid to municipal issuers or the IRS as yield on the subject investment agreements.  In some cases, Rubin and others at CDR agreed with co-

17

conspirator providers on the amount of the kickback to be paid to CDR at the same time they determined the rate at which the provider would win the investment agreement up for bid. In other cases, the amount of the kickback was agreed to, but there was no discussion of the rate to be paid on the investment agreement up for bid. In still others, although there was a discussion specifying the desired amount of the kickback, there was no agreement before the bid but, rather, an acknowledgement that the kickback ultimately depended on the outcome of the bid (meaning how much profit the provider made when it won the bid).

Even without any articulation of a specific "but for" rate, such coordination supports a finding that the amount of the kickback was directly related to the amount of money being diverted from municipal issuers and the Treasury. In fact, the evidence shows that, in many cases, Defendants received a kickback precisely in return for having engineered the award of an investment agreement to a complicit provider at a predetermined price. Therefore, the amount of the kickback serves as a reasonable proxy for the loss suffered by the victim of the corrupt conduct. The Government has calculated that Defendants' bid rigging resulted in a loss of $12,521,595.83 to municipal issuers and the Treasury as calculated by measuring kickbacks in cases where evidence ties the amount of kickback to fraud-based harm.[9]

Under USSG § 2B1.1, Application Note 3(B), the "court shall use the gain that resulted from the offense as an alternative measure of loss if there is a loss but it reasonably cannot be determined" (emphasis added). Moreover, Application Note 3(C) further instructs that a "court need only make a reasonable estimate of loss." In other words, the fact that not every loss can be quantified with precision, does not prevent the

---

[9]     The Government has identified 33 bond issues that were affected by this conduct.

Court from making a reasonable estimation for sentencing purposes. This is true for calculating gain as well. United States v. Bahel, 662 F.3d 610, 646 (2d Cir. 2011). In fact, this Court indicated in the *Ghavami* sentencing that kickback amounts could serve as a proxy for loss so long as the Government carried its burden in showing that there was indeed loss. Tr. 14:3-16:2. Likewise, other courts have recognized that kickbacks are an appropriate measure of loss where the competitive bidding process has been corrupted in exchange for such kickbacks. See, e.g., United States v. Vrdolyak, 593 F.3d 676, 680-81 (7th Cir. 2010). In addition, the Second Circuit has recognized that gain can be used as a proxy for loss in two ways: (a) sometimes, the gain itself can actually measure the loss; and (b) at other times, the gain can be a surrogate for loss where the correlation between loss and gain is less direct. See generally United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012). Both of these methodologies are relevant here.

Kickbacks paid to the Defendants were given various names and structures. The kickbacks were sometimes disguised as legitimate broker fees on other, sometimes unrelated transactions; at other times, they were denominated as "advisory" or "structuring" fees, some of which were paid on an ongoing basis over the life of the subject investment agreement. Whatever they were called, these fees were either unearned or excessive, relative to the value of the services CDR actually provided. Furthermore, they were generally undisclosed to the municipal issuers. When they were disclosed, Defendants withheld or concealed other material information relating to their multiple roles in the transaction, thus preventing their clients from discovering their apparent conflict of interest.

For instance, as revealed during the *Ghavami* and *Carollo* trials, in exchange for Defendants' manipulating the bidding process to favor FSA and to help increase FSA's profits, CDR employees, primarily Wolmark, arranged for the firm to be paid kickbacks that were disguised as legitimate "hedging" or "swap" fees associated with additional transactions such as hedges or swaps.   These fees were either unnecessary or egregiously excessive, relative to the value of any swap-brokering service actually performed.  FSA paid eleven such kickbacks to CDR, although the actual physical payments to CDR were made by co-conspirators UBS and Royal Bank of Canada.  The eleven kickback payments were associated with investment agreements for seven bond issues that Defendants steered to FSA by manipulating the selection of providers asked to bid so that FSA faced as little effective competition as possible.  Regarding the use of UBS as the conduit for FSA's kickback payments, Rubin's testimony at the *Ghavami* trial revealed that he was instrumental in making the arrangements with Peter Ghavami at UBS for UBS to serve this function.

