UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X

UNITED STATES OF AMERICA                    :

      v.                                    :        S1 09-CR-1058 (KMW)

RUBIN/CHAMBERS, DUNHILL INSURANCE           :
SERVICES, INC. dba CHAMBERS, DUNHILL,
RUBIN & CO. and CDR FINANCIAL               :
PRODUCTS, INC. and
DAVID RUBIN,                                :

               Defendants.           :

------------------------------------X


## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM


JEFFREY D. MARTINO                          REBECCA MEIKLEJOHN
Chief, New York Field Office                DANIEL TRACER
Antitrust Division                          Trial Attorneys
U.S. Department of Justice                  Antitrust Division
                                            U.S Department of Justice

TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

I.   FEES PAID TO CDR ARE AN APPROPRIATE PROXY FOR LOSS ON HIGHLY STRUCTURED RIGGED TRANSACTIONS ............................................................. 1

II.  ADDITIONAL PERSUASIVE AUTHORITY ESTABLISHES THAT KICKBACKS CAN SERVE AS A PROXY FOR LOSS ............................................. 4

III. POLICY ARGUMENTS DEMONSTRATE THAT KICKBACKS SHOULD SERVE AS A PROXY FOR LOSS ............................................................................... 8

CONCLUSION ............................................................................................................................ 11

i

# TABLE OF AUTHORITIES

**Cases**

United States v. Canova, 412 F.3d 331 (2d Cir. 2005) .................................................. 8, 9

United States v. Escamilla, 509 Fed. App'x. 254 (4th Cir. 2013) ...................................... 8

United States v. Hausmann, 345 F.3d 952 (7th Cir. 2003) ............................................ 4, 5

United States v. Lamoreaux, 422 F.3d 750 (8th Cir. 2005) ................................................ 4

United States v. Lupton, No. 07 Cr. 219, 2009 WL 1886007 (E.D. Wis. June 29, 2009) .. 7

United States v. Serpico, 320 F.3d 691 (7th Cir. 2003) .................................................. 6, 7

United States v. Thorpe, 166 F.3d 1216, 1998 WL 738624 (6th Cir. 1998) ................... 5, 7

United States v. Vrdolyak, 593 F.3d 676 (7th Cir. 2010) ................................................... 7

United States v. Zangari, 677 F.3d 86 (2d Cir. 2012) ........................................................ 3

**Rules**

USSG § 2B1.1 ............................................................................................................ passim

USSG § 2B1.4 ..................................................................................................................... 9

USSG § 2B4.1 ..................................................................................................................... 9

USSG § 2C1.1 .................................................................................................................. 6, 7

USSG § 2E5.1 ..................................................................................................................... 6

USSG § 2F1.1 ..................................................................................................................... 6

USSG § 2R1.1 ................................................................................................................... 10

PRELIMINARY STATEMENT

The Government submits this memorandum to supplement the materials it filed on February 3, 2014 in connection with the sentencing of Defendants Rubin and CDR on March 6, 2014. In its initial memorandum, the Government addressed, among other arguments, Defendants' claim that many, if not all, of the issuers whose investment agreements were subject to Defendants' bid rigging incurred no loss as a result of that conduct. In response, the Government argued that fees, not including standard broker fees, that Defendants received in connection with three sets of highly structured transactions where they rigged the award of the associated investment agreements should be recognized as either losses to the issuers in those transactions or, alternatively, as Defendants' gain when calculating the specific offense enhancement under USSG § 2B1.1(b)(1).[1] The Government also argued that these fees should be recognized as losses for purposes of determining the scope of an order of restitution. This memorandum identifies additional case law and policy arguments in support of that position.

I. FEES PAID TO CDR ARE AN APPROPRIATE PROXY FOR LOSS ON HIGHLY STRUCTURED RIGGED TRANSACTIONS

The Government's earlier memorandum discussed the relevant facts and circumstances relating to Defendants' fees in connection with the three sets of transactions at issue. Gov't Memo. at 17-30. Upon further review, we have concluded that, in connection with these transactions, Defendants received approximately $10.4 million, not including normal broker fees: approximately $2 million in connection with 4 bonds issued by the Tennessee Municipal Bond Fund ("TMBF"), approximately $4.8 million in connection with 14 bonds issued to raise money in connection with "lease-to-

---

[1] All short citations used herein are consistent with short terms identified in the Government's February 3, 2014 Sentencing Memorandum ("Gov't Memo.").

