UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

UNITED STATES OF AMERICA,

                                  S1 09-Cr-1058-02 (KMW)

        v.

DAVID RUBIN,

                Defendant.

----------------------------------------------------------------X


## DAVID RUBIN'S REPLY SENTENCING MEMORANDUM


Bradley D. Simon
Kenneth C. Murphy

SIMON & PARTNERS LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

*Of Counsel*:

Perry E. Israel

Attorneys for David Rubin

# Contents

Preliminary Statement.................................................................................. 1

Summary of Argument.................................................................................. 1

   I.   Fraudulently Lowered Yields Based on Known But-for Rates ............................. 2

   II.   The Purported Kickbacks ........................................................................ 4

      A.   The Government Has Cited No Precedant that Supports its Position With Respect to the Kickbacks Argument ........................................................ 15

   IV.   The Broker Fees ................................................................................ 17

   V.   The Government's Loss and Restitution Arguments Are in Direct Conflict ..... 18

Conclusion ............................................................................................... 22

## Preliminary Statement

This memorandum is submitted in reply to the Government's Sentencing Memorandum dated February 3, 2014 (hereafter "Gov't Memo") and the Government's Supplemental Sentencing Memorandum dated February 24, 2014 (hereafter "Gov't Supp Memo"), each submitted in opposition to David Rubin's Sentencing Memorandum dated January 24, 2014 (hereafter "Rubin Memo").

## Summary of Argument

The Government makes extensive arguments in both submissions regarding losses it claims were incurred by the victim-issuers with respect to ninety-nine separate transactions.[1] Most importantly, we reiterate (once again) that pursuant to *United States v. Crosby,* 397 F.3d 103, 112 (2d Cir. 2005), these complex loss issues need not be determined on March 6, 2014 should this Court, in its wisdom, decide that a non-Guidelines sentence is appropriate (and as the Government has requested in its 5K1 Motion). Nevertheless, in the event that the Court feels it must determine a specific loss number for the sentencing purposes, we contend that the Government is just wrong in its arguments or, alternatively, has failed to produce sufficient evidence at this point to carry its burden. The heart of the Government's claim is that because Mr. Rubin and CDR earned certain monies, the issuers must have lost that money. That simply has not been proven.

---

[1] Surprisingly, the Government spends fourteen pages of the Gov't Memo arguing why certain enhancements apply under the United States Sentencing Guidelines (e.g. Abuse of Trust, Leader of a Criminal Activity, etc.) even though, after prior conferences with the Government attorneys and at their request, Mr. Rubin decided not to challenge such enhancements (*see* Rubin Memo at p. 85). We disagree with several of the factual assertions laid out in the Gov't Memo regarding these enhancements; nevertheless, since Mr. Rubin is not objecting to those enhancements, we will not address item by item our disagreements with the Government's rendition of those facts.

Additionally, for the reasons set forth below, gain cannot be used in lieu of loss for the purposes of a restitution order under the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A-3664 (hereafter the "MVRA"), and, therefore, all of the Government's restitution requests, except for those involving the fraudulently lowered interest rates, must be denied.  Moreover, with respect to that claim, the Court should exercise its discretion and deny the Government's restitution request because calculating such amounts will complicate or prolong the sentencing process to a degree that is unwarranted and unjustified under the circumstances of this matter.  *United States v. Zangari*, 677 F.3d 86, 93 (2d Cir. 2012)).

## I.      Fraudulently Lowered Yields Based on Known But-for Rates

The Government argues that there are losses attributed to instances where Rubin and others "allowed providers, notably General Electric ("GE") and FSA, to win investment agreements at artificially lower interest rates by permitting those providers to reduce a submitted rate at a time when the provider had already quoted a higher, specific rate." (Gov't Memo at p. 16).  The Government contends that the loss is the difference between the higher forgone rate and the actual winning rate as measured over the life of the loan.  Without identifying a single item of evidence or transcript of testimony, the Government summarily states that, "[e]vidence of these fraudulently lowered interest rates comes directly from tape recordings presented by the Government at the *Corolla* and *Ghavami* trials." (*Id.*)

As stated initially in the Rubin Memo, we do not disagree that a specific and deliberate lowering of an interest rate could have caused a loss.  However, the Government continues to ask Mr. Rubin and this Court to blindly accept its claim that this occurred with respect to thirty-six separate transactions that purportedly amounted to

2

a significant loss of $1,317,495.76.  Mr. Rubin is entitled to proof with respect to each

and every one of these thirty-six transactions regarding what the ultimate rate was and

what it would have otherwise been absent the bid rigging as the Government claims.