Direct evidence from the *Carollo* and *Ghavami* trials as well as from numerous witness interviews, establishes that these swap-based kickbacks are directly linked to loss in the form of lower interest rates to the municipal issuers even in the absence of a "but for" number.  See, e.g., Carollo Tr. at 716:7-717:16 (testimony of Dani Naeh) ("[B]ecause CDR was also paid a swap fee, I believe that Meridian [the issuer] received, directly received a lower rate on the investment they got from FSA."); Id. at 1371:21-24; 1379:1-6 (testimony of Stewart Wolmark).  The fact that numerous CDR witnesses readily understood that the kickbacks FSA paid to CDR ultimately detracted from funds

20

available to the issuers undermines the Defendants' argument that these kickbacks resulted in no loss.  See Def. Memo. at 63.

Regarding these eleven kickbacks, evidence of the circumstances relating to the subject bids shows that the kickbacks resulted in reduced yield to the issuers.  As such, in the case of these kickbacks, gain to both CDR and the relevant co-conspirator providers serves as a reliable proxy for loss.  From an economic standpoint, moreover, it logically follows that if a provider is willing to execute a trade at a particular price and, correspondingly, at a particular profit, net of its kickback to CDR, then that provider should be indifferent to whether it pays the amount of the kickback to CDR or pays it to the issuer in the form of a better yield on the issuer's investment.  In all, the Government has identified kickbacks of this type totaling $830,000 that should be included in loss.

In other instances, Rubin arranged to receive kickbacks in connection with transactions with three providers where he actively negotiated the amount of the kickback and the rate on the investment agreement simultaneously before the bid.  These kickbacks were embedded in complex bond transactions that the Defendants took an aggressive role in structuring and promoting in the market.  In furtherance of these efforts, Rubin sought out the participation of a number of co-conspirator providers, including:  (1) SocGen, in connection with sixteen separate bond issues that raised money for what was known as the lease-to-own program; (2) Sun, in connection with five bond issues that raised funds for the purchase of multi-family housing; and (3) BOA, in connection with four bonds issued by TMBF.  While the structure of these bonds was complex, the underlying scheme was remarkably simple – Rubin and his co-conspirators agreed that CDR would receive kickbacks, and in return CDR would ensure that the complicit provider would

win investment agreements or swaps associated with specific investment agreements at very favorable rates and/or with significantly reduced risk (or almost no risk) on the investment.

The kickbacks were stylized as "advisory fees" for CDR's role in structuring the transaction. In reality, though, in all three instances, these fees were part of a larger artifice that allowed the key players and co-conspirators to divert arbitrage to themselves, in other words, to burn the yields on these investment agreements.[10] Moreover, the artificially determined rates on these investment agreements were integrally linked to the payment of kickbacks to CDR for ensuring that the investment agreements were won by the favored providers. CDR achieved this goal by withholding material information from bidders or giving them false information, by obtaining courtesy bids, and by withholding material information regarding its multiple roles from its issuer clients. While there is no easily identifiable "but for" rate on these investment agreements, the kickbacks Defendants received serve as a valid proxy for loss inasmuch they represent the portion of the yield they diverted to themselves.[11]

In the case of the SocGen transactions, the bonds were intended to raise money for housing programs. The particular, and unusual, structure of the bonds required a form of credit support from a financial services company. Ultimately, Rubin persuaded and

---

[10]    Arbitrage, as defined in the Treasury regulations, refers to a situation in which interest paid on an investment agreement in excess of the interest rate on the underlying municipal bonds must be paid, or rebated, back to the IRS. As an exception, excess interest is allowed only if it is used to pay fees that are necessary to the bond issue and involves the payee bearing some legitimate risk.

[11]    Moreover, the Government submits that the kickbacks paid in connection with the three sets of complex transactions with SocGen, Sun and TMBF are also to be included for sentencing purposes as gain by analogy to other sophisticated crimes, such as insider trading, where the USSG focus on the amount of gain (or losses averted) by the guilty trader. In those cases, as in the more esoteric CDR-brokered investment agreements discussed here, the scheming parties are able to profit by manipulating the market at large, even if it is difficult to assign particular losses and loss amounts to identifiable victims. Nonetheless, there is no question that the Defendants' actions result in serious harm to other market participants and/or are gravely at odds with public policies designed to protect public markets and entities that are affected by transactions involving the financial instruments in question.

enlisted SocGen to provide this credit support in return for a substantial fee, but, critically, only by guaranteeing that SocGen would win the investment agreements for the bond proceeds at artificially determined pre-set rates.  SocGen agreed to Rubin's proposal because, as a result of Rubin's promise, it was able to borrow large sums of money, ultimately nearly $1 billion in total, at rates that were that were favorable compared to its normal cost of funds.