1

own" housing programs,[2] and approximately $3.5 million in connection with 5 bonds issued to raise money for the purchase of multi-family housing. Those fees are properly characterized as kickbacks based on the following:

> (1) The true circumstances surrounding these payments were not disclosed to – and were occasionally actively concealed from – the issuers of these bonds through altered documents, using other brokers as fronts, and disguising kickbacks as *bona fide* fees;
> (2) These payments were negotiated *at the same time* and *before* the bidding for the related investment agreements, thereby embedding the payments in the pricing of the investment agreements and associated hedges;
> (3) Relatively little or only minimal services were provided in return for these payments, and they were calculated as a fixed share of a provider's profit rather than being independently priced; and
> (4) In exchange for these fees, the Defendants guaranteed the outcome of what was supposed to be a competitive bidding process.

The Government is mindful of this Court's ruling during the *Ghavami* sentencing that, in calculating the specific offense characteristics under USSG § 2B1.1(b)(1), it

---

[2] We now believe that our loss calculations for the lease-to-own transactions are subject to a number of corrections and clarifications, although these revisions do not change the applicable Guidelines enhancement. *First*, whereas the Gov't Memo. referred to 16 lease-to-own transactions, we believe the correct number is 14. Each lease-to-own transaction included two funds and Exhibit A to the Gov't Memo. counted these two funds separately for a single transaction in two instances: (a) a single lease-to-own transaction for the Pacific Housing Agency dated 12/13/2001 was counted in both rows 124 and 129; and (b) a single lease-to-own transaction for Pulaski County, Arkansas dated 1/24/2002 was counted in both rows 131 and 132. *Second*, whereas the Gov't Memo. stated that the total loss associated with lease-to-own transactions was $6,166,978.26, we now believe that the appropriate number is $4,890,352.95. The revised numbers are detailed in our updated lease-to-own spreadsheet attached as Supplemental Exhibit A. In sum, this changes the total amount of kickbacks that should be counted for purposes of determining loss from $12,521,595.83 (as outlined in Gov't Memo. at 18) to $11,249,741.04. *Third*, we have also identified amounts paid to CDR specifically as broker fees in connection with many of these 14 lease-to-own transactions. These fees are detailed in Supplemental Exhibit A and total $1,950,723.94. This brings the total amount of broker fees that should be counted for purposes of determining loss from $4,271,672.00 (as outlined in Gov't Memo. at 31) to $6,222,395.94. Broker fees, like kickbacks, should be counted as loss in determining the Defendants' Guidelines levels as explained in Gov't Memo. at 30-35. In sum, these revisions change the total loss attributable to the Defendants from $18,110,763.59 (as outlined in Gov't Memo. at 14) to $18,789,632.74. As such, while overall loss amounts are slightly higher than our earlier estimate, the ultimate Guidelines calculation remains unchanged. The Defendants should receive a 20-level enhancement under USSG § 2B1.1(b)(1)(K) for a loss that is greater than $7 million but less than $20 million. Likewise, there is no material change to the number of victims as set forth in the Gov't Memo.

would not count gain to UBS or kickbacks as a substitute for loss to the victims unless there was evidence that one or more victims actually suffered a loss, even if that loss could not be calculated. The Court therefore included three kickbacks in the *Ghavami* loss calculations because it found, based on trial testimony, that those kickbacks could be linked to a loss to the municipal issuer or the IRS. Tr. at 109:2-110:3 (incorporating amended Court Exhibit 1 that identifies which kickbacks the Court included as loss on a transaction-by-transaction basis). The Court made these findings even though there was no specific testimony that the amount of the kickback had been agreed in tandem with the bid or was otherwise correlated in a dollar-for-dollar fashion with the effects of the bid-rigging or bid manipulation.