In addition, while this Court may have stated at the *Ghavami* sentencing that an

"indication" was a "reasonable starting point to measure the fraudulent change in interest

rates," the Government has taken that statement out of context and placed undue reliance

upon it.  In this matter, unlike in *Ghavami,* the Government has failed to offer even one

iota of evidence what the "indication" was with respect to any particular transaction.  As

a result, Mr. Rubin cannot even check the Government's math, much less question

whether in that particular instance the indication was a reasonable starting point.

Indications came in many different shapes and sizes, some more firm and some more

reliable than others; not all indications can be blindly accepted as having been the rate at

which the winning bidder would have bid but-for the bid rigging.  To this date, Mr. Rubin

is unclear on what any of the "indications" supposedly were on any of the thirty-six

transactions at issue.

In the end, despite the fact that Mr. Rubin is indeed a cooperating witness, it

seems an abdication of the duty of the undersigned to simply accept these numbers and

the attached chart without some level of further proof by the Government.  Neither this

Court, nor Mr. Rubin, is compelled to simply accept what the Government says simply

because the Government says it is so.  Thus, the evidence (tape recordings, documents or

testimony) that reveal the original interest rate that was allegedly trimmed must be

proven by the Government to this Court's satisfaction before the 2B1.1 loss can be

calculated.[2]  More importantly, it certainly must be proven before any restitution may be

ordered by this Court.

## II.     The Purported Kickbacks

With respect to the so-called kickbacks, the largest category of the

Government's loss calculation, the Government deliberately skims over its burden of

proof as it pertains to gain.[3]  Specifically, in order to augment the Guidelines loss range

under 2B1.1 with gains, the Government must first establish that there was indeed some

quantifiable loss on these transactions -- transactions it concedes were highly "complex."

(Gov't Memo at p. 21).  *See* USSG § 2B1.1, App Note 3(B) (the "court shall use the gain

that resulted from the offense as an alternative measure of loss *if there is a loss* but it

reasonably cannot be determined." (emphasis added)).  It is not enough for the

Government to establish that there *may* have been a loss or there *could* have been a loss,

it must establish *by a preponderance of the evidence* (i.e. more likely than not) that there

was factually (not theoretically) some degree of loss to the issuers.  *United States v.*

*Garcia,* 413 F.3d 201, 220, *fn.* 15 (2d Cir. 2005) ("Judicial authority to find facts relevant

to sentencing by a preponderance of evidence survives *Booker.*"); *United States v.*

*Gonzalez,* 407 F.3d 118, 121 (2d Cir. 2005) (same); *see also Crosby,* 397 F.3d at 111.

The crux of the Government's argument (and the corresponding weakness in that

argument) is established in the following statement:  "[T]here is evidence, including

statements by Rubin and fellow CDR co-conspirators, that demonstrate that the amounts

of such kickbacks would *otherwise have been available* to be paid to municipal issuers or

---

[2] Nevertheless, even if this Court accepts the approximately $1.4 million calculation that the Government
has put forth, for the sake of a loss calculation, if the swap fees, broker fees and kickbacks are removed, the
loss enhancement is 16 rather than 20 points on the 2B1.1 loss chart.  (*See* Rubin Memo at p. 64).
[3] Indeed, the Government seems to think that by constantly referring to amounts paid to Mr. Rubin or CDR
as "kickbacks," it has established that the payments were ipso facto illegal gains or monies that would have
otherwise gone to the issuer.  Mr. Rubin does not now, nor has he ever accepted this claim.

the IRS as yield on the subject investment agreements." (Government Memo at p. 17) (emphasis added). The Government chose its words carefully here for a reason -- *would have otherwise been available*. The Government does not (because it cannot) state that there is any evidence that those monies would have otherwise been paid to the issuer if they were not paid to CDR. Indeed, neither Mr. Rubin nor any other witnesses have ever definitively stated that "but for" the fees that CDR received either as swap fees or as the advisory and other fees in, for example, the Sun (also referred to as the Multi-Unit Housing deals), TMBF and Lease to Own transactions, the winning GIC provider would have paid a higher interest rate on the GIC to the issuer. At best, in response to the question "couldn't those monies paid as fees to CDR instead have been used to increase the interest rate on the GIC?" Mr. Rubin and others answered, "yes, they *could have.*" However, this certainly does not mean tha,t more likely than not, they *would* have and neither Mr. Rubin nor anyone else ever said the same.[4] Most importantly, the Government cannot prove in any way (much less by a preponderance of the evidence) that had any of these three transactions been bid in a "pure" bidding environment (i.e. without the courtesy and complementary bids) the GIC rates would ever have been any higher.