In each subject transaction, Rubin specifically calibrated the rate SocGen bid to match the credit support fees to be paid to SocGen, including his share of those fees, plus the municipality's costs of issuing the bonds.  Rubin then delivered on his promise to steer the investment agreements to SocGen through CDR's control of the bidding for these investment agreements.  Among other things, as the scheme progressed, Rubin and CDR withheld from other potential providers information that, in fact, very little money would ever be withdrawn from the invested funds.  This meant that, in reality, no other bidders were given a meaningful opportunity to bid on these transactions.  In return, SocGen paid CDR an agreed upon share of its credit support fee on an ongoing basis, ostensibly for helping to value and manage the risks associated with that credit support. Since the major portion of the funds initially placed in the investment agreements with SocGen remained invested, as the credit support fees paid to SocGen became increasingly overvalued, so, too, the portion of the fees the Defendants received became ever more without any true economic justification.

Other circumstances support the Government's characterization of these advisory fees as kickbacks.  First, they were hidden from the issuers and other participants in the transactions because of the obvious conflict of interest they would reveal, considering

23

that CDR held itself out as a disinterested broker.  Second, the amounts of these

kickbacks also far exceeded the amount of broker fees CDR received on the SocGen

transactions.  And, third, they were excessive relative to the true value of any financial

services that CDR provided to SocGen.  In an interview with the Government on

February 29, 2012, Rubin conceded that "the fees CDR were receiving were not

commensurate with fees for modeling and that it was [expletive deleted] the fees were

paid for services rendered."  Again, from an economic perspective, given that SocGen

agreed to execute these investment agreements at specific pre-determined rates, it should

have been willing to give all or a substantial portion of the kickback amount to the issuer

as additional yield.  Instead, Rubin and SocGen devised a way to secure substantial fess

for SocGen by guaranteeing SocGen's success in obtaining funds at a relatively low cost

of funds in exchange for substantial fees.  As such, the amounts of these undisclosed

kickbacks should serve as a proxy for the loss caused by these transactions.

The housing transactions involving Sun followed much the same pattern as the

SocGen transactions.  Sun agreed to provide credit support but on the condition that

Rubin would steer the associated investment agreements to Sun.  In return, Sun paid CDR

a portion of its fee for providing the credit support.  Again, Rubin hid from the issuers

(and the IRS) the fact that CDR was controlling the bidding process while also receiving

these kickbacks, this time by having another broker appear to handle the bidding for the

investment agreements.  And just as in the SocGen transactions, while CDR may have

appeared to have earned these kickbacks by enlisting Sun to provide the credit support

and by agreeing to review applications for and the terms of any proposed loans made

with the bond proceeds, that entire function was a mere artifice to allow Sun to win

investment agreements at highly favorable rates and to obtain substantial amounts of money that were not withdrawn.  Again, the fact that the kickbacks were enabled, at least in part, by steering the bids to Sun at predetermined rates that covered the kickbacks reinforces the link between the loss and the amounts of the kickbacks Defendants received from Sun.

In the TMBF transactions, the kickbacks paid to Rubin and CDR are even more directly linked to issuer loss.  Here, according to statements made by cooperating witness Douglas Campbell, a senior marketer at BOA, BOA would have been able to provide a more competitive bid on the investment agreements than other providers because BOA was already providing credit support in connection with the underlying bonds.  However, BOA was not solicited for bids on the TMBF investment agreements.  The Government is not aware of any evidence to support Defendants' claim that BOA's derivatives desk "decided not to bid in order to improve its profits."  Def. Memo. at 56.  To the contrary, Campbell and other BOA witnesses have reported that they did not know why BOA was not invited to bid.  The simple fact is that, had BOA bid, then there would have been no opportunity for Rubin and CDR to earn secret fees because, if BOA had been awarded the investment agreements, it would not have needed to hedge the associated risk with another financial institution.  Therefore, Rubin or co-conspirators at TMBF with whom Defendants' kickbacks were shared created that opportunity by keeping BOA out of the bidding.