In contrast, the Government here is focusing on approximately $10.4 million in kickbacks where there is no dispute that Defendants negotiated and agreed on the amount of the kickback in advance of the affected bids and, further, that the determination of that amount was so intertwined with the determination of the price (or rate) to be paid to the customer, that the identification of a "but for" price or rate is virtually impossible. Although there are no easily ascertainable "but for" prices, what is clear is that the Defendants received a portion of the profits on the transactions as a direct result of the artificial rates at which the investment agreements were awarded. Therefore, in this case, "there is a direct correlation between gain and loss, such that the defendant's gain can act as a measure of – as opposed to a substitute for – the victim's loss." United States v. Zangari, 677 F.3d 86, 93 (2d Cir. 2012) (emphasis omitted). This is especially true because the market for investment agreements is neither fluid nor transparent. In other

words, in the absence of competitive bidding to establish price, the Defendants had free reign to set rates on investment agreements to build in extra fees and profits.

## II. ADDITIONAL PERSUASIVE AUTHORITY ESTABLISHES THAT KICKBACKS CAN SERVE AS A PROXY FOR LOSS

The Government has identified three additional cases from other circuits and districts that directly support its argument regarding the application of USSG § 2B1.1. In each case, the court recognized that where a fiduciary exploits his position for private gain, the kickbacks he receives represent a loss to his principal, even in the absence of any evidence what the price would have been if there had been no kickback. As a result, the court factored the kickbacks into the calculation of the defendant's Guidelines level under USSG § 2B1.1. In United States v. Lamoreaux, 422 F.3d 750 (8th Cir. 2005), a prosecution for mail fraud, the defendant, who worked as a buyer for a business that repackaged bulk drug shipments for wholesale distribution, received kickbacks from his employer's supplier. The Court approved using the kickbacks to estimate loss and stated that the kickbacks "should have gone" to the defendant's employer as a matter of "basic economics[.]" Id. at 756. Notably, the opinion arrived at this conclusion notwithstanding the defendant's argument that there was no proof that his employer "could have negotiated a better contract [] absent the secret kickbacks." Id. at 745. Likewise, as a matter of basic economics, the value of kickbacks secretly paid to Rubin and CDR should have inured to the financial benefit of the issuers of the subject municipal bonds.

Next, in United States v. Hausmann, 345 F.3d 952 (7th Cir. 2003), a prosecution for "honest services" fraud, the defendant was a personal injury lawyer who received, indirectly, a twenty percent kickback from the chiropractor to whom he sent his personal injury clients. The doctor's fees, and hence the kickbacks, were paid from the clients'

4

portion of insurance recoveries, though they were never informed that this portion of their money was being diverted to the lawyer. The Court properly included these kickbacks in the calculation of the Guidelines level and specifically noted that it was "of no consequence" that the doctor's fees were competitive. Id. at 957. Rather, there was a loss in the very fact that the client's funds were being secretly siphoned away, and the Court included that entire kickback amount as loss. Similarly, Rubin and CDR's secret direction of issuer funds back to themselves constituted a scheme to deprive clients of their money, and should be wholly included in loss.

Finally, in United States v. Thorpe, 166 F.3d 1216, 1998 WL 738624 (6th Cir. 1998), a prosecution for honest services and mail fraud, the defendant was the manager of a utility that bought coal pursuant to a competitive bidding process. In exchange for a two percent kickback, he gave one supplier information about competitors' bids and that supplier *lowered* his price and won the contract. Citing testimony that the kickback was "factored into" the final quoted price, the court approved using the kickback as a measure of the loss caused by defendant's conduct when calculating his Guidelines level. Id. at *8. It specifically noted its earlier ruling that "a company that is the victim of mail fraud is deprived of a property right for purposes of 18 U.S.C § 1341 if the evidence shows that supplier would have sold materials to the company for less 'had it not been for kickbacks [it] had to pay defendant.'" (citation omitted). Id. at *5. However, other than the testimony that kickbacks had been "factored into" the sales price, there appears to have been no such evidence. Likewise, the fact that Rubin and CDR regularly and artificially factored the amounts of kickbacks into the credit support fees or the hedging rates and then into the investment agreement rates for the TMBF, multi-family housing

and lease-to-own transactions is reason to include those amounts in the overall loss suffered by municipal victims.