    The Government retreats to a general economic theory argument: "From an economic standpoint, moreover, *it logically follows* that if a provider is willing to execute a trade at a particular price and, correspondingly, at a particular profit, net of kickbacks to CDR, then that provider *should* be indifferent to whether it pays the amount of the

---

[4] The undersigned's notes from the proffer sessions are unclear on whether Mr. Rubin ever actually stated this. Nonetheless, we concede that additional monies could theoretically have gone to the issuers instead of to CDR. However, Mr. Rubin firmly contends that the winning GIC providers (Sun, BoA and SocGen) *never* would have given more to the issuers.

kickback to CDR or pays it to the issuer in the form of a better yield on the issuers

investment." (Government Memo at p. 21) (emphasis added).  With respect to Lease –to-

Own, the Government stated it another way: "[G]iven that SocGen agreed to execute

these investment agreements at specific pre-determined rates, it *should have* been willing

to give *all or a substantial* portion of the kickback amount to the issuer as additional

yield." (Government Memo at p. 24)

    This economic "theory" fails for three reasons.  First, because it is just that -- a

theory based upon speculation and conjecture.  That is not enough.  It fails to establish

through pertinent provable facts *by a preponderance of the evidence* (as it must) that

SocGen, Sun or BOA would have given a greater yield on the investment agreement to

the issuer if they  had not agreed to pay fees to CDR in those transactions.  In fact, it is

just as logical (and indeed more likely) that those winning GIC providers would have

simply taken greater profits for themselves rather than give a larger return to the issuer.

If one wants to look at general economic theory, a buyer never pays more than he or she

has to pay for a given item, whether it is an item of durable goods or an investment

agreement.

    In addition, once again, these three unique and specific transaction types at issue

(Lease-to-Own, TMBF and Multi-Unit Housing) *would not have occurred* unless David

Rubin and the financial institutions that structured them put the deals together in the

manner in which he and others did.  (Rubin Memo at p. 58-59).  These were not plain

vanilla GICS such as a GIC for the building of a courthouse or a school, or a GIC for a

bond issued to restructure old debt.  These providers and these financial institutions

controlled the flows of funds on these complex transactions (and, therefore, would have

simply increased their fees as the Forward Purchaser, as the credit enhancer or as the letter of credit provider). As stated in the initial Rubin Sentencing Memo, the winning GIC providers on these three transactions types were destined to win because they were the only parties with a true appetite for those transactions. Nothing the Government stated in either the Gov't Memo or the Gov't Supp Memo has undercut our claim in that regard. Thus, those winning providers were able to dictate the rates that they were going to pay and the disclosure or non-disclosure of this issue is irrelevant from a loss perspective. If the payments were not needed to CDR, the providers were not going to "volunteer" to give greater payments instead to the issuer -- these are financial institutions in a capitalistic structure -- they would have kept those additional profits for their own bottom line.

Most importantly, the Government has *never* offered a single witness from any of the winning GIC providers to support their argument that, more likely than not, if CDR had not received fees on these transaction types that winning GIC provider would have paid more money to the issuing agency. Even accepting the Government's argument that the advisory fees paid with respect to Lease-to-Own, TMBF and the Multi-Unit Housing bonds "allowed the co-conspirators to divert arbitrage to themselves" that statement in and of itself reveals exactly what Mr. Rubin has contended all along, specifically, that the co-conspirators were splitting profits and neither under any circumstance (with or without bid rigging) were going to hand a piece of their profit to the issuer. (Gov't Memo at p. 22).

The Government flatly acknowledges, "there is no specific evidence of what the rate on the subject investment agreements would have been 'but for' the bid manipulation

and the ensuing kickback." (Gov't Memo at p. 17).  However, the Government fails to acknowledge that there is also no specific evidence that the subject investment agreements in the TMBF, Lease-to-Own and Multi-Unit Housing deals would have been capable of closing *without the assurance that the credit providers would win the GICs* in the first place.  In fact, with these non-vanilla, complex transactions where CDR was intricately involved in devising the entire structure, the burden on the Government is actually two-fold.  First, it must establish that the transactions would have come to fruition without the pre-ordained bid pricing.  Then, if the Government can prove the transactions could have been closed absent the credit providers winning the GICs -- which it cannot possibly do but we will accept for the sake of this argument -- the Government still must prove that the final GIC rate would have been higher by a *preponderance of* the *evidence* (not theoretically).  The Government has offered no evidence in either regard.