Once a key provider was eliminated from competing for the TMBF investment agreements, CDR further reduced competition by soliciting only providers whose bids it could control and by not soliciting other providers that potentially would have been able

to offer more competitive rates, specifically financial services companies with triple-A credit ratings (higher than BOA's credit rating) that would typically pay a higher rate for the type of structure in which the TMBF bond proceeds were invested.  Defendants then arranged for a particular co-conspirator provider to win each of the TMBF investment agreements at a predetermined rate, while at the same time arranging for the winning provider to transfer virtually all of the economic risk and benefit of the investment agreement to BOA through a swap.  Rubin furthered arranged and agreed with BOA on the swap rate, which was substantially "off-market."  In other words, he arranged for BOA to make profits from the TMBF-associated swaps that were far in excess of the bank's normal profits from such swaps.  BOA then returned the major portion of that excess profit to CDR as a kickback in the form of a swap fee.  Moreover, and unlike the SocGen and Sun transactions, CDR did not even arguably take on any role that would entitle it to a portion of the swap fee.  According to cooperating witness Brian Zwerner, the BOA trader responsible for these swaps, no broker would have been necessary for this type of swap.  Douglas Campbell has stated that, as result of this scheme, TMBF received less favorable yields on its investments.  Like the Sun and SocGen transactions, CDR also ultimately made much more money on these kickbacks than it could have for brokering the investment agreements.[12]

In arguing that there was no loss associated with these three series of complex bond issues, the Defendants omit and mischaracterize several key aspects of the

---

[12]      In the TMBF transactions, CDR also secretly shared a portion of the kickback from BOA with a TMBF executive who was involved in controlling the TMBF transactions.  This executive, in turn, directed some of the money to political campaigns.  While the Government believes it is clear that the entire swap fee paid to CDR in the TMBF transactions should otherwise have been paid to TMBF as yield, it is even more obvious that payments made to political campaigns out of the bond proceeds is money that should otherwise have been paid to the municipal issuer.

transactions.  Generally speaking, these were not the only structures on the market that

could achieve the same laudable public purpose.  Other structures – ones that did not

involve bid rigging and kickbacks – were widely available to achieve that end.  In any

event, the bond proceeds on the SocGen and Sun transactions were generally not spent

for the intended purpose, a pattern that became obvious and was intentionally exploited

after the first few bond issues.  Indeed, in an interview with the Government on March 1,

2013, Rubin stated that for the lease-to-own transactions, he and SocGen shared the

belief that no more than 20-25% of the funds in the investment agreements would be

withdrawn.  Thus, as money was expected to sit with SocGen longer, SocGen stood to

make extra profit from the use of these funds.  At the same time, the risk SocGen was

exposed to in its role as credit support was correspondingly reduced inasmuch as the

funds invested would remain on hand to pay back bondholders.  Though these funds were

never likely to be spent, CDR nevertheless regularly sent bidders information indicating

that the funds would be fully withdrawn.  By doing this, Defendants allowed SocGen to

win these investments at prices reflecting regular withdrawal of the funds, when those

withdrawals were not actually expected to occur.

In addition, the Defendants are simply wrong to argue that CDR's fee always

reflected a *bona fide* role in the transactions.  See Def. Memo. at 47 (regarding SocGen);

53 (regarding Sun).  In fact, although not mentioned in the Defendants' memorandum,

the IRS issued proposed as well as final adverse determination letters challenging the tax-

exempt status of most of the lease-to-own bonds, in part, based precisely on the fees paid

to CDR.  In particular, the IRS challenged the tax-exempt status of these bonds because it

found that SocGen was sharing a portion of the forward purchase fee with CDR, when

CDR in fact took on no risk that justified increasing the permissible yield on the investment agreements beyond the rates on the underlying bonds and, correspondingly, reducing the yield on the investment agreements that would have otherwise been rebated to the IRS. These adverse determination letters found that the lease-to-own bonds were "abusive arbitrage devices" and that fees to CDR were "not a reasonable arms-length charge for the transfer of credit risk." As such, the letters concluded that the lease-to-own structure, with a focus on the CDR fees, was "an overall scheme to divert arbitrage via excessive fees."