Additional cases from other circuits and districts shed further light on the proper treatment of loss for these Defendants by way of analogy. For example, in United States v. Serpico, 320 F.3d 691 (7th Cir. 2003), the defendant, a union official, was convicted of mail fraud for misappropriating union funds to use as loans to a real estate partnership, in exchange for kickbacks. These loans supported an application by the partnership for a bank loan. As in Hausmann, the Court concluded that where the defendant is a fiduciary, his receipt of kickbacks represents a loss to his principal even in the absence of specific evidence of how the economics of the transaction at issue would be different. The Court noted that since the loan to the partnership had been fully repaid, the union had not suffered any out of pocket losses. However, the Court found that more money "could have been" earned by the union if the defendant had been acting in the union's best interest and therefore approved including the amount of the kickbacks in the calculation of loss. Serpico, 320 F.3d at 696. While the Serpico Court arrived at its conclusion under former USSG § 2F1.1 (now incorporated in USSG § 2B1.1), the Court also indicated that its analysis would be the same if the defendant's sentence were determined under USSG § 2E5.1, a section that applies to corrupt union officials and specifically directs that the value of the prohibited payment should be used in calculating the Guidelines level.

A fifth case is also instructive on the issue whether there must be direct evidence of loss, even though the defendant in that case was sentenced under USSG § 2C1.1 of Part C (Offenses Involving Public Officials and Violations of Federal Election Campaign

6

Laws), rather than USSG § 2B1.1 of Part B (Basic Economic Offenses) Subsection 1 (Theft, Embezzlement, Receipt of Stolen Property, Property Destruction, and Offenses Involving Fraud or Deceit). In United States v. Lupton, No. 07 Cr. 219, 2009 WL 1886007 (E.D. Wis. June 29, 2009), the defendant, a real estate broker hired by the State to sell a state office building, solicited and received a bribe in connection with the sale. He was prosecuted under both bribery and mail fraud statutes. As directed by USSG § 2C1.1, the court used the value of the bribe Lupton received in determining the specific offense characteristics of his crime, despite the fact that there was no evidence or discussion of the exact detrimental effect, if any, on the price of the transaction. Id. at *3.

Taken together, these cases, as well as the Seventh Circuit's decision in United States v. Vrdolyak, 593 F.3d 676 (7th Cir. 2010) (cited in Gov't Memo. at 19), show that the language in USSG § 2B1.1 regarding loss should not be read literally to require direct evidence of an actual loss. Rather, a court may infer a loss when a fiduciary's obligation to engage in financial dealings on behalf of his principal is corrupted through kickbacks. That conclusion is especially warranted where, as here, the defendant is a fiduciary of a public or quasi-public entity, as in Thorpe (a utility), Serpico (a union), Lupton (a state), or Vrdolyak (a medical school). As such, in the circumstances of the case before this Court, because the Defendant's crime had an impact on contracts entered into with public funds, the Court should be vigilant to identify any efforts by the Defendants to inflict losses – whether those losses can be measured directly or indirectly observed through their secret recoupment. In addition, this Court should be particularly liberal in interpreting the language of USSG § 2B1.1 in this case, considering that the victims at issue were located in circuits other than the Second Circuit.

### III. POLICY ARGUMENTS DEMONSTRATE THAT KICKBACKS SHOULD SERVE AS A PROXY FOR LOSS

In assessing whether Defendants' conduct resulted in an actual loss, the Court should give weight to the fact that the crimes at issue occurred in a critical, regulated market involving substantial sums of public money. The Treasury has found the need to regulate this market, indeed to revise its regulations on several occasions, to account for recurrent fraudulent behavior, in order to ensure that activity that is designated as tax-exempt lives up to certain undertakings. Defendants repeatedly abused the process by which the Treasury seeks to bring integrity to this market for their personal gain and placed affected bond issues at risk of losing their tax-exempt status. Regardless of whether any bond issue actually lost its tax-exempt status – and many of the bonds at issue here did in fact lose that status – Defendants' conduct caused an economic loss. Cf. United States v. Escamilla, 509 Fed. App'x. 254, 255 (4th Cir. 2013) (noting that in prosecution for immigration document fraud, defendant caused "actual economic loss, to the persons whose information is used on the documents, to employers who mistakenly rely on the counterfeit documents, and to the United States in protecting its borders and citizens. While these losses may be difficult to measure, that they do not exist imply does not follow.").