For example, the Government does not appear to take issue with the fact that, with respect to the Lease-to-Own transactions, no other financial institution was interested in participating as the Forward Purchaser despite Mr. Rubin's earnest efforts to convince others to get involved. (*Compare* Rubin Memo at p. 48-49 with Gov't Memo at p. 23).  Indeed, the Government concedes that, "the structure of the bonds required a form of credit support from a financial services company." (Gov't Memo at p. 22).   The Government implicitly recognizes the difficulty of finding such credit support by pointing out that "[u]ltimately, Rubin persuaded and enlisted SocGen to provide this credit support." (Gov't Memo at pp. 22-23).  Without the participation of SocGen, those transactions would never have happened. (The same is also true of the Sun and BOA

transactions.)  Although the Government claims CDR "steered" the investment agreements in the Lease-to-Own transactions to SocGen, it offers no evidence that anyone else wanted them.  While Mr. Rubin wrongly participated in bid rigging by bringing in courtesy bids, CDR did not steer anything if *no one else was interested.*

In fact, the Government offers nothing to contradict the repeated statements by the other CDR cooperating witness, Douglas Goldberg, that Mr. Rubin genuinely attempted to enlist other banks and financial institutions to participate in those transactions.  It does not dispute, for example, Mr. Golberg's statements that, "SocGen was the only provider willing to take the risk and the only competitive bid," or his statements that "even if someone else bid or brokered the deal SocGen was going to win." (*See* Rubin Memo at p. 48-49).  Moreover, the Government's claim now that "no other provider was given enough information to accurately bid for the investment agreements," is nothing more than an unsupported assertion backed by no evidence.  (Gov't Memo at p. 28).  Once again, simply because the Government says it is so doesn't make it true.

Moreover, it is false that CDR withheld from other providers information that, in fact, very little money would ever be withdrawn from the investment funds at issue in those agreements.  All of the withdrawal and use of funds information was readily available if anyone chose to research the data.  Neither Mr. Rubin nor anyone else withheld or hid this information.  The fact that less money was withdrawn than originally anticipated was only discovered after the passage of time.  More importantly, the trends in withdrawals on these programs, like any market or economic cycle, were never certain.  Now, a decade and one half later, it is clear that less money than anticipated was ultimately withdrawn from the invested funds.  However, at the time that the Lease-to-

Own programs were launched, none of this was guaranteed. Instead, the investment

providers had to be prepared to allow for draws from the invested funds in accordance

with the terms of the bid specifications. Indeed, the governmental issuers of the Lease-

to-Own bonds fully expected (and hoped) to draw down those monies to accomplish the

governmental purposes of the programs -- getting low income individuals into homes of

their own. Mr. Rubin's ultimate conclusion that only twenty to twenty-five percent of the

funds would be withdrawn (Gov't Memo at p. 27), only happened after years of program

experience and despite *both* CDR and Freddie Mac's efforts to market these programs.[5]

     The Government goes to great lengths to discuss the non-disclosure of CDR's role

in certain aspects of these transactions and the fees that CDR received. However,

nowhere does the Government explain how the non-disclosures lead to a loss. No issuer

has come forward to say, for example, "had we known that CDR was getting an advisory

fee or had a conflict of interest on that transaction, we would not have issued the bonds,

or we would have found some other way to structure that Multi-Unit Housing bond." No

GIC provider has come forward to say, for example, "had CDR included us on the GIC

bidding list for the TMBF investment agreements, we would have bid a higher rate than

that which was ultimately awarded." In the context of loss (as opposed to guilt or

innocence) it is not too late, as the Government contends, to argue that had the

_____

[5] It is worth noting that the Government has mischaracterized one particular fact. The IRS challenge to the tax-exempt status of the Lease-to-Own transactions as set forth in the Gov't Memo indicates that the IRS thought those transactions were abusive arbitrage devices because the *issuer* should not have been allowed to treat the entire amount of the fee paid to the credit provider as the cost of a qualified guarantee because some of that fee was paid to CDR in a transaction that was not viewed a reasonable arms-length charge for the transfer of credit risk. (See Gov't Memo at p. 28.) The Government does not provide the IRS adverse determination letters that were issued with respect to those transactions for our review. Nevertheless, it is our understanding that the fact that the IRS viewed that payment as not being for a transfer of credit risk does not mean that the IRS or anyone else concluded that the amounts paid to CDR did not represent legitimate charges for other services—just that those payments could not be taken into account as an adjustment to the yield on the bonds.

information simply been disclosed the final GIC rates would have been the same, the

GICs would have qualified as "market" rates and all of these transactions could have

legally been closed without any crime. (Gov't Memo at p. 28).  The point is this:  we do

not disagree that these non-disclosures and Mr. Rubin's behind-the-scenes deal making

were improper; nevertheless, these acts on the part of Mr. Rubin and others do not lead to

the undeniable conclusion that any issuer lost any money with respect the Sun, TMBF

and Lease-to-Own deals.  As noted by the 2B1.1 Sentencing chart itself, not all

fraudulent conduct necessarily results in a monetary loss.