Similarly, the Defendants' argument that no other provider was willing to bid as high as the favored provider on these transactions is misguided. It ignores the fact – as conceded by the Defendants – that winning the investment agreements was a precondition to these providers providing the necessary credit support on the transaction and that the bid was calibrated to cover substantial payments to the winning provider as well as CDR's fee. See Def. Memo. at 58. Moreover, no other provider was even given enough information to accurately bid for the investment agreements.

The Defendants are also wrong to argue that the favored providers would have kept any additional profit for themselves rather than increasing yields on investment agreements. See Def. Memo. at 43. For example, in regard to the lease-to-own transactions, it is undisputed that SocGen won the investment agreements on these transactions at favorable rates that created generous profits for SocGen. Rubin himself stated in an interview on March 1, 2013 that SocGen told Rubin that they wanted to win these investment agreements at 20 basis points below LIBOR – a rate that he believed was very profitable to SocGen in the context of these transactions. On top of this profit,

28

SocGen built the CDR fees into its bid on the investment agreement.  However, as noted, Rubin himself admitted that those fees were unearned or highly excessive.  Thus, instead of having those funds siphoned off to CDR, SocGen should have been indifferent to having that money paid out as part of the yield on the investment agreement.

In addition, nothing in this analysis is changed by the fact that some of these bonds were issued by what the Defendants refer to as conduit issuers.  See Def. Memo. at 60-61.  To begin with, Paragraph 8 of the Superseding Indictment makes clear that the conduit issuer and the intended or eventual borrower are referred to as "issuers."  In any event, the SocGen, Sun and TMBF bond issues involved money set aside for a specific public purpose, and there is no dispute that Rubin and CDR arranged for a portion of those funds to be siphoned off to themselves in exchange for their corrupt services. It is too late to argue, as the Defendants do, that without the fees to CDR, these bonds would not have been issued or that the IRS, after receiving full disclosure, might have allowed the bonds to be issued without requiring competitive bidding for the investment agreements.  See Def. Memo. at 49-50.  Rather, these transactions should be evaluated as they actually occurred.  In light of the fact that Rubin and CDR promoted these transactions, rigged the bids for the investment agreements and secretly diverted excessive fees to themselves, the Court should focus on those fees and find that they represent a loss to the issuers and/or the IRS.

Finally, in calculating loss amounts based on kickbacks paid to CDR, the Government has not included any kickbacks that were paid in connection with transactions that were at issue in the *Ghavami* sentencing.  In certain of those transactions, the Court found that the kickback amounts should not be included because,

with limited exceptions, there was not sufficient evidence "to support the Government's contention that these fees would otherwise have gone to the municipalities or to the Treasury in the form of more favorable interest rates or otherwise competitive bids."  Tr. 14:10-13.  By contrast, the kickback payments associated with the three sets of complex transactions negotiated by Rubin as well as the FSA kickbacks at issue here possess a much greater nexus to the underlying loss.  For one thing, these kickbacks went directly to CDR and Rubin from the winning providers.  Moreover, some of these kickbacks were negotiated in tandem with the setting of interest rates.  Furthermore, direct testimony fully supports that there were losses on these transactions to the issuers and the Treasury such that excluding them from the loss calculation would severely understate the harm caused by the bid-rigging conduct to municipalities and the Treasury.  Therefore, a further $12,521,595.83 should be included as loss for the Defendants in computing their total offense level under USSG § 2B1.1.

### C. Broker Fees

The third component of loss is broker fees paid to CDR on the subject transactions.  Municipalities hired CDR because of CDR's status as an expert in conducting bids that complied with the Treasury regulations.  Moreover, the competitive bidding process prescribed by the Treasury regulations was the only commonly accepted and utilized mechanism in the market for ensuring that municipal bond proceeds were invested at "fair market value."  As such, adherence to the Treasury regulations was crucial to maintaining the tax-exempt status of municipal bonds.  The loss of tax-exempt status for a municipality's bonds would severely undercut the whole purpose of its issuing tax-exempt bonds.  Therefore, to the extent that issuers would have become aware

that CDR conducted bidding that did not comply with the Treasury regulations, CDR's entire service would have been worthless to them and they simply would not have invested any resources in supporting a process that could jeopardize the tax-exempt status of their bonds.  Even if issuers discovered the conduct after the fact but before the necessary representations were made to the Treasury and the IRS, they were exposed to the risk of having to hire another broker and have the investment agreements rebid in order to comply with the Treasury regulations.  The Government has calculated that CDR's bid rigging conduct resulted in a loss of $4,271,672.00 to municipal issuers who paid broker fees to CDR for conducting bids that were supposed to but did not comply with the Treasury regulations.[13]