This Court should also recognize that the evolving response of the Sentencing Commission to the ever-evolving nature of crimes of fraud suggests that the Court should be careful to include loss in all of its many forms. See generally United States v. Canova, 412 F.3d 331, 351 (2d Cir. 2005) ("Because fraud is a crime of infinite variety, it presents particular challenges for sentencing courts striving to achieve proportionality in

8

sentencing while reducing unwarranted disparity . . . The Commission has long recognized that the calculation of exact loss amounts in individual cases is no easy task. Accordingly, it instructs that, in applying the Sentencing Guidelines, loss need not be determined with precision; a sentencing court need only make a reasonable estimate of the loss, given the available information.") (internal citations omitted). Moreover, the Canova Court easily found that, under circumstances similar to those here, there is loss when a good or service is purchased that lacks certain necessary specifications. Id. at 354 ("[A] party who contracts to have goods produced or services performed according to certain specifications, and who pays for those goods or services in reliance on a fraudulent representation that they conform to the specifications, *has sustained a measure of pecuniary loss for purposes of calculating the fraud guideline*.") (emphasis added).

In the same vein, USSG § 2B1.1 covers a wide variety of frauds and the sheer number of special enhancements and application notes is instructive. Indeed, a number of related sections of the USSG contain provisions to ensure that the full amount of the harm resulting from a fraud-based crime are captured in the sentencing levels, whether that is best measured through loss, gain or some other value, see e.g., USSG §§ 2B1.4(b)(1) (insider trading); 2B4.1 (Bribery). Defendants' crimes do not neatly fit into any of the prescribed categories where the substitution of gain for loss is specifically directed. However, that should not prevent this Court from finding that the scores of public entities that relied on the Defendants and paid them to perform a very specific service suffered an economic loss.

Finally, in taking the full amount of Defendants' harm into consideration, this Court should give weight to another section of the Guidelines, Part R (Antitrust Offenses)

9

that deals with a type of economic crime where the Sentencing Commission has observed that loss is difficult to determine and therefore directed that the severity of the crime be measured on the basis of "volume of commerce," in other words, sales. Defendants pleaded guilty to bid rigging and the three sets of transactions at issue here were part of that crime. The Government has conservatively estimated that the volume of commerce for the approximately 230 transactions affected by Defendants' bid rigging was at least $500 million. Using this figure, Defendants' Guidelines level pursuant to USSG § 2R1.1 would be level 25, before any further adjustments for abuse of trust or role in the offense, which would bring the total adjusted offense level to level 31. Although slightly lower than the Guidelines level determined for all three crimes of conviction pursuant to USSG § 2B1.1, this calculation suggests that regardless of which specific part of the Guidelines is used to measure the severity of Defendants' conduct, the result is far more serious than Defendants would have this Court find, were this Court to adopt their claim that the lease-to-own, multi-family and TMBF transactions resulted in no loss.

## CONCLUSION

For the reasons stated, the Court should find that Rubin's total offense level is 36. It should then should impose sentence accordingly and in light of the relevant statutory authority and the Government's anticipated motion for a departure pursuant to USSG § 5K1.1. It should also issue an appropriate order of restitution that reflects the full scope of the losses caused by Defendants' conduct.

Respectfully submitted,

JEFFREY D. MARTINO  
Chief, New York Field Office  
Antitrust Division  
U.S. Department of Justice

Dated:     New York, New York  
           February 24, 2014

*/s/ Rebecca Meiklejohn*  
REBECCA MEIKLEJOHN  
DANIEL TRACER  
Trial Attorneys, Antitrust Division  
U.S. Department of Justice  
26 Federal Plaza, Room 3630  
New York, New York 10278  
(212) 335-8000