     With respect to the TMBF transactions, the Government's arguments make even

less sense.  The Government claims that "according to statements made by cooperating

witness Douglas Campbell ... BOA would have been able to provide a more competitive

bid on the investment agreements than other providers because BOA was already

providing credit support in connection with the underlying bonds.  However, BOA was

not solicited for bids on the TMBF investment agreements."  (Gov't Memo at p. 25-26).

Here the Government appears to argue that Mr. Rubin and CDR deliberately "duped"

their co-conspirator BOA.[6]  The claim that Mr. Rubin and CDR prevented BOA from

bidding so that CDR could earn greater fees is nonsensical.  BOA was intimately

involved in all aspects of these transactions, indeed, the bank controlled them.  If BOA

wanted an opportunity to bid on the GICs, it would have been able to do so with a phone

call to CDR.  The idea that the "all powerful" David Rubin prevented the letter of credit

provider, BOA – perhaps the largest bank in the United States at the time -- from bidding

---

[6] Notably, the Government claims it is "not aware of any evidence to support [Mr. Rubin's] claim that
BOA's derivative desk 'decided not to bid in order to improve its profits" and, in the same breath, it admits
that Mr. Campbell and other BOA witnesses "did not know why BOA was not invited to bid." (Gov't
Memo at p. 25). Mr. Rubin, a cooperating witness upon whom the Government has relied, knows this
information because it was revealed to him by other high ranking BOA employees.

on the investment agreements for bonds, and then BOA went on to do a back-end swap, economically taking the burdens and benefits of the investment agreements, *to the benefit of CDR and to the detriment of BOA*, makes little sense. As the letter of credit provider on these transactions, BOA dictated the bid specifications and could have easily had CDR removed entirely from the process.

What occurred with respect to TMBF is exactly that which was set forth in the Rubin Sentencing Memo. Specifically, BOA as the letter of credit provider, dictated what the GIC rate would be and the ultimate back end swap. (Rubin Sentencing Memo at p. 54-57). There is no evidence (and certainly not a preponderance of evidence) that a higher interest rate on those investment agreements *ever* would have been awarded had there been no pre-determined rigging. The Government's new argument that Mr. Rubin and CDR "eliminated" BOA or somehow "victimized" BOA is inconsistent with its entire prosecution.

In addition, the Government and Mr. Rubin simply disagree that the fees CDR received represented compensation for a *bona fide* role in the transaction. The Government at some points calls these fees "unearned or highly excessive" (Gov't Memo at p. 29). And while the Government references a statement Mr. Rubin made in a proffer on February 29, 2012, the Government is confused. (Gov't Memo at p. 24). The fees in the transaction he was receiving were called one thing in a document he had been shown and Mr. Rubin explained that those fees were actually fees paid for another transaction. Nevertheless, it is irrelevant whether the court accepts the Government's position (that these fees were unearned and excessive) or Mr. Rubin's position (that fees were earned albeit with a healthy profit to CDR) because the Government still must prove, *more likely*

12

*than not*, that those fees to CDR would have gone to the issuer but for the bid rigging. The Government has failed to do this.

Furthermore, the Government's desperate attempt to sway this Court by relying on "policy" arguments reveals the weakness of its position. Because the Government knows it simply cannot meet its burden on loss, instead it to relies upon enhancements (not applicable according to Probation or the PSR) that are applied in sentencing provisions applicable for other crimes -- crimes that do not dictate his Guidelines calculation in this case. Specifically, the Government argues that Mr. Rubin should be punished for the gains here as defendants are punished for gains in securities fraud transactions (USSG § 2B1.4) or bribery cases (USSG § 2B4.1). Alternatively, the Government now argues Mr. Rubin's gains should be equated to the "volume of commerce" enhancement applied in Antitrust cases (USSG §2R1.1). (Gov't Memo at p. 22, *fn.* 11, Gov't Supp Memo at p. 8-10). These arguments are a red herring. This is a fraud prosecution and Mr. Rubin is sentenced, therefore, under USSG § 2B1.1 for fraud where the loss drives the analysis. This is not an insider trading prosecution or a bribery prosecution. Moreover, *the Antitrust Division* chose to pursue this as a case of fraud prosecution. Certainly it did this because in many ways such a prosecution served to benefit its cause. Now, however, as it confronts significant problems in proving loss, it unilaterally wants to change the rules and start evaluating the volume of commerce issue. The Government hopes to do this because such an analysis would be easier for it. This, however, does not does justify such a consideration. This Court is not permitted to simply "for policy reasons" to change the argument -- either there was (or was not), by a preponderance of the evidence, a loss to the issuer-victims pursuant to 2B1.1. If there was not, the gain is irrelevant.