Under USSG § 2B1.1, loss is broad and includes any actual or intended loss as well as any "reasonably foreseeable pecuniary harm."  Application Note 3(A)(iv).  This includes any harm that a defendant should reasonably have known was a potential result of the offense.  The Second Circuit has also held, for example, that amounts paid to a defendant for services that were not valuable to the victims are properly included in loss.  United States v. Spencer, 129 F.3d 246, 254 (2d Cir. 1997) (including as loss full amount paid for airline operation services where the District Court found that no one should have trusted the defendant with the services in question).  In a similar vein, the USSG specifically contemplates the recognition of loss for any price paid for services to obtain government or regulatory approval where such approval was obtained through fraud.  In such cases, loss includes the full amount paid without any offset for the value of the item or service transferred.  Application Note 3(F)(v)(III).

---

[13]    The Government has identified 178 bond issues that were affected by this conduct.

CDR marketed itself extensively as an expert on conducting bids for municipal investment agreements for the purpose of complying with Treasury regulations. When CDR conducted bidding on behalf of clients, CDR received a fee for its services, usually on a transactional basis.  The amount of CDR's fee was, in effect, subtracted from the rate that the municipality would otherwise receive on its investment and then actually paid to CDR by the winner of the investment agreement and disclosed in the final documentation.  For example, witnesses stated that they would generally quote a rate to a municipally that was net of any expected broker fee.

Testimony by a number of municipal issuers indicates that CDR's services would have been worthless to them, if they had known that the bidding did not comply with the Treasury regulations.  See, e.g., Ghavami Tr. at 2744:20-22 (testimony of St. Onge) ("If we felt we were not in compliance with the Safe Harbor regulations, we would not be able to proceed with the transaction.").  This is because they would simply never pay for a process that jeopardized the tax-exempt status of their bonds.  As such, fraudulent bidding services conducted by CDR are akin to services that require Government approval under USSG § 2B1.1, Application Note 3(F)(v)(III), and were sold under the guise that they had that approval, when they, in fact, did not.  This whole amount is a loss to the issuer who is deceived into paying for it.  Indeed, fraudulent bidding certifications are a relatively straightforward example of a false representation of compliance with governmental conditions.

In this context, it is also immaterial that these certifications were never actually submitted to the IRS to obtain the tax-exempt status for the bonds.  Bond counsel for these bonds would not have provided opinion letters that the bonds were tax-exempt

(which ultimately are part of the basis upon which representations are made to the IRS about tax-exempt status) if bond counsel did not receive adequate certifications upon which they could rely that the bidding was competitive.  See, e.g., Carollo Tr. at 657:2-7; 699 at 21-24 (testimony of Dani Naeh).  In the end, the issuers were deceived into believing that the circumstances of the award of their investment agreements complied with IRS regulations when they did not.

Whether each transaction in fact had to be rebid or not, the direct and foreseeable risk that this might happen underscores the fact that the fees paid to CDR were given for no value and represent a foreseeable and intended part of total loss to the issuer.  And, as noted earlier, adverse tax determination letters were in fact issued by the IRS on many lease-to-own transactions.  As such, since the worthless broker fee was ultimately paid by the issuer as reduced yield on the investment agreement, it detracted from the issuer's yield or from potential rebate to the IRS.   As the Court stated in United States v. Marsh, 820 F. Supp. 2d 320, 340-41 (E.D.N.Y. 2011) concerning payments made to fraudulently scheming investment advisors, "[i]f the truth had been revealed, there is little doubt that none of the victims would have paid to receive investment advice from defendants" and "in a fully informed market place, the value of [defendant's] services would be zero." The same is applicable here.