13

Finally, the Government appears to lump together in its papers the issue of the "kickbacks" and swap fees. (Gov't Memo at p. 21-22). The two are actually different. The so-called kickbacks are described in the Government Loss Chart (Ex A to the Gov't Memo) and are a total of $11,691,595.83.[7] These are the assorted payments that were paid to CDR for the Lease-to-Own, TMBF and Multi-Unit Housing deals discussed above. The swap fees, however (a total of $830,000) were the fees paid to CDR to act as a swap broker. With respect to these fees, it was established that swaps or hedges were entered regularly by the winning GIC bidder. (Rubin Memo at p. 63-64). Therefore, these were fees were going to be incurred regardless of the bid rigging. However, the Government has argued that what was paid to CDR in the form of swap fees was "either unnecessary or egregiously excessive." (Gov't Memo at p. 20). The Government fails to show by a preponderance of the evidence that these fees would have resulted in higher rates on the GICs. Other than the statement of Dani Naeh, a former CDR employee, that, because CDR was also paid a swap fee on one transaction, he "believ[ed]" that the issuer received a lower rate on the investment agreement from FSA, the Government has no support for this argument. (Gov't Memo at p. 20). And this speculation on the part of Mr. Naeh is insufficient to prove more likely than not that the swap fee would have gone to the issuer in the form of a higher interest rate on the GIC. No one, for example, from FSA has ever stated that it would have paid a higher rate if it was not paying a swap broker fee to CDR.

---

[7] In fact, the numbers in the Government submissions are inconsistent. Exhibit A to the Gov't Memo, which is the Government Loss Chart filed on February 3, 2014 (Dkt. No. 434-1), had $11,691,595.83 as the total loss attributable to kickbacks. (Gov't Memo. Ex A at p. 18). Then, when the Government filed the Gov't Supp Memo on February 24, 2013 it revised the numbers yet again and stated the number now is $11,249,741.04. However, in noting the revision, the Government asserted that the prior kickback number was actually $12,521,595.83 which is inconsistent with its previously filed chart. *Compare* Gov't Supp Memo at p. 2, *fn.* 2 (Dkt. No. 437) with Gov't Memo  Ex A at p. 18 (Dkt. No. 434-1).

In any event, even if the Court were to attribute the $830,000 received in swap

fees as a part of the loss calculation, and even if the Court were to accept the purported

$1,317,495.76 for the fraudulently lowered interest rates as having been established by a

preponderance of the evidence (which it has not), the loss is still less than $2,500,000

and, therefore, the enhancement under the 2B1.1 loss chart is 16 points rather than 20.

### A.    The Government Has Cited No Precedent that Supports its Position With Respect to the Kickbacks Argument

In the Gov't Supp Memo, the Government relies upon several cases it claims

support its position that "where a fiduciary exploits his position for private gain, the

kickbacks he receives represent a loss to the principal, even in the absence of what the

price would have been if there had been no kickback." (Gov't Supp Memo at p. 4).

While in each of those matters the "kickbacks" were determined to be a gain that was

used in lieu of a loss, each of those cases were entirely different factually and any

comparison severely oversimplifies this matter and the analysis in this proceeding.

First, in *United States v. Lamoreaux,* 422 F.3d 750 (8th Cir. 2005), an honest

services mail fraud prosecution, the defendant was president of a company that re-

packaged drugs, NuCare.  While working for NuCare, he set up a separate company and

took payments on the side from a supplier.  The Government contended that those

payments were kickbacks received in return for the defendant ignoring his fiduciary duty

to his employer and negotiating lower rates to the detriment of NuCare.  The defendant

argued that there was no way to prove that simply because he received the payments from

the supplier he could have negotiated a better rate with the supplier on behalf of NuCare.

The Court found that the payments he received were kickbacks and should be considered as gains in lieu of loss under 2B1.1.

These circumstances are wholly different. In *Lamoreaux* the defendant's job as President of that closely held corporation was to get accounts and expand business *for that corporation*. Mr. Rubin, on the other hand, was not from the beginning and throughout the process the Lease to Own, TMBF and the Multi-Unit Housing deals working for the issuer. In fact, CDR was not even the GIC broker on any TMBF or Multi-Unit Housing transactions or on all the Lease-to-Own transactions. He was, however, intimately involved in setting up complex financial structures from the beginning in conjunction with the other financial institutions. This all occurred before any of the issuers were ever identified or involved. Thus, the fees CDR received were not kickbacks to ignore his fiduciary duty but, instead, fees for his structuring of the financial product. Due of the complex structure of the transactions and all of the moving parts, the last step was actually finding the issuer interested in the program. This is quite different than one individual working solely for a company full time as in *Lamoreaux*.