The broker fees paid here are also distinguishable from cases where courts have held that fees paid to unlicensed professionals, like attorneys, for  work that was, in fact, satisfactory do not count toward loss, see e.g., United States v. Maurello, 76 F.3d 1304, 1311-12 (3d Cir. 1996).  In those cases, the victim receives what he has paid for and there is no danger that work will somehow be undone or is jeopardy because of the defendant's

misrepresentation.  By contrast, when CDR fraudulently represented that its bidding procedures supported the determination that the bonds qualified for tax-exempt status under the Treasury regulations, the service provided was fundamentally flawed.  The municipalities that hired CDR did not want or pay for mere bidding services; rather, they desired to achieve such services as would help them issue bonds with tax-exempt status.  As such, the services provided by CDR were in fact of no value to an issuer if they did not comply with that objective.

The broker fees included herein also differ from those paid to UBS at issue during the *Ghavami* sentencing.  At that time, this Court held that broker fees paid to UBS would not be included because UBS provided some value to the issuer and therefore "the loss is not necessarily the full contract price."  <u>Ghavami</u> Tr. 13:1-21.  Moreover, this Court found it relevant that the broker fee paid to UBS could not be subdivided into a legitimate and corrupt portion and, therefore, no amount could be included.  However, broker fees paid to Rubin and CDR are distinguishable for a number of reasons.  First, unlike UBS, CDR was only a broker, not a provider.  It is important to note that in each instance where UBS functioned as a broker, it was also the underwriter of the underlying municipal bonds and, in that capacity, had substantial contacts with its issuer client.  By contrast, CDR did not provide some of the other services of value that UBS did.  Moreover, because CDR held itself out as an expert in the specific field of compliance with the Treasury regulations, its failure to comply with those regulations undermined the entire value of its services.  Furthermore, the entire amount of broker fees at issue in this case were paid directly to Rubin and CDR, a company he alone owns, whereas broker fees at issue during the *Ghavami* sentencing were paid to UBS and not to the individual

defendants. As such, there is a greater nexus between the payments to the Defendants here and the corrupted bidding process for which that those payments were exchanged. Therefore, a further $4,271,672.00 should be included as loss in computing Rubin's total offense level under USSG § 2B1.1.

### D.  Number of Victims

Finally, the Government submits that more than 50 but less than 250 victims were harmed by the Defendants' conduct. Therefore, the offense level should be increased by four (4) levels under USSG § 2B1.1(b)(2)(B). As the Application Note 1 under § 2B1.1 states, "victim" includes any entity that "sustained any part of the actual loss determined under subsection (b)(1)." Because all three of the categories of loss enumerated above affected numerous municipal victims, as well as the Treasury, all of those victims would be included under the total calculation in § 2B1.1(b)(2).

Counting loss associated with each municipal bond issue as harm to a separate victim,[14] the Government has calculated that the following numbers of victims were harmed by each type of loss enumerated earlier:

| Type of Harm | Number of Municipal Victims |
| --- | --- |
| Fraudulently lowered interest rates | 36 |
| Kickbacks | 33 |
| Broker fees | 178 |
| **Total** | **212** |

Additionally, even if this Court were to conclude that numerous municipal bond issues by a single municipal entity constitute harm to a single victim for purposes of the USSG, the

---

[14]     For each municipal bond issue, a new trust is created with, among other parties, the participation of the municipality through an indenture, bond counsel and a trustee who holds the funds on behalf of the bondholders. Once the funds are collected and allocated for a particular bond issue, those funds are set aside exclusively for the funding and operation of the bond issue and the underlying municipal operation. Therefore, losses associated with bid-rigging in connection with each municipal bond issue constitute harm to a separate victim. Even if the same municipal entity issues multiple bond issues, loss in connection with each bond issue should be treated separately inasmuch as a new legal framework, municipal trust and trustee is created for each bond issue and the funds for each issue are strictly segregated for the municipal project at hand.