All of the other cases relied upon by the Government (none of which are in the Second Circuit) are distinguishable and offer this Court no guidance with respect to whether or not the GIC providers here would have paid a higher rate on the GICs if CDR had not been receiving the advisory and structuring fees. *See United States v. Vrdolyak*, 593 F.3d 676 (7th Cir. 2010) (A fraud prosecution where the trustee of a medical school clearly and unequivocally steered the bidding for the sale of the school in a direction that cost the school millions of dollars when the building was ultimately sold to a buyer of his choice, despite other bidders having made higher offers); *United States v. Hausmann*, 345

16

F.3d 952 (7th Cir. 2003) (An honest services fraud case in the pre-*Skilling* era where an attorney was being paid a twenty percent kickback of the medical fees received by a chiropractor to whom he referred personal injury clients); *United States v. Thorpe*, 166 F.3d 1216, 1998 WL 738624 (6th Cir. 1998) (A 6th Circuit unpublished opinion with no precedential value where there was direct testimony that the kickback was 'factored into' the quoted price); *United States v. Serpico,* 320 F.3d 691 (7th Cir. 2003) (applying USSG § 2F1.1 rather than 2B1.1); *United States v. Lupton,* No. 07 Cr. 219, 2009 WL 1886007 (E.D. Wis. June 29, 2009) (a bribery case applying USSG 2C1.1).

## IV.    The Broker Fees

Despite this Court's clear holding in the *Ghavami* matter that the broker fees simply are not a part of the loss calculation, the Government obstinately refuses to concede this number.  As of its most recent calculation, the broker fees have now grown $6,222,395.94  (Gov't Supp Memo at p. 2, *fn.* 2).  The Government's attempt to distinguish the broker fees received by CDR from those received by the UBS fails because there simply was no difference.  In fact, with respect to broker fees paid to CDR, the analysis is even easier.  Unlike UBS, CDR was not the provider.  Unlike UBS, there is no challenge to determine what the broker fee was.  That fee was a set percentage of the transaction and it would have been the same whether CDR did the brokering or other GIC brokers such as Sound or Image conducted the bidding.  (Rubin Memo at p. 61-62). In addition, the argument that "because CDR held itself out as an expert in the specific field of compliance with Treasury regulations, its failure to comply with those regulations undermined the value of its services" makes no sense.  (Gov't Memo at p. 34).  Whether CDR claimed to be a novice or an expert at the GIC bidding process, the fees paid for the

GIC bidding would have been the same -- a percentage of the transaction. Experts were not paid more than novices. Accordingly, CDR's experience (and the experience of any other broker the issuer might have used had it not used CDR) is irrelevant to the fixed cost. Finally, while Mr. Rubin was the owner of CDR and Mr. Ghavami was not the "owner" of UBS, this has no nexus to whether or not there was a loss. Indeed, this argument by the Government is puzzling.

Finally, and most notably, the Government's position pushes aside the fact that Judge Baer has already rejected its argument in its entirety when he sentenced other CDR employees. (Rubin Memo p. 62-63). There is no distinguishing the facts before Judge Baer with those before this Court with respect to the broker fees. Should this Court rule otherwise, there will be diametrically opposed rulings on this issue with multiple CDR defendants.

### V.     The Government's Loss and Restitution Arguments Are in Direct Conflict

It is now black letter law in this Circuit that "a sentencing court ordering restitution under the MVRA may not substitute a defendant's ill-gotten gains for the victim's actual loss." *United States v. Zangari,* 677 F.3d 86, 92-93 (2d Cir. 2012)). "The Government bears the burden of proving a victim's *actual loss* by a preponderance of the evidence." *Id.* at 92 *citing* 18 USC § 3664(e) (emphasis added). Thus, with respect to restitution, the Government does not get the benefit of simply arguing that there was some unquantifiable loss, however, because it cannot be determined, the Court should look to the gain (as it does with the 2B1.1 sentencing analysis). The Government must prove by a preponderance of the evidence that every dollar it seeks was actually lost by the issuers. It simply cannot do this with respect to most of the restitution it seeks (the

exception being the fraudulently lowered interest rate transactions addressed below). Indeed, the Government's own arguments on loss concede this fact.  With respect to the TMBF, Lease-to-Own and Sun transactions, the Government repeatedly acknowledges that there is " no specific evidence of what the rate on the subject investment agreements would have been" absent the bid manipulation and that it is "virtually impossible" to determine what the rate on the GICs would have been without the bid-rigging (Gov't Memo at p. 17; Gov't Supp Memo at p. 3).  Despite this admission, the Government reflexively asserts that the gains are "a valid proxy for loss" and that they can be used to compute restitution as well.  (Gov't Memo at p. 22, 36-38).