Government has calculated that the following numbers of victims were harmed by each type of loss:

| Type of Harm | Number of Municipal Victims |
|---|---|
| Fraudulently lowered interest rates | 28 |
| Kickbacks | 29 |
| Broker fees | 119 |
| **Total** | 138 |

Finally, the Treasury is an additional victim of Rubin and CDR's bid-rigging conduct to the extent that their conduct prevented the payment of rebate to the IRS through various forms of yield burning and arbitrage.  Therefore, a four (4) point enhancement is appropriate because Rubin and CDR's bid-rigging conduct harmed more than 50, but less than 250, victims under USSG § 2B1.1(b)(2)(B).

## III.    RESTITUTION

The Government submits that, under 18 U.S.C. §§ 3663A and 3664, the Defendants should be ordered to pay a total of $11,528,661.20 in restitution to 99 victims whose losses remain uncompensated.  In support of this application, the Government submits Exhibit B-1 and Exhibit B-2.  Exhibit B-1 is identical to the exhibit (Ex. 3-B) submitted to Judge Baer on July 9, 2013 in connection with the sentencing of co-defendant Stewart Wolmark whose liability for restitution is the same as Rubin's.  This exhibit identifies the 99 victims and the amount each is owed.  Exhibit B-2 is identical to the exhibit (Ex. 1) submitted to Judge Baer at the same time.  This exhibit is the worksheet supporting the totals in Exhibit B-1.  It identifies additional components of loss including legal fees and other expenses incurred by the victims in connection with the investigation and prosecution of this matter, as well as the amounts, if any, the victims received pursuant to the various settlements described below.  Exhibit B-2 also identifies the documents that support the different components of restitution in Exhibit B-

36

1. Because Exhibit B-2 was initially created in support of the Government's Consolidated Application for Restitution in connection with the sentencings of the CDR and *Carollo* defendants, as well as defendant Adrian Scott-Jones, it includes data for 359 transactions, substantially more transactions than are at issue in this case. As noted earlier, Judge Baer has not yet issued a ruling regarding restitution for any of the CDR or *Carollo* defendants.

As noted, these exhibits contain detailed evidence regarding financial settlements that BOA, JPMorgan Chase, UBS, Wachovia and GE reached with various government agencies, including with the SEC, OCC, IRS and the State Attorneys General. These settlements relate to claims arising from Defendants' conduct as well as similar conduct involving others. Defendants' argument that these settlements make restitution unnecessary here is without merit. Determinations of how much money would be paid and to whom were the responsibility of those agencies and not the Department of Justice. Each relevant government agency applied its own standards for identifying victims and amounts to be recovered, based on its own assessment of the facts and circumstances. These standards may differ from those that the Department of Justice might use. For example, the Government believes that the SEC routinely recognizes interest as a component of loss when calculating the recovery for victims of the violations it prosecutes. By contrast, interest is not a component of loss when calculating recovery for victims in federal criminal proceedings.

Further, a number of entities, including SocGen, FSA, Bear Sterns and Lehman Brothers, never reached any settlements with any government agency. However, each of these entities won substantial numbers of contracts as a result of Defendants' crimes.

The Government believes that, for the most part, the funds collected from each of the five settling financial institutions were distributed to victims that had entered into contracts with that settling financial institution. As a result, victims of offenses where none of the settling financial institutions was the winning provider remain largely uncompensated. There is, therefore, no reason for the Defendants not to be subject to ordinary restitution as a part of their sentence.

The Government stands ready to provide the Court with any additional information it may require in determining restitution in this case and a proposed order of restitution specifically identifying the entities that are to receive restitution and the amounts to be received.  In the interest of making the victims whole as soon as possible (and considering that some of their losses date back to 1998), any order of restitution should, to the degree possible, provide that either or both Defendants make an initial lump sum payment, commensurate with his or its economic circumstances, followed by monthly payments of a percentage of his or its gross wages, earnings and other income.

## CONCLUSION

For all of the reasons stated, the Court should find that Rubin's total offense level is 36, including all of the aforementioned enhancements.  This conclusion, in connection, with the Government's 5K1.1 letter, should serve to guide the Court in imposing sentence pursuant to 18 U.S.C. § 3553 and ordering restitution.

Respectfully submitted,

JEFFREY D. MARTINO
Chief, New York Field Office
Antitrust Division
U.S. Department of Justice

Dated:      New York, New York
            February 3, 2014

REBECCA MEIKLEJOHN
DANIEL TRACER
Trial Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
(212) 335-8000

39