Once again, as with loss, the Government's argument rests upon its unsupported assumption that the winning GIC bidders would have, more likely than not in the absence of bid rigging, simply paid all the fees that were paid to CDR directly to the issuer in the form of increased interest rate on the investment agreements.  This is a claim that has never been made by a single witness.  This convenient argument also assumes three things: first, that CDR would have received nothing (zero) for its role in advising and structuring those highly complex transactions (Lease-to-Own, TMBF and Multi-Family Housing); second, that CDR would have received nothing for the GIC broker fee  (on those occasions when it acted as the GIC broker); and, third, that this one for one exchange (loss for gain) would have happened in each transaction despite innumerable factors at stake in each deal (the varying interest rates, the varying bidders, etc.)  None of those facts can be assumed.

The problem with the Government's dollar-for-dollar exchange with respect to restitution is exemplified in the broker fees.  If this Court accepts the Government's

restitution argument, it will have Mr. Rubin re-pay the amounts the issuer paid in GIC

broker fees even though those services were actually rendered.  In other words, although

the bidding services were provided and those fees would have been incurred regardless of

whether CDR or another broker did the bidding, the issuer should still get back its

money.  Restitution is compensatory, it is intended to make the victim whole and not to

provide a victim a windfall.  *United States v. Boccagna,* 450 F.3d 107, 115 (2d Cir.

2006). [8]

The same applies to the swap fees in certain transactions.  As stated previously,

swap fees were incurred by the winning GIC provider as a normal practice in order to

hedge risk.  While the Government has argued that the fees paid to CDR were *excessive*,

some swap fee would still have been incurred by the GIC provider.  Therefore, even

accepting the Government's claim, the full swap fee would never have gone to the issuer,

nevertheless, the Government seeks to attribute the full swap fee to a restitution

calculation.  Accordingly, in order to accurately gauge the restitution amount when

evaluating swap fees paid to CDR, the Court would need to determine the "excess" in

order to determine the restitution owed.

In the end, the swap fees are a perfect example of the complex challenges that the

Court will face in determining what, if any, restitution is appropriate.  Even with respect

to the fraudulently reduced interest rate calculation, arguably the easiest calculation to

determine, there too the inquiry will be extremely complex and involved.  The Court will

need to evaluate evidence on each and every transaction regarding what the initial interest

---

[8] For example, compare the Gov't Memo, Exhibit A (Government Loss Chart, Dkt. No. 434-1) at line 3
assigning the $10,000 broker fee as a "loss" for the Onondaga County Industrial Development Agency,
Solid Waste Disposal Facility Revenue Bonds, Series 1997 (Vic id 003) with Gov't Memo, Exhibit B-1
(Government Restitution Chart, Dkt. No. 434-2) identifying the same $10,000 broker fee as an amount
appropriate for restitution.

rate would have been and what it ultimately became after the defendants advised a bidder

to lower his bid (assuming that there is such evidence in each of the thirty-six instances).

This will require a fresh look at the bid specifications, the emails between the brokers and

the bidders and the audiotapes.  This level of fact-fining could conceivably require weeks

(even months) of testimony.  All of this in an Antitrust prosecution in which the federal

and state governments have already recovered *several hundred million dollars in*

*penalties and fines above and beyond the total loss.*  While this Court certainly has the

power and the stamina to undertake such an inquiry, it also has the discretion to decline

to do so.  As the Second Circuit has stated, " if [the sentencing Court] finds that 'complex

issues of fact related to the cause or amount of the victim's losses would complicate or

prolong the sentencing process to a degree that the need to provide restitution to any

victim is outweighed by the burden on the sentencing process,' then the  court may, in the

exercise of its sound discretion, decide not to order restitution at all." *Zangari,* 677 F.3d

at 93 *quoting* 18 U.S.C. § 3663A(c)(3)(B) and *citing*  USSG § 5E1.1(b)(2).

**Conclusion**

For the foregoing reasons, Mr. Rubin's arguments regarding the appropriate PSR

calculation as set forth in the Rubin Memo should be accepted in all respects. .

Respectfully Submitted,

Bradley D. Simon
Kenneth C. Murphy
Simon & Partners LLP
551 Fifth Avenue
New York, NY 10176
(212) 332-8900

*Of Counsel*:
Perry E. Israel

Attorneys for David Rubin

Dated: March 3, 2014
New York, NY

22